**Michael Lee WILSON, Petitioner–Appellant,**

v.

**Marty SIRMONS, Warden, Oklahoma State Penitentiary, Respondent–Appellee.**

No. 06–5179.

United States Court of Appeals, Tenth Circuit.

Aug. 8, 2008.

1066

Lanita Henricksen, (Mark Henricksen, with her on the briefs), Henricksen & Henricksen Lawyers, Inc., Oklahoma City, OK, for Petitioner–Appellant.

Jennifer B. Miller, Assistant Attorney General, (W.A. Drew Edmondson, Attorney General of Oklahoma, with her on the briefs), Oklahoma City, OK, for the Respondent–Appellee.

Before HARTZ, McCONNELL and TYMKOVICH, Circuit Judges.

McCONNELL, Circuit Judge.

Michael Lee Wilson, a death row inmate in the Oklahoma State Penitentiary, appeals the district court's denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Mr. Wilson was convicted of one count of murder in the first degree and robbery with a dangerous weapon. In the sentencing phase, the jury found three statutory aggravating factors. He was sentenced to death for the first degree murder and to life in prison for the robbery. For the reasons set forth below, we affirm the district court as to all issues other than ineffective assistance of counsel at the mitigation phase; with respect to that issue we remand for an evidentiary hearing. Judge Hartz and Judge Tymkovich join all but Part III of this opinion, which addresses the ineffective assistance of counsel claim. Judge Hartz joins Part III(c) and concurs in the result of Part III. Judge Tymkovich dissents from the holding of Part III.

## I. Background

The factual findings of the Oklahoma Court of Criminal Appeals ("OCCA") are

presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Our account of the crime and the trial is based on the OCCA's opinion in *Wilson v. State*, 983 P.2d 448 (Okla. Crim.App.1998) (*"Wilson I"*).

### A. The Crime

Michael Lee Wilson, along with Billy Alverson, Darwin Brown, and Richard Harjo, planned to rob the QuikTrip convenience store in Tulsa, Oklahoma, where Mr. Wilson was an employee. The planning occurred for approximately two weeks prior to the crime. At 11:00 p.m. on the night of February 25, 1995, Mr. Wilson completed his shift at the QuikTrip and was replaced by Richard Yost. In the early morning hours of February 26, Mr. Wilson, along with Alverson, Brown, and Harjo, entered the QuikTrip. The subsequent events were captured on the store's surveillance tape. *Wilson I*, 983 P.2d at 455.

The four found Yost cleaning the windows on the coolers and surrounded him. When Yost tried to walk away, the four attacked him and dragged him into the back room. What occurred in that room is not visible on the surveillance tape, but the tape captured noises coming from there. At some point, Yost was handcuffed.

After helping to drag Yost to the back room, Alverson exited, picked up some items that had been knocked from the shelves during the struggle, and kept watch for customers. Soon after, Harjo also left the back room and the two walked out of the store together. As they exited, Yost yelled and screamed for help, believing that a customer had entered the store. When Alverson and Harjo returned, Harjo was carrying a black aluminum baseball bat. Both returned to the back room. *Id.*

Sounds of the bat striking Yost are audible on the surveillance tape. In addition to striking his head, trial evidence suggested that the baseball bat struck the hand-

cuffs on Yost's wrists as he held his hands above his head in an attempt to block the blows. These blows eventually caused Yost's death. *Id.*

During the attack, Mr. Wilson exited the back room, examined his hands, put on a QuikTrip jacket, and went behind the counter. He greeted customers as they entered and completed sales, attempting to remove the safe below the counter between customers. He eventually succeeded. He also took money from the cash drawer and from the currency change machine, and removed the video from the surveillance camera recorder. Using a dolly from the store, the defendants loaded the safes and money into Mr. Wilson's car. *Id.*

A customer discovered Yost's dead body soon after the defendants left the Quik-Trip. It was in a gruesome condition. Yost's ankles had been taped together with duct tape. There was a handcuff near his body; a piece was later discovered embedded into his head. His body was lying in a pool of spilled milk, beer, and blood.

After speaking to witnesses, the police discovered that Mr. Wilson had been in the store between 4:00 a.m. and 6:00 a.m. When he failed to come to work during his scheduled 3:00 p.m. shift that day, Officer Wayne Allen set up surveillance at Mr. Wilson's home. Around 5:00 p.m., a gray vehicle pulled up to Mr. Wilson's house. Mr. Wilson got out of the car, picked up a shovel and waived it in the air; soon after, he returned to the vehicle and the car drove away. Officer Allen stopped the car and arrested Mr. Wilson along with Alverson, Harjo, and Brown, who were also inside. The police discovered large sums of money on all of the defendants except for Mr. Wilson. *Id.*

Following the arrest, Detective Charles Folks questioned Mr. Wilson. Part of the questioning was recorded, but another

component was not. In an unrecorded component, Mr. Wilson indicated that he knew Yost would be killed, and that the four had planned the robbery for approximately two weeks. Mr. Wilson was to act as the sales clerk after Yost was "taken care of." *Id.*

When the police searched Alverson's home, they discovered the drop safe, the dolly, QuikTrip glass cleaner, money tubes, and the surveillance video tape. Nothing was discovered at Mr. Wilson's home. However, on February 27, Mr. Wilson's mother, Patricia Taylor, requested that the police come to her house. When they arrived, they found a baseball bat, a bloody QuikTrip jacket with Mr. Yost's name on it, Mr. Wilson's Nike jacket, (which matched the one he wore during the robbery), and the other handcuff, all placed on the front porch. *Id.* at 455–56.

### B. Judicial Proceedings

Mr. Wilson was tried, along with Darwin Brown, before a jury in the Tulsa County District Court. The court used a dual jury procedure, where one trial was conducted in front of two juries. One jury was assigned to adjudicate the charges against Mr. Brown while a separate jury was assigned to Mr. Wilson's case. *Wilson I*, 983 P.2d at 456. The jury convicted Mr. Wilson of first degree murder and robbery with a dangerous weapon.

At the sentencing phase, the Bill of Particulars charged that Mr. Wilson should be punished by death due to the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed

for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) it was probable that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Okla. Stat. Ann. tit. 21, § 701.12(4),(5), & (7). The jury found the existence of all three aggravating circumstances and recommended that Mr. Wilson be sentenced to death. The trial court agreed, and sentenced Mr. Wilson to death.

The OCCA affirmed both Mr. Wilson's conviction for murder in the first degree and his death sentence. It reversed his conviction and sentence for robbery with a dangerous weapon; because Mr. Wilson was convicted of felony murder, under Oklahoma law, he could not be convicted of the underlying felony.[1] *Wilson I*, 983 P.2d at 463. The United States Supreme Court denied Mr. Wilson's petition for writ of certiorari on October 4, 1999. *Wilson v. Oklahoma*, 528 U.S. 904, 120 S.Ct. 244, 145 L.Ed.2d 205 (1999). The OCCA denied post-conviction relief on November 15, 1999. R. Vol. III Box 2, "Opinion Denying Post–Conviction Relief" ("*Wilson II*"). Mr. Wilson filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the District Court for the Northern District of Oklahoma on February 16, 2000. *Wilson v. Sirmons*, No. 00–CV–147, 2006 WL 2289777 (N.D.Okla. Aug. 8, 2006) ("*Wilson III*").

The district court denied the petition on August 8, 2006, but granted a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(2) on fourteen grounds: (1) the use of the dual jury procedure; (2) the introduction of DNA evidence without

---

1. Mr. Wilson was charged under alternative theories of first degree murder: either malice murder or felony murder. The court, however, gave the jury only a general first degree murder verdict form, making it impossible to determine under which theory the jury found him guilty. As a result, the OCCA assumed

that Mr. Wilson was convicted of felony murder so that he could "receive the benefit of the rule that a defendant cannot be convicted of felony-murder and the underlying felony." *Wilson I*, 983 P.2d at 463 (citing *Munson v. State*, 758 P.2d 324, 332 (Okla.Crim.App. 1988)).

a *Daubert* hearing; (3) the introduction of evidence in violation of the Oklahoma discovery code; (4) the failure to give jury instructions on a lesser included offense; (5) the introduction at trial of Mr. Wilson's statements obtained without *Miranda* warnings; (6) the admission of prejudicial hearsay; (7) the sufficiency of the evidence to support the heinous, atrocious, or cruel aggravator and the constitutionality of the heinous, atrocious, or cruel aggravator; (8) the introduction of irrelevant and prejudicial evidence; (9) prosecutorial misconduct; (10) the improper sequence of *voir dire* questioning; (11) the improper use of victim impact evidence; (12) ineffective assistance of counsel; (13) application of the continuing threat aggravator and the constitutionality of the continuing threat aggravator; and (14) the cumulative impact of the errors on Mr. Wilson's rights.

## II. Standard of Review

Mr. Wilson filed his habeas corpus petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, AEDPA's standards apply to all claims adjudicated on the merits in state court proceedings. Under AEDPA, a writ of habeas corpus will not be granted unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2); *Turrentine v. Mullin*, 390 F.3d 1181, 1188 (10th Cir.2004). We must presume that the state court's factual findings are correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Smith v. Mullin*, 379 F.3d 919, 924–25 (10th Cir.2004) (quoting *Smallwood v. Gib-*

*son*, 191 F.3d 1257, 1264–65 (10th Cir. 1999)). The district court's legal analysis is reviewed de novo and any factual findings are reviewed for clear error. *Turrentine*, 390 F.3d at 1189; *Smallwood*, 191 F.3d at 1264–65.

A state court decision is "contrary" to clearly established law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). A state court decision is an "unreasonable application" of clearly established law when the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). "[T]he state court's decision must have been more than incorrect or erroneous ... [it] must have been 'objectively unreasonable.'" *Id.* at 520–21, 123 S.Ct. 2527 (citing *Williams*, 529 U.S. at 409, 120 S.Ct. 1495).

If we find that the state court erred, we still must determine whether the error is a structural defect "in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). If it is not a structural error, then we apply the harmless-error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and in *O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Under the harmless-error test, relief is only proper if the error "had substantial and injurious effect or influence in determining the jury's ver-

dict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Fry v. Pliler,* —— U.S. ——, 127 S.Ct. 2321, 2327–28, 168 L.Ed.2d 16 (2007). A " 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." *Bland v. Sirmons,* 459 F.3d 999, 1009 (10th Cir. 2006) (citing *O'Neal,* 513 U.S. at 436, 115 S.Ct. 992). There is "grave doubt" when the issue of harmlessness "is so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *O'Neal,* 513 U.S. at 435, 115 S.Ct. 992.

If the state court did not decide the claim on the merits, the stringent principles of deference under 28 U.S.C. § 2254 are inapplicable. *Mitchell v. Gibson,* 262 F.3d 1036, 1045 (10th Cir.2001). Additionally, if the district court's factual findings are entirely dependent on the state court record, our review of those findings is de novo. *Smallwood,* 191 F.3d at 1265 n. 1.

### III. Ineffective Assistance of Counsel

Petitioner's most persuasive claim is that he was deprived of effective assistance of counsel because of his trial attorney's failure "to adequately prepare his mental health expert, Dr. Eugene Reynolds, to testify in second stage or even make use of all of the mitigating information about Petitioner's mental state that Dr. Reynolds could have provided to the jury." Aplt. Br. 71. Mr. Wilson argues that he is entitled to an evidentiary hearing on this matter, which he has yet to receive. If not barred by AEDPA, a defendant is entitled to an evidentiary hearing "so long as his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Miller v. Champion,* 161 F.3d 1249, 1253 (10th Cir.1998).

In recent years, the Supreme Court and this Court have placed increasing emphasis on the obligation of defense counsel in capital cases to develop and present mitigating evidence in the penalty phase of the trial, often on the basis of family upbringing and mental health. This is a closer case than some, because defense counsel did hire an appropriate expert, provide some background information, and present some of the expert's findings to the jury. *Cf. Anderson v. Sirmons,* 476 F.3d 1131 (10th Cir.2007) (reversing denial of habeas relief where defense counsel utterly failed to present mitigating evidence based on family history and mental health). The Supreme Court, however, has made clear that the investigation and presentation of *some* mitigating evidence is not sufficient to meet the constitutional standard, if counsel fails to investigate reasonably available sources or neglects to present mitigating evidence without a strong strategic reason. *Wiggins v. Smith,* 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6 (1989) [hereinafter "ABA Guidelines"]. As we said in *Romano v. Gibson,* 239 F.3d 1156, 1180 (10th Cir.2001): "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." Because Mr. Wilson's allegations, if true and fully developed, would entitle him to relief, we reverse the district court's denial of an evidentiary hearing on this claim, and remand to the district court.

### A. Factual Background

#### 1. Pre-trial Preparation

Although counsel was appointed to defend Mr. Wilson some two years before

trial, he waited until just three weeks before trial started before he contacted and hired a mental health expert to assist in mitigation. This expert was Dr. Eugene Reynolds, a clinical psychologist. No explanation for this delay appears in the record. Dr. Reynolds was able to visit Mr. Wilson three times prior to the sentencing phase, but only during the first visit did the two have any privacy. Pet. Addendum 2, at ¶ 2; Tr. trans. 2/19/97, at 53–54. The second two visits were conducted in a cubicle in the hallway, with police officers and inmates walking by within earshot. Pet Addendum 2, at ¶ 2. Trial counsel provided Dr. Reynolds with the following materials: Hillcrest Medical Center Records, Scholastic School Records, Children's Medical Center Records, and statements by five individuals, three of whom testified at trial. None of those statements came from family members. During his interviews with Mr. Wilson, Dr. Reynolds administered several psychological tests from which he formulated three major conclusions: (1) that Mr. Wilson had an IQ score of 126; (2) that there was no evidence of neurological or organic brain damage; and (3) that Mr. Wilson suffered from generalized anxiety disorder, bipolar disorder (severe without psychotic features), and post-traumatic stress disorder (PTSD). The testing also indicated paranoid personality disorder and narcissistic personality disorder with passive-aggressive and schizotypal personality features. One test suggested Mr. Wilson suffered from schizophrenia; however, that test was invalid.[2] According to Dr. Reynolds, "additional testing" and "further collateral data" were required to support this diagnosis, but "[u]nfortunately, there wasn't enough time to obtain this information before the trial." Pet. Addendum 2, at ¶ 4. Twelve days before his testimony, which was four days after jury

selection had already begun, Dr. Reynolds made his results available to trial counsel, though it is unclear in what form. We do know, however, that counsel did not meet with Dr. Reynolds to discuss these results until the day before the sentencing phase began—two days before Dr. Reynolds' testimony.

The only family member counsel made available to Dr. Reynolds was Ms. Patricia Taylor, Mr. Wilson's mother, and Dr. Reynolds spoke to her only after he completed his testing. At no point did counsel himself interview Ms. Taylor about Mr. Wilson's life. Neither counsel nor Dr. Reynolds spoke to any other family member. Mr. Wilson has a sister and a brother, as well as a girlfriend, with whom he has a child.

### 2. Mitigation Phase at Trial

During the mitigation phase, counsel called six witnesses to testify for Mr. Wilson. Two individuals knew Mr. Wilson through church, but they could provide only limited observations about Mr. Wilson, including that he was "mannerable," "respectful," and "intelligent." Tr. trans. 2/19/97, at 13, 19, 22. Two of Mr. Wilson's former teachers also testified. Because they had not seen him in approximately five to six years, they also provided only limited insight, describing Mr. Wilson as "respectful," "fun-loving," and a "very good student." *Id.* at 35, 38.

Counsel's most important witness was Dr. Reynolds. On direct examination, counsel asked Dr. Reynolds generally about the tests administered to Mr. Wilson. He asked Dr. Reynolds about Mr. Wilson's high IQ of approximately 126, placing Mr. Wilson in the "superior range of intelligence" category, which, Dr. Reyn-

---

**2.** What exactly made the testing invalid, and what "invalid" means precisely, is not clear

from the briefs, nor could habeas counsel clarify this for the Court at oral argument.

olds stated, indicated that Mr. Wilson could "do something with himself." Tr. trans. 2/19/97, at 55–56, 63. Counsel asked Dr. Reynolds only a few additional questions about the results of his testing. In response, Dr. Reynolds testified that Mr. Wilson experienced a "severe mental disorder with many of the personality scales elevated. That would suggest that he has a severe personality disturbance." *Id.* at 57. Despite the fact that Dr. Reynolds had other diagnoses to give, counsel asked him no further questions about the specific results and conclusions from the psychiatric testing. Counsel asked briefly about Mr. Wilson's social history; Dr. Reynolds described in a few sentences Mr. Wilson's father as someone who was active in "drugs and alcohol, and pretty much ... not involved in Michael's life." *Id.* at 59. Dr. Reynolds focused primarily on the "two pictures" of Mike. "On the one hand, you have the picture of the Sunday school-going child. On the other hand, you have the picture of the gang and the uninvolved father, who did not set a particularly good role model." *Id.* at 60.

At no point did counsel elicit Dr. Reynolds' more concrete, scientifically rooted diagnoses, including the PTSD, bipolar disorder, generalized anxiety disorder, and schizotypal personality features. The entirety of Dr. Reynolds' description of Mr. Wilson's psychological state is no more than a page of the sentencing transcript.

What occurred on cross-examination was a train wreck for Mr. Wilson. The prosecutor asked Dr. Reynolds:

Q: [A]re there psychopathic criminals who have superior intelligence?

A: Yes.

. . . .

Q: The sharp contrast [Mr. Wilson] exhibits ... aren't those classic designs of a psychopath? 'Yes' or 'no'?

A: It can be.

Q: And aren't psychopaths the most likely to re-offend, based on the studies?

A: Yes.

Tr. trans. 2/19/97, at 65. Later in the cross examination, the prosecutor continued:

Q: [A]ren't superficial charm and good intelligence, coupled with cunning and manipulative lack of imp[ul]sivity behavior characteristics of a psychopath?

A: Yes, they are.

Q: And that's what Mr. Wilson has, isn't it?

A: Some of those characteristics, he has.

Tr. trans. 2/19/97, at 76. In his closing argument, the prosecutor used this testimony to again call Mr. Wilson a "psychopathic killer based on the evidence." Tr. trans. 2/20/97, at 46.

Finally, Mr. Wilson's mother testified at trial. She had not talked with defense counsel at any point prior to her testimony. She spoke briefly about Mr. Wilson's father and discussed Mr. Wilson's involvement at church. That Ms. Taylor had more to say was apparent from her statement, after defense counsel finished his questioning, that she "did want to say something else, if I'm allowed." Tr. trans. 2/19/97, at 103. Because defense counsel had rested, the court could not permit her to do so.

*3. Post–Conviction Investigation By Appellate Counsel*

On direct appeal, new counsel was appointed to represent Mr. Wilson. Appellate counsel provided Dr. Reynolds with additional information, including Tulsa County Gang Intervention Team Records, hospital records, Tulsa public school records, and, most significantly, affidavits from Ms. Taylor, James Leon Wilson (Mr. Wilson's brother), Staci Faenze (Mr. Wil-

son's sister), and Tonya Holt (Mr. Wilson's former girlfriend and the mother of his child). With this information as background material, Dr. Reynolds performed a second set of tests. These tests supported a diagnosis of schizophrenia, paranoid type. Typical symptoms include "delusions, hallucinations, disorganized speech, disorganized or catatonic behavior and negative" manifestations. Pet. Addendum 2, at ¶ 7, 11. Testing also revealed that Mr. Wilson had a "severe psychological disturbance with the possibility of delusions or hallucinations." *Id.* at ¶ 7. Dr. Reynolds reported that Mr. Wilson believed "evil spirits" possessed him at times, and that it was "possible [Mr. Wilson] could have been delusional at the time of the crime." *Id.* at ¶ 10.

Interviews with the family members revealed that Mr. Wilson suffered from depression, concentration problems, and delusions, that he heard voices, and that he frequently experienced memory lapses. At one point, when his girlfriend informed Mr. Wilson she heard voices, Mr. Wilson responded "I've heard them too, I hear voices and its OK. You just have to fight them, you just have to pray them away and they will go away." Pet. Addendum 4, at ¶ 11. All of the family members, as well as his girlfriend, vividly described the violent nightmares from which Mr. Wilson suffered throughout his life, during which he would kick, punch and shout all night. Mr. Wilson often experienced severe headaches that lasted for hours and sometimes days.

The affidavits also highlighted several experiences during Mr. Wilson's youth that may have led to his emotional and mental problems, including his relationship with his father. Although there was testimony at trial that Mr. Wilson's father was uninvolved in his life, the affidavits explained the effect that this absence, and his father's constant drug use in and out of

the home, had on Mr. Wilson. Mr. Wilson's older brother, with whom Mr. Wilson was very close, sold dope to support the family and eventually became hooked on crack cocaine. He, like his father, was in and out of prison. The brother was heavily involved in a gang from the time Mr. Wilson was young, and Mr. Wilson in turn grew up surrounded by and involved with the same individuals. Mr. Wilson's brother stated that gang members fired shots at Mr. Wilson "at least once every week." Pet. Addendum 5, at ¶ 4.

Dr. Reynolds stated in his affidavit that "[t]hese affidavits and additional testing helped me reach a more accurate diagnosis since this information was not previously provided during my first evaluation." Pet. Addendum 2, at ¶ 7. He concluded:

> My testimony could have been improved upon enormously had I been provided with the additional information provided to me by the Appellate Defense Council [sic]. This information provides the history of Micheal [sic] experiencing delusions and hallucinations, and other behaviors which supports the diagnosis of schizophrenia, paranoid type. Knowing this may have helped the jury better understand Micheal's [sic] emotional illness and how he could have participated in the crime.

*Id.,* ¶ 15.

### 4. The OCCA Decision

On direct appeal, the OCCA rejected Petitioner's argument that trial counsel's representation with respect to mental health mitigation was constitutionally deficient. As explained more fully below, the OCCA made no reference to the post-conviction investigation or affidavits, relying entirely on the record at trial. After briefly summarizing Dr. Reynolds' preparation, the court concluded:

Reynolds testified that Wilson had a severe personality disturbance. Reynolds explained that Wilson had some unusual, bizarre types of thinking that would suggest that he is not in touch with reality at times. Reynolds [sic] testimony indicated that Wilson committed this crime as an intelligent but immature person, and that, because of his family support and his intelligence, he had the capability of being rehabilitated. The mere fact more evidence could have been presented is not, in itself, sufficient to show counsel was deficient. Reynold's [sic] testimony was credible and well developed. We find Appellant has failed to carry his burden to show either deficient performance by counsel, or prejudice from the omission of this specific evidence.

*Wilson I,* 983 P.2d at 472 (citation omitted). The court made no finding that any of the alleged deficiencies in trial counsel's performance were a product of strategic judgment. It denied Petitioner's motion for an evidentiary hearing.

*5. The District Court Decision*

The district court denied the petition based on the OCCA's analysis, which the court found was not an unreasonable application of Supreme Court precedent. *Wilson III,* 2006 WL 2289777, at *43. According to the district court:

A careful reading of the trial transcript confirms that Petitioner's trial counsel questioned Dr. Reynolds thoroughly during his second stage testimony. This Court finds nothing deficient in the performance of trial counsel. Accordingly, the Court finds that the OCCA's rejection of this claim on direct appeal was not an unreasonable application of the legal principle announced by the Supreme Court in *Strickland* to the facts of Petitioner's case. Petitioner has failed to satisfy the § 2254(d) standard

on this portion of his ineffective assistance of counsel claim.

*Id.* The district court made no finding on prejudice, and also denied Mr. Wilson's request for an evidentiary hearing.

**B. The State's Nonresponsive Brief**

In its brief in this Court, the State offers almost no defense of counsel's performance. The entirety of its argument is found in this short paragraph:

Trial counsel hired Dr. Reynolds to provide a complete evaluation of Appellant's mental health. In addition, counsel provided information to Dr. Reynolds and made the Appellant and others available to assist in the diagnosis. Trial counsel did not provide deficient performance. *See Trice v. Ward,* 196 F.3d 1151, 116[sic] (10th Cir.1999).

Resp. Br. 80. Significantly, the State offers no reason we should regard the affidavits based on post-conviction investigation as either procedurally or substantively deficient, and no argument that any of the alleged deficiencies in trial counsel's performance were the product of strategic judgment.

If the entirety of counsel's obligation to present mitigation evidence based on mental health were to hire an expert (no matter when), to provide him *some* "information," and to arrange for access to the defendant and one family member, this would be responsive. It is unresponsive when the defendant has introduced specific evidence indicating that counsel hired the expert so late in the process that he was unable to complete necessary mental health evaluations, that counsel failed to gather or provide readily available relevant information that would have affected the diagnosis, and that counsel failed to present the expert's actual diagnoses to the jury.

It bears mention, therefore, that much of the dissenting opinion's analysis is based on arguments not developed, or even hinted at, by the State's brief.

### C. The Need for De Novo Review

■ As already noted, the district court denied Petitioner's request for habeas relief, or even an evidentiary hearing, on the basis of deference to the OCCA's decision rejecting Petitioner's arguments on direct appeal, as ordinarily required by 28 U.S.C. § 2254(d). *Wilson III,* 2006 WL 2289777, at *43. The State similarly rests on this deferential standard of review in arguing for affirmance. Resp. Br. 78. We cannot follow this path. While we review a district court's denial of an evidentiary hearing for abuse of discretion, *see Coronado v. Ward,* 517 F.3d 1212, 1217 (10th Cir.2008), it is well established in this Circuit that when a state court's disposition of a mixed question of law and fact, including a claim of ineffective assistance, is based on an incomplete factual record, through no fault of the defendant, and the complete factual record has since been developed and is before this Court, we apply de novo review to our evaluation of the underlying claim. *Bryan v. Mullin,* 335 F.3d 1207, 1215 (10th Cir.2003) (en banc); *see Miller,* 161 F.3d at 1254 (when "the state court [does] not hold an evidentiary hearing" on non-record evidence proffered on direct appeal, the Court is in "the same position to evaluate the factual record as [the state court] was."). When the state court makes factual findings on the basis of an incomplete factual record in such a case, "we need not afford those findings any deference." *Miller,* 161 F.3d at 1254.

■ Of course, to obtain an evidentiary hearing on habeas, Mr. Wilson has the burden of first showing that he "diligently sought to develop the factual basis underlying his habeas petition, but a state court prevented him from doing so," or that his

evidentiary proffer falls within an exception to 28 U.S.C. § 2254(e)(2)'s ban on the admission of new evidence. *Miller,* 161 F.3d at 1253. But the State does not argue that Mr. Wilson failed to satisfy this requirement, and we find that he acted diligently before the OCCA.

To be clear, this does not mean that we apply de novo review every time the state court declines to hold a hearing on a defendant's evidentiary proffer. Had the state court evaluated the non-record evidence in its denial of Mr. Wilson's *Strickland* claim and his request for an evidentiary hearing, we would apply AEDPA's deferential standard. *See, e.g., Welch v. Sirmons,* 451 F.3d 675, 704, 708–09 (10th Cir.2006) (applying AEDPA deference when the OCCA referred to the proffered affidavits in the course of denying an ineffective assistance claim); *Bland v. Sirmons,* 459 F.3d 999, 1030 (10th Cir.2006) (the OCCA "[e]xamin[ed] the affidavits that would be proffered at such a[n] [evidentiary] hearing."). In these cases, the state court examined the claim on the merits, including the proffered non-record evidence, but decided that even if that new evidence were fully developed, the defendants could not meet their burdens under *Strickland.* As we explain more fully below, the OCCA in this case, by contrast, made clear that it was relying solely on the trial record, and not the non-record evidence, when it denied the claim and the evidentiary hearing. *Wilson I,* 983 P.2d at 472 & n. 8 ("[a] review of the trial record shows trial counsel did put forth mental health expert.... Accordingly, we further find that Wilson's application for an evidentiary hearing on this claim should be denied."). Because Mr. Wilson did not receive consideration of his non-record claim, *Bryan,* 335 F.3d at 1215, and *Miller,* 161 F.3d at 1254, govern the standard of review in this case.

■ Because of the importance of standard of review to this case, we now set forward in detail the reasons we conclude both that Mr. Wilson was diligent in pursuing his non-record claims and that the OCCA did not consider his non-record evidence in the course of affirming the sentence and denying his application for an evidentiary hearing.

Assigned new counsel on direct appeal to the OCCA, Petitioner asserted that his trial counsel was ineffective during the sentencing phase of trial because he failed to properly investigate Mr. Wilson's mental health background and to adequately prepare the expert witness. Petitioner also claimed that defense counsel did not properly present those mental health diagnoses that the expert did make prior to trial. Petitioner proffered five affidavits in support of these claims. Three of these affidavits were from family members and one was from Mr. Wilson's former girlfriend, who is also the mother of his child. All described different mental health problems Mr. Wilson had, along with other struggles he experienced throughout his youth. The fifth was from the trial expert, Dr. Eugene Reynolds. In his affidavit, Dr. Reynolds described the diagnoses he reached after receiving the additional affidavits from Mr. Wilson's family, provided by appellate counsel. He also outlined the diagnoses he made prior to the sentencing phase but which were never presented to the jury, and recounted his interactions with the defendant. To develop his ineffective assistance claim and bring this non-record evidence into the record, Mr. Wilson requested an evidentiary hearing under Oklahoma Court of Criminal Appeals' Rule 3.11(B)(3)(b). Okla. Stat. tit. 22, ch. 18, App. Rule 3.11(B)(3)(b). This was sufficient to meet the "diligence" requirement of 28 U.S.C. § 2254(e)(2), and the State does not contend otherwise.

The question, then, is whether the state court considered this evidence when it rendered its decision. If so, its decision is entitled to deference; if not, we must make our own de novo evaluation. Oklahoma Appellate Rule 3.11(B)(3)(b) allows a defendant, on direct appeal, to offer non-record evidence in support of an ineffective assistance of trial counsel claim. If the court finds, "by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence," the OCCA will remand to the trial court for an evidentiary hearing based on the claims raised in the application. Okla. Stat. tit. 22, ch. 18, App. Rule 3.11(B)(3)(b); *Dewberry v. State*, 954 P.2d 774, 775 (Okla. Crim.App.1998). Following the evidentiary hearing, the trial court makes written findings of fact and conclusions of law. "It is the record from this evidentiary hearing which ... supplements the trial court record on appeal." *Dewberry*, 954 P.2d at 776. Any affidavits or other evidence supplied in support of the evidentiary hearing are not considered part of the record on which the OCCA bases its *Strickland* ruling unless they are properly introduced at the evidentiary hearing. *Id.* ("The record on appeal must remain as *only that* which has been presented through the trial court.") (emphasis added). If it does not remand for an evidentiary hearing or consider the non-record evidence in the course of denying the application for an evidentiary hearing, the OCCA's ultimate ruling on the *Strickland* issue cannot be based on the non-record information proffered in support of the claim.

■ Judge Tymkovich argues that "[b]ecause the standard for obtaining an evidentiary hearing under Rule 3.11 is lower than the standard set forth in *Strickland*—petitioner need only show a 'strong possibility' of ineffective assistance—when

the OCCA denies an evidentiary hearing under Rule 3.11, it necessarily makes a merits determination petitioner cannot meet the substantive *Strickland* standard." Diss. Op. 1129. We cannot accept this interpretation. Although Rule 3.11 uses a lower substantive standard ("strong possibility") it erects a much higher evidentiary hurdle for meeting that standard: to obtain an evidentiary hearing under Rule 3.11, the movant must provide "clear and convincing evidence" of this "strong possibility." The federal standard does not impose this "clear and convincing evidence" hurdle. To receive an evidentiary hearing on a *Strickland* claim, a petitioner need show only that "the allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Miller*, 161 F.3d at 1249. Although the interplay of these two standards—one more demanding, one less demanding, than the federal—is not clear, we cannot conclude that when the state court denies an evidentiary hearing under Rule 3.11 it has necessarily decided that the federal standard was not satisfied.

The OCCA did not remand for an evidentiary hearing, *Wilson I*, 983 P.2d at 472 n. 8. Nor did it consider the affidavits in the course of denying Mr. Wilson's application for an evidentiary hearing. The entirety of the OCCA's analysis of the *Strickland* issue was based on the court's review of the trial record. *Id.* at 472 ("A review of the trial record shows that counsel did put forth a mental health expert...."). The court's sole reference to the affidavits was to note that "Wilson has filed, contemporaneously with this issue, an application for an evidentiary hearing ... in an attempt to supplement the record ...," *id.*, and then to deny the application. This was consistent with the State's litigation position on appeal. The State's appellate brief to the OCCA stated that "the information contained with the affidavits ... are [sic] not being referred to in this brief

as such affidavits are not part of the record on appeal." Brief of Respondent–Appellee at 70 n. 40, *Wilson I*, 983 P.2d 448 (Okla.Crim.App.1998). At oral argument before this Court, counsel for the State conceded that the affidavits would not have been part of the OCCA's *Strickland* determination. *See Bryan*, 335 F.3d at 1215 (applying de novo review where the defendant sought an evidentiary hearing before the OCCA and attached affidavits, but the OCCA decided the case with only a minor reference to the new evidence); *accord Miller*, 161 F.3d at 1254.

Had the district court held an evidentiary hearing or otherwise made any factual findings based on the affidavits, we would accept those findings unless they were clearly erroneous. *Bryan*, 335 F.3d at 1216. However, the district court relied only on a "careful reading of the trial transcript" in denying Mr. Wilson's ineffective assistance claim. *Wilson III*, 2006 WL 2289777, at *43. We therefore have no choice but to review both legal and factual findings de novo, in light of the affidavits filed and the allegations made by the defendant but not considered by the OCCA or the district court. For purposes of determining whether Mr. Wilson is entitled to an evidentiary hearing on his *Strickland* claim, we treat these allegations as true. *Miller*, 161 F.3d at 1258.

The dissent argues that *Schriro v. Landrigan*, —— U.S. ——, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), overruled our prior precedent requiring de novo review of timely-filed habeas claims involving non-record evidence not considered by the state court. We do not read it that way. In *Schriro*, the Supreme Court stated: "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.* at 1940. It is this statement

that Judge Tymkovich thinks overrules our prior precedent in *Miller* and *Bryan*. *See* Diss. Op. 1128. Our precedent, however, does consider (or "take into account") AEDPA's mandate. Under § 2254(d), AEDPA's standard of deference applies only to claims that have been "adjudicated on the merits in State court proceedings." When a state court has not examined the non-record evidence, it has reached no conclusion "on the merits." *See Hoffman v. Arave*, 236 F.3d 523, 536 (9th Cir.2001) ("Because the state court denied Hoffman's ineffective assistance of counsel claims without holding a hearing ... those claims have never been litigated on the merits.").

*Schriro* does not undermine this analysis. In that case, the defendant—first in his application for state post-conviction relief and later on federal habeas—sought an evidentiary hearing to show that his trial counsel had failed to investigate certain mitigating evidence. The state court declined to hold an evidentiary hearing on the ground that the defendant had instructed trial counsel not to present any mitigating evidence at the sentencing hearing, rendering any failure to investigate nonprejudicial. The federal district court likewise refused to grant him an evidentiary hearing, but the Court of Appeals reversed, finding that the defendant's instructions referred only to a narrow subset of the potential mitigating evidence. *Schriro*, 127 S.Ct. at 1938–39. The Supreme Court in turn reversed, finding that the trial record "establish[ed] that the Arizona postconviction court's determination of the facts was reasonable." *Id.* at 1941.

It held that the federal courts were bound under AEDPA to defer to the state court's reasonable finding that the defendant had instructed counsel not to present mitigating evidence, and that this rendered any factual questions regarding counsel's investigation irrelevant: "If [the defendant] issued such an instruction, counsel's failure to investigate further could not have been prejudicial under *Strickland*." *Id.*

■ *Schriro* thus stands for the proposition that if a state court considers non-record evidence and declines to hold an evidentiary hearing—for example, because it finds that the record flatly refutes the evidentiary proffer or renders it irrelevant—the federal court must defer to that determination unless it is "based on an unreasonable determination of the facts" in light of the record. 28 U.S.C. § 2254(d)(2). It was therefore error in *Schriro* for the Court of Appeals to make its own independent judgment of the facts. But when the state court makes no reference to the new, non-record allegations, either because it simply ignores the information or because it employs a procedural bar against incorporating non-record evidence higher than that permitted by the Constitution, AEDPA deference is not due to the state's decision not to hold the evidentiary hearing, or to any factual determinations made without reference to the proffered evidence. *See Bryan*, 335 F.3d at 1215–16. We therefore do not regard Schriro as having overruled our prior precedent in *Miller* and *Bryan*. We continue to be bound by that precedent. *See Dubuc v. Johnson*, 314 F.3d 1205, 1209 (10th Cir. 2003).[3]

---

**3.** The Supreme Court recently granted certiorari to resolve a circuit split on this very question. *Bell v. Kelly*, —— U.S. ——, 128 S.Ct. 2108, 171 L.Ed.2d 228 (2008) *granting cert. in Bell v. Kelly*, 260 Fed.Appx. 599 (4th Cir.2008) (considering whether "the Fourth Circuit err[ed] when ... it applied the deferential standard of 28 U.S.C. § 2254(d), which

is reserved for claims 'adjudicated on the merits' in state court, to evaluate a claim predicated on evidence of prejudice the state court refused to consider." Petition for Writ of Certiorari, *Bell v. Kelly*, 2008 WL 819276, *1 (March 26, 2008) (No. 07–1223)). It seems unlikely that *Schriro* already answers

Finally, while "federalism, comity, and finality," Diss. Op. 1126, are undoubtedly important values, the importance of these values is reduced when a claim has never been considered on the merits. Most *Strickland* claims are based on evidence gathered after the initial trial, which perforce is not part of the original record. A petitioner who has diligently presented such a claim in a timely fashion is entitled to have a court perform a de novo review of his evidence of ineffective assistance. If the state court does not perform this review but instead confines its review to the original trial record, and the federal court defers to its judgment anyway, that de novo review will never be performed.

## D. Specific Claims of Defective Performance By Trial Counsel

Mr. Wilson argues that trial counsel was ineffective because of his poor investigation in preparation for the sentencing phase and his failure to put on relevant mitigating evidence at trial. "To establish ineffective assistance of counsel, a petitioner must prove that counsel's deficient performance was constitutionally deficient and that counsel's deficient performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable result." *Boyd v. Ward*, 179 F.3d 904, 913 (10th Cir.1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Counsel's performance must be "completely unreasonable" to be constitutionally ineffective, not "merely wrong." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir.1997). When the issue is the adequacy of counsel's investigation for the sentencing phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made." *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing *Strickland*, 466

U.S. at 689, 104 S.Ct. 2052). To assess the thoroughness of counsel's investigation and counsel's overall performance, the Court must conduct an objective review measured for "reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). We are "highly deferential" to counsel's decision, and a petitioner must "overcome the presumption that counsel's conduct was not constitutionally defective." *Wallace*, 191 F.3d at 1247.

Our analysis today is guided by the Supreme Court's recent jurisprudence emphasizing the importance of thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial. While initially, the Supreme Court applied *Strickland* rather narrowly, *see, e.g., Burger v. Kemp*, 483 U.S. 776, 789–92, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), this is no longer the case. In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), counsel conducted some inquiries, but the Court required a more robust, complete investigation, tethered at minimum to the norms of adequate investigation articulated by the American Bar Association Standards for Criminal Justice. Because of counsels' deficient investigations, the Supreme Court overturned the petitioners' death sentences in each case.

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court, for the first time under *Strickland's* two-part test, reversed a death sentence based on an ineffective assistance of counsel claim. *See* Jenny

the question on which the Court granted cer- tiorari in *Bell*.

Roberts, *Too Little, Too Late: Ineffective Assistance of Counsel, The Duty to Investigate, and Pretrial Discovery in Criminal Cases,* 31 Fordham Urb. L.J. 1097, 1110 (2004). The Court focused not on what was presented at trial, but on the adequacy of trial counsel's preparation for the mitigation phase. *Williams,* 529 U.S. at 396, 120 S.Ct. 1495. To evaluate the reasonableness of trial counsel's preparation, the Court looked to the standards for adequate investigation expressed in the ABA Standards for Criminal Justice. *Id.* at 396, 120 S.Ct. 1495 (citing 1 ABA Standards for Criminal Justice 4–4.1, cmt., p. 4–55 (2d ed.1980)). The Court found that undiscovered evidence of an abusive childhood and borderline mental retardation may have "influenced the jury's appraisal of his moral culpability." *Id.* at 398, 120 S.Ct. 1495.

Soon after, the Court decided *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), again focusing on trial counsel's investigation and stressing that counsel, in most cases, must pursue all reasonable leads. In *Wiggins,* trial counsel employed a psychologist, used Social Services Records, and read through the Presentence Investigation Report to prepare for the mitigation phase. The Court nonetheless found counsel's investigation unreasonable, as he did not prepare a forensic social history report as recommended by the ABA, and failed to pursue leads he already had suggesting his client suffered from a history of abuse and neglect. *Id.* at 524, 123 S.Ct. 2527. The Court stressed that it is "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further" that is the appropriate inquiry under *Strickland. Id.* at 527, 123 S.Ct. 2527. It also reminded us that physical and sexual abuse and diminished mental capacities compose the kind of

"troubled history" that may diminish moral culpability. *Id.* at 535, 123 S.Ct. 2527.

Most recently, in *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the Court reaffirmed that counsel's unreasonably limited investigation cannot withstand scrutiny under *Strickland.* Counsel in *Rompilla* conducted a more thorough investigation than in the prior two cases, speaking with five family members and employing three experts who examined the defendant's mental health at the time of the offense. *Id.* at 381–82, 125 S.Ct. 2456. Rompilla himself was unhelpful and even sent counsel on false leads. *Id.* at 381, 125 S.Ct. 2456. Despite this, the Court found counsel ineffective. The Court again relied on the ABA Standards, holding that counsel must investigate everything relevant to the penalty phase, regardless of the accused's admissions or statements. *Rompilla,* 545 U.S. at 387, 125 S.Ct. 2456 (quoting 1 ABA Standards for Criminal Justice 4–4.1 (2d. ed 1982 Supp.)). As in *Wiggins,* knowledge of potential leads was critical in triggering the duty to continue investigating, and as in both prior cases, the Court found that the evidence of child abuse and mental health problems would have been persuasive in the mitigation phase. *Id.* at 392–93, 125 S.Ct. 2456.

■ These cases stand for three important principles. First, the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident. *See Dickerson v. Bagley,* 453 F.3d 690, 693 (6th Cir.2006) (stating that in *Williams* and *Wiggins,* the Supreme Court "made it clear and c[a]me down hard on the point that a thorough and complete mitigation investigation is absolutely necessary in capital cases."); *Smith v. Dretke,* 422 F.3d 269, 278–79 (5th Cir.2005) (same). Second, to determine what is reasonable

investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case. *Rompilla,* 545 U.S. at 387 n. 7, 125 S.Ct. 2456 ("[The 1989] Guidelines appl[y] the clear requirements for investigation. . . ."); *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 ("[T]he standards for capital defense work articulated by the American Bar Association (ABA) . . . [should be used] as 'guides to determining what is reasonable.' "). Finally, because of the crucial mitigating role that evidence of a poor upbringing or mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence. Our own Circuit has emphasized this guiding principle. In *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir.2004), we held that it was "patently unreasonable" for trial counsel to fail to present evidence of Smith's borderline mental retardation, brain damage, and troubled childhood, and stated that this type of mitigating evidence "is exactly the sort of evidence that garners the most sympathy from jurors." Though the state's aggravating case was particularly strong, we reversed Smith's death sentence because of the power the mitigating evidence had to explain his behavior to the jury. *Id.* at 944.

■ As in *Williams, Wiggins,* and *Rompilla,* Petitioner's complaint is based on his counsel's limited investigation into potential mitigating evidence about Mr. Wilson's mental health, as well as counsel's failure to present the available mental health diagnoses. Specifically, Petitioner raises two objections to counsel's pre-trial preparation: his failure to engage an expert until shortly before trial, and his failure to supply the expert with readily available relevant information. Petitioner raises one objection to counsel's performance at trial: his failure to present the expert's actual diagnoses to the jury.

### 1. Pre–Trial Preparation Deficiencies

#### a. Delay in Hiring Mental Health Expert

First, counsel hired Dr. Reynolds only three weeks prior to trial and met with him only two days before he testified, despite the fact that counsel was assigned to this case two years in advance of trial. Under the American Bar Association Guidelines, "preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case." ABA Guidelines 11.8.3 (1989). The reason for the ABA's direction is obvious—there must be sufficient time for interviews, research, and adequate testing before strategic planning can even begin. Additionally, if counsel waits until immediately before trial, it is too late to correct any invalid tests or to pursue leads discovered during the testing process, a requirement for counsel to be effective. *See Rompilla,* 545 U.S. at 392, 125 S.Ct. 2456 (effective counsel would have conducted further investigation after discovering "red flags" in initial investigation). The rush to prepare will invariably lead to unnoticed and untapped resources.

Mr. Wilson's case exemplifies the problems with delaying the investigation. Dr. Reynolds did not have time to conduct additional testing to confirm a diagnosis of schizophrenia, nor could the defense team gather collateral evidence that might provide insight into Mr. Wilson's psychology. In his affidavit, Dr. Reynolds states flatly that "I needed additional testing, and further collateral data to support [a schizophrenia] diagnosis" but "[u]nfortunately, there wasn't enough time." Pet. Addendum 2, at ¶ 4. He further stated that, with the additional family information provided by appellate counsel after conviction and the additional testing he could then perform, he was able to "reach a more accurate diagnosis," *id.* at ¶ 7, and that this

would have improved his testimony "enormously" and "helped the jury better understand Micheal's [sic] emotional illness and how he could have participated in the crime." *Id.* at ¶ 15. He stated his opinion that among "the most important and significant data to tell the jury was Mr. Wilson's diagnosis of paranoid personality disorder," or schizophrenia. *Id.* at ¶ 14; *see also id.* at ¶ 8 ("Mr. Wilson meets the criterion for a diagnosis of schizophrenia, paranoid type...."). Time constraints due to counsel's tardy preparation precluded this more accurate and helpful diagnosis and testimony. *Id.* at ¶ 4.

In *Anderson v. Sirmons,* 476 F.3d 1131 (10th Cir.2007), we concluded that trial counsel in a capital case was constitutionally ineffective, partly on the ground that the investigator assigned to investigate the case in mitigation did not begin his work until the month before trial. *Id.* at 1143. Citing the 2003 version of the ABA Guidelines 10.7 Commentary, the Court regarded this delay as indicative of ineffectiveness, even without specific evidence regarding the consequences of delay. *Id.* ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses ..., decisions about the need for expert evaluations ..., motion practice, and plea negotiations."). We regard the timeliness of engagement of expert evaluators as no less important.

The Ninth Circuit reversed a denial of habeas corpus on grounds of ineffective assistance in a case with similar facts. In *Bloom v. Calderon,* 132 F.3d 1267, 1271 (9th Cir.1997), defense counsel contacted a psychiatric expert twenty days before trial—a period almost identical to the three weeks in this case. "Because counsel did not acquire the services of this key witness until days before trial, a hurried and inaccurate report resulted." *Id.* at 1277. The court roundly rejected the claim that delay

of this sort could be regarded as "strategic," commenting that this would " 'strip[ ] that term of all substance.' " *Id.* (quoting *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994)). The court concluded: "The complete lack of effort by Bloom's trial counsel to obtain a psychiatric expert until days before trial, combined with counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance." *Id.* Below, we explain why this case, like *Bloom,* involved inadequate preparation and presentation of the expert witness, as well as delay in engagement. We are, therefore, driven to the same conclusion.

Judge Tymkovich argues, in dissent, that the decision not to readminister the MMPI–2 test or collect collateral data was attributable not to the lack of time, but to Dr. Reynolds' failure to recommend further testing to counsel: "Wilson's counsel appropriately relied on Dr. Reynolds to decide how many rounds of mental health testing should be conducted. The record does not reveal that Dr. Reynolds ever advised counsel further testing beyond the initial round was necessary or advisable." Diss. Op. 1133–34; *see also id.* at 1144 ("counsel did not consider additional tests and interviews necessary").

We do not read the record that way. According to his affidavit, Dr. Reynolds administered the MMPI–2 test during the first battery of testing, but (for an unexplained reason) the results were invalid. "[B]ecause his first MMPI–2 was invalid," Dr. Reynolds explains, "I needed additional testing, and further collateral data to support this diagnosis. Unfortunately, there wasn't enough time to obtain this information before trial." Pet. Addendum 2, at ¶ 4. The failure to retest had nothing to do with whether Dr. Reynolds "advised counsel further testing beyond the initial

round was necessary or advisable." Dr. Reynolds did not need authorization from counsel to redo the invalid test. According to his affidavit, his inability to administer the MMPI–2 a second time was due to the lack of time. That was counsel's fault for not engaging Dr. Reynolds until just before trial.

The dissent also suggests that no negative consequences flowed from the late hiring because "[i]f counsel had considered further investigation necessary, he could have sought a continuance or conducted what further investigation was possible in the time remaining." Diss. Op. 1144 (emphasis omitted). Perhaps so, but that does not make his performance any less ineffective. It might well be regarded as exacerbating counsel's ineffective performance that he did not take any steps to repair the damage of his late start even when the consequences became apparent. Dr. Reynolds, in his affidavit, stated as follows: "Evaluations were performed on 1–22–97, 1–29–97, and 2–06–97. Results were made available to defense counsel shortly after February 7th, 1997." Pet. Addendum 2, at ¶ 13. The MMPI–2 test "provided some evidence for a diagnosis of schizophrenia," *id.* at ¶ 4, but was invalid and had to be administered again. If counsel did not grasp the importance of obtaining an accurate diagnosis and deliberately chose to do nothing, as the dissent seems to suggest, this is but confirmation of his lack of understanding of the role of mental health evidence in the mitigation phase of a capital trial. In any event, it is far from clear that if counsel had requested a continuance, the judge would have granted the motion. The trial court might well have been reluctant to keep the jury sitting additional days so late into an already lengthy trial on account of a problem caused by counsel's own dilatoriness.

### b. Deficient Investigation

We are also disturbed by counsel's exiguous investigation. The ABA requires counsel to consider "[w]itnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing. . . ." ABA Guidelines 11.8.3 (1989). This specifically includes "[w]itnesses drawn from the victim's family or intimates who are willing to speak against killing the client." *Id.* Yet counsel neglected to interview a single family member—despite the fact that his mother, sister, brother, and girlfriend all were readily available and willing to talk. As we concluded on similar facts in *Anderson v. Sirmons,* "Trial counsel did not undertake a strategic decision in this case to omit the mitigation evidence identified above [including family background]; counsel simply did not investigate and therefore did not know such evidence was available." 476 F.3d at 1145.

As described in affidavits, interviews with family members would have produced potentially valuable evidence of Mr. Wilson's delusions, hallucinations, nightmares, and inability to maintain contact with reality. They also would have provided evidence supporting the schizophrenia diagnosis. Testimony about these problems, both from Dr. Reynolds and the family, would have changed the substance and tone of the sentencing hearing and would have given meaning and color to any testimony about a "personality disturbance," tr. trans. 2/19/97, at 57, providing the jury with details highlighting the depth of Mr. Wilson's problems.

In his affidavit, Dr. Reynolds testified to the importance of this information. He explained that the family's statements, along with additional testing, "helped me reach a more accurate diagnosis since this information was not previously provided during my first evaluation." Pet. Adden-

dum 2, at ¶ 7. He stated that his "testimony could have been improved upon enormously had I been provided with the additional information provided to me by the Appellate Defense Council [sic]." *Id.* at ¶ 15.

All of this information was easily within counsel's reach, and yet he never contacted the family. The investigation counsel performed here was far more deficient than that conducted in *Rompilla,* where counsel at least interviewed five family members, 545 U.S. at 381–82, 125 S.Ct. 2456, and where he had some reason to believe additional investigation would not be fruitful.

To be sure, although counsel did not interview Mr. Wilson's mother, Patricia Taylor, he did make her available to Dr. Reynolds, who interviewed her for approximately one hour. But he neither interviewed the other immediate family members nor made them available. Counsel cannot know whether other family members are able to contribute important information without talking to them.

This is an example, then, of trial counsel who did not trouble even to talk to a large portion of the "reasonably available" witnesses. *Wiggins,* 539 U.S. at 546–47, 123 S.Ct. 2527. Interviewing the family members is hardly an onerous requirement, rather, it is the starting point for most investigation. *See Rompilla,* 545 U.S. at 381–82, 125 S.Ct. 2456 (counsel at least interviewed family and defendant). It is true that at times, some investigation will produce no new information. But while we do not require counsel to interview every single extended family member, *see, e.g., Rompilla,* 545 U.S. at 389, 125 S.Ct. 2456 ("[q]uestioning a few more family members . . . can promise less than looking for a needle in a haystack *when a lawyer truly has reason to doubt there is any needle there*" (emphasis added)), it is incomprehensible that counsel can be effective in a case where life is at stake

without interviewing *any* family members—particularly those in the immediate family.

Nor were the witnesses counsel did interview and present adequate substitutes for the family members. The two teachers had not seen Mr. Wilson in five to six years. There is no evidence that the family friends from church knew Mr. Wilson particularly well; their testimony at sentencing certainly does not suggest a close relationship. *See* tr. trans. 2/19/97, at 13, 19, 22 (describing Mr. Wilson as "mannerable," "respectful," and "intelligent."). None of them were in a position to observe the kind of strange behavior, nightmares, and delusions noted by the family members in their affidavits, much of which took place during the night or at odd times when outsiders would not be present. And in general, there is no substitute for the information counsel can glean from the family when researching the defendant's background, as they are almost always the only people who can provide a complete narrative of the defendant's life.

Under our precedents, this was ineffective performance. *Anderson,* 476 F.3d at 1145; *Hooper v. Mullin,* 314 F.3d 1162, 1170–71 (10th Cir.2002). As with the delay in engaging a mental health expert, other courts of appeals have found ineffective assistance on the basis of a similar failure to interview family members. *See, e.g., Morales v. Mitchell,* 507 F.3d 916, 931–35 (6th Cir.2007); *Haliym v. Mitchell,* 492 F.3d 680, 712 (6th Cir.2007).

Judge Tymkovich, in dissent, argues that "counsel fulfilled his obligation by engaging Dr. Reynolds and providing him with access to Wilson's mother, other witnesses, and Wilson's records." Diss. Op. 1136. "If Dr. Reynolds thought further interviews would be helpful, he could have suggested them to counsel, but we have no

information that Dr. Reynolds did so." *Id.* We cannot agree.

The information here—interviews with close family members—is so basic that counsel should not have to be told by an expert that they are necessary. ABA Guideline 11.8.3 (1989) specifically instructs defense counsel to investigate "[w]itnesses drawn from the victim's family or intimates who are willing to speak against killing the client." *Id.*; *see also Anderson*, 476 F.3d at 1143–44 (reversing denial of habeas where counsel did not investigate family history). Such witnesses are commonly valuable for reasons entirely aside from assistance to mental health experts. And *Rompilla* holds that the failure to investigate readily available sources can be ineffective assistance even if the fruits of that investigation would be something other than what counsel could reasonably have expected to find. *Rompilla*, 545 U.S. at 390, 125 S.Ct. 2456. We would be remiss to hold that the lack of evidence, in the record, that Dr. Reynolds specifically asked defense counsel to interview family members excuses counsel's failure to do so.

Of course it is true that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383, 125 S.Ct. 2456. But there is a certain threshold of investigation counsel must conduct *prior to* making that strategic decision—in other words, counsel must be "reasonably diligent" to be able to decide where to "draw [the] line." *Id.*; *see also Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527 (the defendant was deprived of competent representation when his "counsel abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources."). Without conducting a reasonable investigation, counsel's choice of strategy will be arbitrary, as

the strength of each potential strategic choice is contingent on the outcome of the initial investigation. *Hooper*, 314 F.3d at 1170–71; *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir.1990). *Wiggins* makes clear that to be reasonably diligent, counsel must " 'conduct a *thorough* investigation of the defendant's background' " for "*all reasonably available* mitigating evidence." *Id.* at 522, 524, 123 S.Ct. 2527 (quoting *Williams*, 529 U.S. at 396, 120 S.Ct. 1495, and ABA Guideline 11.4. 1) (first emphasis added). Mr. Wilson's immediate family and his girlfriend were readily available and all swore that they would have testified at trial.

■ We recognize that in many situations, the expert will know better than counsel what evidence is pertinent to mental health diagnoses and will be more equipped to determine what avenues of investigation are likely to result in fruitful information. To a degree, counsel should be able to rely on that expert to determine what evidence is necessary to an effective evaluation, and what additional evidence the expert needs to complete testing. *See, e.g., Hendricks v. Calderon*, 70 F.3d 1032, 1038–39 (9th Cir.1995). However, counsel may not simply hire an expert and then abandon all further responsibility. As another court has stated: "an attorney ha[s] a responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir.1999) (Kozinski, J.). As in any managerial role, counsel must at a minimum continue to exercise supervisory authority over the expert, ensuring that the expert examines those sources of information that the ABA has indicated are necessary for adequate preparation for the sentencing phase. Only once either the expert or counsel has consulted all readily available sources can

counsel's reliance on the expert's opinion be reasonable.

Finally, we note that the State does not defend counsel's pre-trial investigation on the ground that the expert did not ask counsel to provide the family interviews. Generally speaking, we do not rely on a ground not put forward by the party. *See Webber v. Scott*, 390 F.3d 1169, 1179 n. 6 (10th Cir.2004); *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n. 7 (10th Cir.1994); *but see Richie v. Mullin*, 417 F.3d at 1128 n. 3 (Hartz, J., concurring). If the government had argued that Dr. Reynolds' affidavit was insufficient because it failed to provide the expert's recommendations to counsel regarding necessary background information, Petitioner might well have been able to cure the deficiency with a supplemental affidavit reciting what Dr. Reynolds recommended to counsel. Because the State did not, and to this day still has not, contended that Dr. Reynolds' affidavit was insufficient on account of its failure to report his recommendations to counsel, we cannot affirm on that ground. It would be unfair to allow the government to sit back and decline to object to the sufficiency of the proffered affidavits, and then to penalize the defendant when it is too late for him to supplement any alleged gaps. If, on remand, this issue proves material, the district court may wish to obtain additional testimony, or hold an evidentiary hearing, to resolve it.

### c. Lack of an Affidavit from Counsel

In dissent, Judge Tymkovich argues that it is impossible to determine that counsel "knew or should have known further investigation was necessary," or that counsel's late hiring of the expert prejudiced the investigation, because we lack an affidavit from counsel that sheds any light on these issues. Diss. Op. 1132. According to the dissent "[t]he absence of any admissions in counsel's affidavit to errors at trial stands in stark contrast to other death-penalty appeals in which counsel confesses his performance was deficient." *Id.* at 1132 n. 7.

■ There is no support for the proposition that the absence of an affidavit from trial counsel is fatal to a habeas petitioner's claim of ineffective assistance. *See Barkell v. Crouse*, 468 F.3d 684 (10th Cir. 2006) (remanding for an evidentiary hearing without an affidavit from counsel); *Sallahdin v. Gibson*, 275 F.3d 1211, 1240 & n. 11 (10th Cir.2002) (remanding for an evidentiary hearing so that counsel could testify as to his "reasons, or lack thereof, for not presenting" the expert, as the affidavit submitted was "extremely vague."). There is often a conflict of interest between client and counsel on this question. If trial counsel confesses to deficient performance, he may face court sanctions such as fees or removal from the court appointed attorney list. Even if counsel does not receive some court-induced punishment, his reputation will certainly be impugned, which may in turn affect his practice. A requirement that the defendant receive a full confession of deficiency, in writing, from trial counsel puts the defendant at the mercy of his lawyer. If more information from trial counsel is necessary to resolve particular issues, which the State here does not contend, the court may subpoena him at the evidentiary hearing.

In any event, an affidavit from trial counsel is unnecessary here. While the record lacks a statement from Wilson's counsel "that he did not have enough time to obtain a further diagnosis," diss. op. 1132, Dr. Reynolds' affidavit provides us with that information. Moreover, the undiscovered witnesses in this case were Mr. Wilson's immediate family members—the most obvious of resources. We do not need an affidavit from trial counsel informing us that he was aware he had in-

complete information, as even the most inexperienced trial counsel knows that an investigation cannot be complete without talking to the immediate family.

### 2. Failure to Present Diagnoses At Trial

Finally, we are troubled by counsel's failure to present the diagnoses that Dr. Reynolds had already made. At trial, Dr. Reynolds testified only briefly and in general terms about Mr. Wilson's mental health problems. Counsel never asked Dr. Reynolds about the bipolar diagnosis, the PTSD, the paranoid personality disorder, the passive-aggressive and schizotypal personality features, or the generalized anxiety disorder, despite the fact that the ABA rules state that "[c]ounsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." ABA Guidelines 11.8.6 (1989). Among those topics counsel should consider are medical history, as well as family and social history. *Id.* In his affidavit, Dr. Reynolds explained additional deficiencies in counsel's examination:

> I should have been given the opportunity to explain how psychological testing is merely a guide or a hypothesis to understanding an individual's behavior. That the test results must be used in conjunction with the patient's history, and other data. I should have been given the opportunity to explain that the prosecutor's emphasis on psychopath was not a DSM–IV diagnosis and that the questionnaire he used to support this diagnosis was not a psychological test but simply a questionnaire with no validity or reliability factor found in psychological tests.

Pet. Addendum 2, at ¶ 14.

In *Anderson v. Sirmons,* this Court emphasized the importance of explaining to the jury the difference between abnormalities of personality and actual mental disorders. In the absence of such explanation, jurors may perceive the defendant's personality traits "as 'meanness' or antisocial behavior, but with expert evaluation and explanation [they] are properly explained as deriving from disruption and impairments to the nervous system." 476 F.3d at 1144. Given the nature of counsel's examination of Dr. Reynolds, this distinction did not come across. Dr. Reynolds testified that Mr. Wilson experienced a "severe mental disorder with many of the personality scales elevated. This would suggest that he has a severe personality disturbance." Tr. trans. 2/19/97, at 57. This triggered a devastating response by the prosecution during cross-examination, repeated during closing argument: that Dr. Reynolds' description of Mr. Wilson made him sound like a psychopath. When Dr. Reynolds was given no opportunity to refute the "psychopath" charge or tell the jury his actual psychological diagnoses, that highly pejorative characterization stuck.

Notwithstanding these apparent deficiencies, counsel's failure to present a more detailed case for mitigation based on mental health might still be regarded as reasonable if it were the result of a strategic choice. As the Court explained in *Strickland,* "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91, 104 S.Ct. 2052. However, in this case the State does not argue that defense counsel made a strategic choice. *See* Resp. Br. 77–80. Nor did the OCCA, in denying Mr. Wilson's ineffective assistance of counsel claim, suggest that

counsel was making a strategic choice. *Wilson I*, 983 P.2d at 472. Because the State has failed to suggest this as grounds for affirmance, the argument is waived. *Webber*, 390 F.3d at 1179 n. 6.

We nonetheless will briefly address the strategic choice argument, because it forms the basis for so much of Judge Tymkovich's analysis in dissent. Counsel's strategy, he argues, was to present Mr. Wilson to the jury as a person of very high intelligence, with capacity to benefit society. Evidence of Mr. Wilson's mental illness, he argues, might have undercut this approach. "Once counsel decided to focus his mitigation strategy on Wilson's high intelligence and capacity for reform, it was reasonable for counsel not to pursue further leads of mental illness." Diss. Op. 1132.

We find this argument unpersuasive, and certainly short of the "strong strategic reasons" that ABA Guideline 11. 8.6 requires before counsel should forego presentation of available mitigating evidence. First, counsel did put on limited evidence that Mr. Wilson suffered from mental health problems, albeit without the diagnostic detail or explanation that would have enabled the jury, in Dr. Reynolds' words, to "better understand Micheal's [sic] emotional illness and how he could have participated in the crime." Pet. Addendum 2, at ¶ 15. If evidence of mental illness would conflict with defense counsel's chosen strategy of emphasizing Mr. Wilson's intelligence and capacity for reform, the damage was already done. Once this information was presented to the jury, there is no plausible strategic reason to refrain from presenting the more powerful and vivid mental health evidence, including the bipolar disorder, the generalized anxiety disorder, the PTSD, as well as the paranoid personality disorder and schizotypal personality features.

Further, Dr. Reynolds' mental health diagnoses are not necessarily inconsistent with defense counsel's argument that Mr. Wilson had "potential, under the structure of the penal system," to do well. Tr. trans. 2/20/97, at 43. The specific mental disorders to which Dr. Reynolds could have testified are, at least in some cases, unlike generalized "personality disorders," amenable to medication. If it is true that Mr. Wilson could succeed given structure despite suffering from a "personality disorder," there is no reason to think it is any less true if Mr. Wilson were incarcerated and medicated for something like bipolar disorder.

### 3. Conclusion

Trial counsel's preparation for the sentencing phase, in sum, fell below acceptable standards on numerous levels. First, he did not hire an expert until just a few weeks before trial, and he waited until the sentencing phase began to meet with that expert. This time crunch prevented trial counsel from providing the expert relevant information that could have corrected flaws in the testing and from conducting further investigation based on the leads the expert developed. We know now that, with time for retesting and with additional collateral information, the expert would have arrived at a diagnosis of schizophrenia. Second, he failed to conduct even the most basic investigation: meeting with family members. These interviews would have provided significant information related to Mr. Wilson's background and mental health. Finally, he did not even present the mental health diagnoses that the expert was able to develop prior to testifying. Neither the delay nor the failure to investigate could have been strategic, and the State does not claim that they were. The failure to present the expert's full mental health diagnoses to the jury does not appear to be strategic, and the

State does not claim that it was. This performance, taken as a whole, falls short of the standard set by the Supreme Court in *Williams, Wiggins,* and *Rompilla.*

### E. Prejudice

To prevail on his *Strickland* claim, the defendant must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. If the ineffectiveness occurred during the sentencing phase, the defendant must demonstrate "a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stafford v. Saffle,* 34 F.3d 1557, 1564 (10th Cir.1994) (citing *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052).

The district court made no findings on the issue of prejudice. Accordingly, we can reach this issue as an alternative ground for affirmance only if the record is sufficiently clear with respect to all facts bearing on the issue. *United States v. Carrizales–Toledo,* 454 F.3d 1142, 1149 (10th Cir.2006).

It would be difficult, on this record, to conclude with any confidence that the jury's verdict would not have been affected by a proper presentation of the mental health evidence and related family history. The mitigation evidence that was presented consisted of statements that Mr. Wilson was generally a good, churchgoing boy with a high IQ and a "severe personality disturbance." Tr. trans. 2/19/97, at 57. The prosecutor was able to use this testimony to label Mr. Wilson as a "psychopath." *Id.* at 76. Psychopath, defined as a "mentally deranged person," carries with it an extremely negative connotation. *Ox-*

*ford English Dictionary* (2d. ed.1989); *see Caro v. Woodford,* 280 F.3d 1247, 1257 (9th Cir.2002) (expert testimony painted defendant as a "violent psychopath" and was not mitigating). Dr. Reynolds' testimony about Mr. Wilson's "severe personality disturbance" was hardly strong enough to rebut the prosecutor's constant invocation of "psychopath." Had counsel, at the very least, asked Dr. Reynolds on re-direct about the additional diagnoses, the jury would have had an alternative, and more palatable, way to understand Mr. Wilson's gruesome conduct. It would have provided some explanation, besides being a "psychopath," for the "two pictures of Mike." Tr. trans. 2/19/97, at 60.

There may well be grounds for skepticism that a jury in this type of case would have been swayed by hearing Dr. Reynolds present his specific diagnoses. But we do not write on a blank slate. Courts have repeatedly found this type of evidence to be powerful mitigation. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to ... emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)); *see also Rompilla,* 545 U.S. at 391, 125 S.Ct. 2456 (highlighting schizophrenia as one mental health problem with a potentially mitigating effect); *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ("Evidence of ... emotional disturbance is typically introduced by defendants in mitigation."); *Smith,* 379 F.3d at 942 (juries respond to evidence of mental illness); *Silva v. Woodford,* 279 F.3d 825, 847 (9th Cir.2002) (holding that failure to present

evidence of childhood abuse, mental illness, organic brain disorder, and substance abuse, which included PTSD, fetal alcohol syndrome, and attention deficit disorder, was extremely prejudicial); *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir.1988) ("[P]sychiatric evidence ... has the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior.").

Diagnoses of specific mental illnesses such as schizophrenia or bipolar, which are associated with abnormalities of the brain and can be treated with appropriate medication, are likely to regarded by a jury as more mitigating than generalized personality disorders, which are diagnosed on the basis of reported behavior, are generally inseparable from personal identity, and are often untreatable through medical or neurological means. *See* Christos Pantelis et al., *Structural Brain Imaging Evidence for Multiple Pathological Processes at Different Stages of Brain Development in Schizophrenia*, 31 SCHIZOPHRENIA BULL. 672 (2005) (reviewing studies); Steven R. Hirsch & Daniel Weinberger, SCHIZOPHRENIA (1995); Nick Manning, *Psychiatric Diagnosis Under Conditions of Uncertainty: Personality Disorder, Science and Professional Legitimacy*, 22 SOC. HEALTH & ILLNESS 621 (2000). We thus cannot regard the inability of Dr. Reynolds to conduct the retesting necessary to establish a diagnosis of schizophrenia, and the failure of counsel to elicit Dr. Reynolds' psychological diagnoses during the mitigation phase of trial, as having no effect on the probable outcome.

We assume, had Dr. Reynolds been given the opportunity to testify about these diagnoses, he would not just have used the terms "schizophrenia" and "bipolar disorder," but would also have testified about the ways in which these illnesses prevented Mr. Wilson from conforming his conduct to the law. This is a far cry from the limited testimony actually given where Mr. Wilson was described as having a "severe mental disorder" and a "severe personality disturbance." Tr. trans. 2/19/97, at 57. The description of the effects of Mr. Wilson's mix of mental illnesses might well have made a difference to the jury's ability to evaluate his culpability. *Compare with Clark v. Mitchell*, 425 F.3d 270, 285–86 (6th Cir.2005) (counsel was not deficient for failing to give specific diagnoses because the experts described the *effects* of the disorder); *see also Penry*, 492 U.S. at 319, 109 S.Ct. 2934.

Additionally, Mr. Wilson's family, ignored by counsel, could have provided personal narratives of Mr. Wilson's problems and experiences from his childhood through adulthood, which both led to and revealed his mental health problems. There is evidence that expert testimony on mental illness is most powerful when combined with narratives from lay witnesses such as family and friends. *See* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L.Rev. 1109, 1135 (1997).

Far from presenting "a full picture of Wilson to the jury," diss. op. 1135, counsel failed to present even the most rudimentary facts about his family circumstances, such as that Mr. Wilson is a father. Mr. Wilson's family could have testified about Mr. Wilson's struggles with his drug-addicted father, a subject upon which Ms. Taylor only briefly touched, his immersion in gang life because of his brother, and his delusions, nightmares, and hallucinations, all of which may have evoked empathy from the jury. Though counsel called Ms. Taylor to testify, he had not interviewed her before she was called to the stand; because of this, he did not know to ask questions that might elicit this information.

All in all, as in *Anderson,* 476 F.3d at 1148, the mitigation evidence put on by defense counsel gave the jury a "pitifully incomplete" picture of Mr. Wilson.

As with the first *Strickland* prong, the State offers little argument that the deficiencies in counsel's performance, if they were deficiencies, were non-prejudicial. The State's entire argument on prejudice is contained in this paragraph:

> In addition, Appellant cannot demonstrate any prejudice as Appellant has filed to demonstrate a reasonable probability that any further mental health evidence would have affected the jury's imposition of the death penalty. *See Malicoat v. Mullin,* 426 F.3d 1241, 1261 (10th Cir.2005). In light of the overwhelming evidence of the three aggravators found by the jury, there is no reasonable probability that any additional mental health evidence would have changed the jurors' minds.

Resp. Br. 80. The bulk of this is nothing more than a statement of the legal test for prejudice, unaccompanied by any argument why it has not been satisfied.

The State's sole argument is that it is unlikely the jury would have been moved by more powerful mental health evidence in light of the overwhelming evidence, which the jury credited, of three statutory aggravating factors. We recognize the force of the point. *See McCracken v. Gibson,* 268 F.3d 970, 978–80 (10th Cir.2001);

*but see Smith v. Mullin,* 379 F.3d at 944 (granting habeas on grounds of ineffective assistance in presentation of mental health mitigation evidence despite the state's "strong" case for aggravation). The murder for which Mr. Wilson was convicted was especially brutal. It is also true, however, that one of Mr. Wilson's co-perpetrators received a life sentence from the jury, presumably because of his youth, even though he was the one who beat the victim to death with a baseball bat while Mr. Wilson stood guard at the register. It is not beyond reasonable possibility that, if it had been properly informed, the jury would have regarded him in a similar light—as less culpable due to his mental illness. The burden on the defendant is simply to show that there is a "reasonable probability" that the outcome would have been different—such a result requires only one juror to vote differently. Though some jurors may have been disinclined to employ mercy, it is equally as likely that at least one juror would have empathized with Mr. Wilson, given the additional insight into his mental state. *See Smith,* 379 F.3d at 944.

Going beyond the arguments put forth by the State, Judge Tymkovich argues in dissent that the mental health evidence was not necessarily mitigating and may have had a "double-edged sword" effect.[4] This could possibly be true, but if true the

---

4. The majority of empirical studies demonstrate that mental health evidence has a mitigating effect on juries. We acknowledge, however, that there are some conflicting studies; additionally, almost all of the studies are based on the same data set, which is now over ten years old. *See* John H. Blume et. al., *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation,* 36 Hofstra L.Rev. 1035 (2008) (describing the empirical research on what is effective mitigation); Justice Research Ctr., Northeastern Univ., Juror Interview Instrument: National Study of Juror Decision Making in Capital Cases (1997); William J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings,* 70 Ind. L.J. 1043 (1995) (providing an overview of the Capital Jury Project); Stephen P. Garvey, *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L.Rev. 26, 27 n. 4 (2000) (citing the quantitative analyses of the Capital Jury Project data). The State does not rely on these studies to rebut the prejudicial impact of counsel's deficiencies, and so we need not delve into them any farther than to comment that more investigation of this important issue would be useful.

point would apply not just to this case, but also to *Williams, Wiggins,* and *Rompilla,* as well as *Anderson, Smith,* and many more decisions across the country holding that the failure of counsel to present mental health evidence of this sort was prejudicial. These precedents do not permit us to regard the failure of counsel to effectively present mitigating evidence based on mental health as inconsequential. Indeed, this Court has labeled such information "exactly the sort of evidence that garners the most sympathy from jurors." *Smith,* 379 F.3d at 942.

Judge Tymkovich also argues that the jury may have "drawn a negative picture about Wilson's gang involvement and the murder itself" after hearing the family's testimony. Diss. Op. 1137. We think this is unlikely. Far from demonstrating that Mr. Wilson was a loyal gang member, the family's testimony would have shown that Mr. Wilson jeopardized his own safety by helping the police in their investigations of the gang. He did this despite having been pulled into the gang scene as early as the ninth grade. While gang involvement may normally be aggravating, Mr. Wilson's cooperation with the police, at great risk to himself, likely neutralized its harmful effects.

In any event, whatever doubts there might be regarding the impact of counsel's deficiencies on the verdict, the district court did not address the issue. We therefore cannot affirm on that ground. The State is free to argue lack of prejudice on remand.

### F. Further Proceedings

Because Mr. Wilson has alleged facts that, if true, would entitle him to relief, we conclude that an evidentiary hearing is appropriate. While we normally defer to a district court's decision on whether to hold an evidentiary hearing, *Coronado,* 517 F.3d at 1217, here, the district court erro-

neously applied AEDPA deference to the OCCA's analysis of the *Strickland* claim and the request for an evidentiary hearing. We therefore find that the district court abused its discretion. *See United States v. Seals,* 419 F.3d 600, 607 (7th Cir.2005) ("By applying the wrong legal standard, the district court abused its discretion"). We remand to the district court to hold an evidentiary hearing on this matter. *Miller,* 161 F.3d at 1253; *see also* R. Governing § 2254 Cases, R. 8(a).

### IV. Claims of Pre–Trial Error

Although we have determined that remand to the district court is appropriate, we must consider the remainder of Mr. Wilson's claims, as he has presented several arguments which, if meritorious, would require reversal of either his conviction or sentence. We therefore proceed to those claims.

### A. Voir Dire

#### 1. Voir Dire Questioning

Mr. Wilson contends that he was denied his right to "an impartial jury drawn from a venire that has not been tilted in favor of capital punishment. . . ." *Uttecht v. Brown,* —— U.S. ——, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007). The trial court began its examination of the issue by inquiring whether each juror was "opposed to or in favor of the death penalty." Tr. trans. 2/3/97, at 38. Only after this question did the court ask whether, if the case should reach the penalty phase, the juror would "automatically vote against the death penalty, regardless of the evidence and the law." *Id.* at 48. Three jurors informed the court that they were opposed to the death penalty; upon further questioning, they told the court that they would "automatically vote against it, regardless of the evidence and the law." *Wilson I,* 983 P.2d at 459. Two jurors stated that they were

in favor of the death penalty, but that either their conscience or religious convictions would not allow them to impose it. *Id.* Though Mr. Wilson's argument is less than clear, our best interpretation of his complaint is that by eliciting information on the jurors' views on capital punishment, the court considered irrelevant information in its decision to strike jurors and removed jurors in violation of the standard set forth in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

The OCCA found that while the trial court could have improved the manner in which it conducted voir dire, there was no error because "[t]he trial court's follow-up questions were designed to determine whether the jurors' personal views on the death penalty would impair their ability to render an impartial verdict." *Wilson I,* 983 P.2d at 459. The district court similarly denied relief on this basis. *Wilson III,* 2006 WL 2289777, at *37–38.

■■■■ A capital defendant's right to an impartial jury prohibits the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). However, the state has "a strong interest in jurors who are able to apply capital punishment within the framework state law prescribes." *Uttecht,* 127 S.Ct. at 2224 (citing *Witt,* 469 U.S. at 416, 105 S.Ct. 844). To balance the defendant's right to an unbiased jury and the state's interest in a jury that can apply the death penalty, the Supreme Court has instructed that removal for cause is appropriate only when "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 469 U.S. at 424, 105 S.Ct. 844. The trial court must determine " 'whether the venireman could

follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' " *United States v. Chanthadara,* 230 F.3d 1237, 1270 (10th Cir.2000) (quoting *Dutton v. Brown,* 788 F.2d 669, 675 (10th Cir.1986)). The trial court's evaluation of bias is a factual finding entitled to substantial deference by reviewing courts. *Uttecht,* 127 S.Ct. at 2224; *Moore v. Gibson,* 195 F.3d 1152, 1168 (10th Cir. 1999) (internal citations omitted).

■■ We agree with the OCCA's ruling. The trial court retains great flexibility in conducting voir dire. *Mu'Min v. Virginia,* 500 U.S. 415, 427, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). The record indicates that all jurors removed for cause stated that they could not impose the death penalty, no matter what the evidence presented. Mr. Wilson points to no jurors who were removed simply because of a general disagreement with the death penalty. Nor has Mr. Wilson highlighted some other form of prejudice, such as providing an example of how the initial questions might have skewed the jurors' answers about their ability to apply the death penalty. Our own thorough review of the record has not shown any reason to believe that this occurred. We therefore affirm the district court's denial of relief.

### 2. Refusal To Conduct Individual Voir Dire

Mr. Wilson also argues that both his Sixth Amendment right to an impartial jury and his due process rights were violated by the trial court's refusal to conduct individual, sequestered voir dire. He claims that the group voir dire educated the jurors on what answers would automatically result in their removal from jury service. The OCCA found "no evidence that the potential jurors were anything but candid in their answers to the trial court's questioning," and so there was no error. *Wilson I,* 983 P.2d at 459. The district

court agreed. *Wilson III*, 2006 WL 2289777, at \*39.

A defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). There is no absolute constitutional right to individual voir dire in capital cases, *Trujillo v. Sullivan*, 815 F.2d 597, 606–07 (10th Cir.1987); *McCorquodale v. Balkcom*, 721 F.2d 1493, 1496 (11th Cir.1983) (en banc), but the method of voir dire must comport with due process requirements, *Trujillo*, 815 F.2d at 607. "An exercise of discretion to deny sequestered voir dire ... may comport quite easily with due process under the specific circumstances, whereas that same exercise of discretion may offend notions of fairness" in another setting. *Id.* "There may be a case where *en masse* death-qualifying voir dire may be so egregious and may so taint the jury that the process denies the defendant his constitutional right to an impartial jury." *Id.* We might be concerned, for example, if a juror stated in front of other venire members that he was aware that the defendant had been arrested in another state for some heinous crime; *Byrd v. Armontrout*, 880 F.2d 1, 11 (8th Cir.1989) (finding, however, that this questioning was harmless error); or if a juror expressed his opinion on guilt or innocence, formed because of pre-trial publicity, thereby tainting the entire venire, *United States v. Tegzes*, 715 F.2d 505, 508 (11th Cir.1983) (same).

Mr. Wilson has failed to show that his voir dire was so "egregious" that it violated his due process rights. *Trujillo*, 815 F.2d at 607. Though the trial court conducted an *en masse* voir dire in front of a venire of sixty jurors, Mr. Wilson has not shown any evidence of prejudice resulting from that process. *See Kilgore v. Bowersox*, 124 F.3d 985, 994 (8th Cir.1997) ("[T]here is no indication in the record that group questioning of potential jurors was insufficient, or that the composition of the jury would have been different. . . ."); *United States v. Rezaq*, 134 F.3d 1121, 1140 (D.C.Cir.1998) ("Although the collective voir dire is not ordinarily the instrument of choice for discerning the impartiality of jurors," sometimes, general questions to the jury are an appropriate way to root out bias.). Lacking such evidence of prejudice, we find that the decision of the OCCA was not contrary to, or an unreasonable application of, clearly established law.

## V. Claims of Error in the Guilt Phase

### A. Dual Jury Procedure

Mr. Wilson claims that the use of the dual juries during his trial with codefendant Darwin Brown violated his rights under the Sixth, Eighth, and Fourteenth Amendment. He argues that the use of the dual jury procedure is structural error; in the alternative, he contends that the procedure prejudiced his defense and that the prejudice was not harmless. Before we determine whether a dual jury procedure is amenable to harmless error analysis, however, we must determine if there was any error at all. *See Bland v. Sirmons*, 459 F.3d 999, 1009–10 (10th Cir. 2006); *Turrentine v. Mullin*, 390 F.3d 1181, 1189 (10th Cir.2004). The OCCA found that there was no error in the use of the dual jury procedure, *Wilson I*, 983 P.2d at 456–58, and the district court agreed. *Wilson III*, 2006 WL 2289777, at \*6–7.

Because a great deal of the evidence pertained to both Mr. Wilson and Mr. Brown, the two were tried jointly with two separate juries assigned each to one defendant. Each was represented by separate counsel. Both juries sat in the jury box together and the state presented the evidence against both defendants simultaneously. When evidence admissible only

against or in favor of one defendant was introduced, the court removed the other jury from the courtroom. *See* Tr. trans. 2/3/97, 3–6; *Cohee v. State*, 942 P.2d 211, 213 (Okla.Crim.App.1997); *see also Beam v. Paskett*, 3 F.3d 1301, 1302 (9th Cir.1993) (reversed on other grounds) (describing the dual jury procedure). In order to facilitate this, Mr. Wilson's counsel was required to inform the court whenever he was about to present a defense or evidence antagonistic to Brown so that the court could remove Brown's jury.

The dual jury procedure is not without problems. Dual jury trials require counsel to guard against prejudicial evidence that might be entered against another defendant, drawing the lawyer's attention away from his own client. This increases the already difficult job of the capital defense lawyer. Additionally, constantly removing a jury from the room interrupts the flow of trial and can confuse the jury. Jury management difficulties increase two-fold. *Scarborough v. State*, 50 Md.App. 276, 437 A.2d 672, 674–75 (Spec.App.1981); *see also United States v. Rimar*, 558 F.2d 1271, 1273 (6th Cir.1977); *State v. Corsi*, 86 N.J. 172, 430 A.2d 210, 213 (1981) ("[T]he multiple jury procedure … can involve substantial risks of prejudice to a defendant's right to a fair trial."). Our role as an appellate court, however, is not to determine what would have been the optimal procedure, but rather, to determine whether there has been a constitutional violation. Mr. Wilson's argument that the dual jury procedure is unconstitutional is precluded by this Court's recent decision in *Brown v. Sirmons*, 515 F.3d 1072, 1078–79 (10th Cir. 2008) (finding no error in the use of the dual jury procedure).

Moreover, many of the potential harms from a dual jury procedure, including the inadvertent introduction of prejudicial evidence against one defendant, are also present and possibly magnified in a trial where the defendants are tried jointly. "In joint trials without dual juries, defense counsel and defendants often wind up at the same counsel table." *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir.1999) (en banc). Though the jury is instructed that at times they may have to consider evidence against one defendant but not against the other, "there might be some rub off." *Id.* Yet the Supreme Court has expressed a preference for joinder. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The use of a dual jury system may very well be a reasonable response to prejudicial joinder, as it recognizes the court's interest in efficiency while mitigating the prejudice inherent in joint trials by diminishing the amount of inadmissible evidence a jury hears. *See Lambright*, 191 F.3d at 1186; *Smith v. DeRobertis*, 758 F.2d 1151, 1152 (7th Cir. 1985) ("[T]he double-jury procedure may reduce the prejudice from being tried jointly with another—a form of prejudice usually held outweighed by the economies of joint trials."). Given the Supreme Court's continuing approval of joinder, we can scarcely conclude that the generally less problematic alternative of dual juries is categorically forbidden. Indeed, every federal appellate court that has considered a dual jury system has upheld the procedure. *See Lambright*, 191 F.3d at 1186 (finding no violation of due process or any other trial right in the use of dual juries in a capital case); *Smith*, 758 F.2d at 1152 (same); *United States v. Lewis*, 716 F.2d 16, 19 (D.C.Cir.1983) ("We accept the dual jury procedure so long as it comports with the ethos of due process commanded by our stringent rules of criminal justice."); *United States v. Hayes*, 676 F.2d 1359, 1366 (11th Cir. 1982) (rejecting a challenge to the use of multiple juries and noting that "neither [defendant] has alleged any more than a generalized possibility of harm").

Mr. Wilson cites several reasons why the dual jury procedure violated his constitutional rights. First, he contends that the dual jury procedure created a conflict of interest by requiring counsel to notify the judge in advance of potential prejudicial testimony. He cites no specific incidents where a conflict occurred. *Mack v. Peters*, 80 F.3d 230, 235 (7th Cir.1996) ("For [a dual jury] trial to be unconstitutional, a defendant tried in such a trial must show some specific, undue prejudice."). Mr. Wilson's counsel's sole duty to the court was to inform it of questions against Brown that were potentially prejudicial. And though this was an important duty, in the end, if he failed to fulfill it, Brown's counsel could object to any prejudicial information introduced against his client. *See Brown*, 515 F.3d at 1079. While Mr. Wilson's counsel had to inform the court in advance of potential prejudicial questions, his additional duty to the court did not diminish his presence at counsel table during all stages of the trial, nor did it prevent him from acting as counsel, as he was free to ask all questions and present all evidence. Whatever minimal obligation he had did not materially limit his ability zealously to represent Mr. Wilson. The defendant invokes *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), but that was a far different case. In *Holloway*, a single attorney represented three co-defendants despite having confidential information from one adverse to the others, which limited his representation; the Court naturally presumed prejudice from that egregious situation. Nothing in the dual jury procedure rises to that level.

Second and more specifically, Mr. Wilson argues that defense counsel was loathe to remove the jury and cause a spectacle, and therefore refrained from cross-examining some of the government's witnesses.

We note that Mr. Wilson has not identified any specific information that might have been, but was not, elicited from a proper cross-examination of any witnesses. Additionally, we are slightly puzzled by why counsel would elect not to cross-examine important witnesses, given that the trial court gave "careful and meticulous ... instructions," *Brown*, 515 F.3d at 1078, informing the juries that they would at times leave the courtroom, and that they could "not attempt to draw any inference, or come to any conclusions, or guess at what evidence may be presented or is being presented at the time when they were outside of the courtroom." *Wilson I*, 983 P.2d at 457. We are aware that cautionary instructions cannot entirely eliminate juror suspicion, but we cannot imagine why a reasonable counsel would have refrained from cross-examining key witnesses under those circumstances.

Mr. Wilson also claims that the dual jury system resulted in improperly admitted evidence about Yost's death on the theory that because he was not in the back room while the beating occurred, details of the event were not relevant to his case. This argument borders on the absurd. The government tried Mr. Wilson for felony murder and for first degree malice murder; the government's theory was that Mr. Wilson helped plan Yost's murder two weeks prior to the robbery and that the murder occurred in furtherance of the robbery of which Mr. Wilson was an integral part. Details of the victim's death were relevant.

Because we find no error, we do not reach Mr. Wilson's claim that the dual jury procedure is structural error, though we note that this Court recently rejected this argument when made by Mr. Wilson's co-defendant. *Brown*, 515 F.3d at 1078–79. We would be bound to reach the same conclusion here.[5]

5. Mr. Wilson also argues that because at the time of his trial the Oklahoma Constitution

### B. Introduction of DNA Evidence and Lack of Daubert Hearing

██ During the guilt phase, the state introduced the results of a Polymerase Chain Reaction (PCR) test performed on blood stains found on various pieces of evidence, including the black aluminum baseball bat, shoes, sweatpants, a QuikTrip jacket, a Nike jacket, a paper bag, a latex glove, and a steering wheel. Tr. trans. 2/12/97 at 257. As the state's expert, Cindy Brown, a criminalist with the Oklahoma State Bureau of Investigation, ("OSBI"), explained, the PCR test is a method used to replicate DNA which can then be typed.[6] *United States v. Beasley,* 102 F.3d 1440, 1445 (8th Cir.1996); David H. Kaye & George F. Sensabaugh, Jr., *Reference Guide on DNA Evidence,* in Reference Manual on Scientific Evidence 485, 493 n. 32 (2d ed.2000); *see also* Tr. trans. 2/12/97, at 263–270. The PCR tests demonstrated that Yost's blood was on all of those items. Tr. trans. 2/12/97, at 260.

Mr. Wilson argues that the admission of the PCR DNA test results without a *Daubert* hearing violated his Eighth and Fourteenth Amendment rights. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579,

113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). He also argues that the State did not lay the proper foundation to admit this evidence, nor did it properly lay the foundation to qualify its expert witness. Defense counsel did not make these objections at trial. The OCCA found that the use of the PCR test did not amount to plain error. *Wilson I,* 983 P.2d at 460–61. The district court affirmed. *Wilson III,* 2006 WL 2289777, at *16.

██ "As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence...." *Moore v. Marr,* 254 F.3d 1235, 1246 (10th Cir.2001) (internal citations omitted). Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court on habeas review will not disturb the state court's evidentiary ruling unless it was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir.2000) (quoting *Williamson v. Ward,* 110 F.3d 1508, 1522 (10th Cir.1997)); *Milone v. Camp,* 22 F.3d 693, 702 (7th Cir. 1994). Because *Daubert* does not set any

did not explicitly permit a dual jury system and the OCCA had not yet authorized the procedure, he was deprived of his due process right to a trial by one jury. *See Cohee v. State,* 942 P.2d 211 (Okla.Crim.App.1997) (authorizing the procedure in 1997). State statutes "may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment," even when those rights would not exist independent of the statute. *Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). However, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). A state court's interpretation of its own statute governs. The OCCA, in an "Extraordinary Writ" action brought by Brown, held that the trial court had discretion to implement a dual jury pro-

cedure because the Oklahoma Constitution did not prohibit it. *Wilson,* 983 P.2d at 456. Under *Estelle,* we do not disturb this ruling.

6. PCR analysis uses a heating process to replicate the one percent of DNA strands which exhibit genetic variation within the population. When the hydrogen bonds that join complementary strands of DNA are heated, they separate, or "denature." A denatured DNA strand "forms a template that allows the manufacture of a new strand that is identical to the former complementary strand." *Beasley,* 102 F.3d at 1445–46. Through a process by which free nucleotides are added to each denatured strand, new, identical strands of a DNA-sequence are created. Eventually, a sufficiently large sample is created and the investigator can determine the sample's gene type. *Id.*

specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the PCR test rendered the trial fundamentally unfair. *Milone*, 22 F.3d at 702; *see also Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir.1998).

The introduction of this evidence did not violate traditional notions of due process. Numerous federal and state courts as well as scientific investigators have found that PCR DNA analysis is reliable. *See, e.g., United States v. Wright*, 215 F.3d 1020, 1027 (9th Cir.2000); *United States v. Shea*, 159 F.3d 37, 41 (1st Cir.1998); *United States v. Lowe*, 145 F.3d 45, 51 (1st Cir. 1998); *Beasley*, 102 F.3d at 1448; *United States v. Hicks*, 103 F.3d 837, 844–45 (9th Cir.1996); *State v. Hill*, 257 Kan. 774, 895 P.2d 1238, 1246–47 (1995); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739, 743 (1997); George Bundy Smith & Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Courts*, 65 Fordham L.Rev. 2465, 2470 (1997) (noting that PCR analysis "has received overwhelming acceptance in the scientific community and the courts."). Mr. Wilson has offered no reason to believe these holdings were in error.

Mr. Wilson's claim that Cindy Brown was unqualified to testify as a DNA expert is similarly meritless. She had worked as a criminalist with OSBI for seven and a half years. She holds a Bachelor of Science in chemistry and received training in DNA testing from OSBI and from the FBI. Before Mr. Wilson's trial, she had testified in about a dozen other trials, six times as a DNA analyst. Mr. Wilson has not demonstrated any error in the admission of Ms. Brown's testimony, "much less that the admission of the ... evidence rendered the proceeding fundamentally unfair." *Fox*, 200 F.3d at 1297.

## C. Introduction of DNA Evidence In Violation of Oklahoma's Discovery Code

Okla. Stat. Ann. tit. 22, § 2002 provides that, upon request from defense counsel, the state shall disclose, at least ten days prior to the start of trial, "the names and addresses of witnesses which the state intends to call at trial" with their statements or summaries thereof, along with results of scientific tests or experiments and tangible objects which the prosecution intends to use at trial. Mr. Wilson contends that the trial court violated his constitutional rights when it admitted evidence, specifically, the PCR DNA results, in violation of the Oklahoma discovery code, because the district attorney did not inform him ten days in advance of the presence of the DNA evidence.

"Because federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), we construe Mr. Wilson's claim to allege that the late notice deprived him of his ability to provide a proper defense. Though not entirely clear, he also seems to argue that the admission of the DNA evidence in contravention of the Oklahoma Discovery Code violated a specific, protected liberty interest created by state law. *See Vitek v. Jones*, 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). The OCCA rejected this claim, finding that the defendant had been given the notice required under the discovery code. *Wilson I*, 983 P.2d at 461. The district court affirmed, *Wilson III*, 2006 WL 2289777, at * 17–18, and we agree.

First, Mr. Wilson has not shown that the Oklahoma Discovery Code creates a protected liberty interest, *compare with Vitek*, 445 U.S. at 488, 100 S.Ct. 1254, and even if it did, we agree with the OCCA's assessment that proper notice was given. On

July 16, 1996, defense counsel filed a motion for discovery requesting all physical evidence. On January 24, 1997, ten days prior to trial, the District Attorney informed counsel that the entire file was available for him at the office. Defense counsel, however, failed to pick up the file until Monday, January 27, 1997. Defense counsel was unaware of the fact that the DNA evidence existed only because of his own negligence, and we therefore find no violation of the prosecution's obligations under the Code.

■ Second, while "[a] defendant's right to notice of the charges against which he must defend is well established," there is no clearly established constitutional right to non-exculpatory discovery. *Gray v. Netherland*, 518 U.S. 152, 167–68, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). So long as Mr. Wilson had a meaningful "opportunity to deny or explain," *Gardner v. Florida*, 430 U.S. 349, 361, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), there is no clearly established due process violation. *Gray*, 518 U.S. at 169–70, 116 S.Ct. 2074. 28 U.S.C. § 2254 thus prohibits us from finding error here. Mr. Wilson knew about the DNA evidence before trial and heard about it in open court during the trial, and so he was free to contest it; additionally, he has shown no evidence of prejudice— for example, that defense counsel tried to hire an expert but was unable to do so because of the short notice. Because Mr. Wilson has failed to show that the admission was so prejudicial that it fatally infected the trial, we must deny this claim. *Fox*, 200 F.3d at 1296.

### D. Second Degree Murder Instruction

Mr. Wilson next argues that the trial court erred when it refused to instruct on the lesser included offense of second degree felony murder. We recently denied a similar claim in *Brown*, 515 F.3d at 1085–86, and we do the same here.

Under *Beck v. Alabama*, "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. 625, 627, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Mr. Wilson must demonstrate that "he presented sufficient evidence to warrant" a lesser included instruction. *Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir.1999). He must also show that "the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder." *Young v. Sirmons*, 486 F.3d 655, 670 (10th Cir.2007); *Hooks v. Ward*, 184 F.3d 1206, 1223–29 (10th Cir.1999).

■ Mr. Wilson claims that he presented sufficient evidence at trial to warrant a jury instruction on second degree felony murder. A person commits first degree felony murder when he "takes the life of a human being during, or if the death of a human being results from, the commission or attempted commission of [certain listed felonies, including] ... robbery with a dangerous weapon...." Okla. Stat. tit. 21, § 701.7(B). Homicide is murder in the second degree when it is "perpetrated by a person engaged in the commission of any felony other than the unlawful acts" set out in § 701.7. 21 Okla. Stat. tit. 21, § 701.8(2). Second degree felony murder encompasses murder committed during a robbery by force or fear, which is *not* an enumerated felony in the first degree murder statute. *See Brown*, 515 F.3d at 1086.

■ The use of the weapon is what distinguishes robbery by force or fear from robbery with a dangerous weapon: "once the state has established that a defendant used a dangerous weapon in the

course of a robbery that results in death, the offense of second degree murder is no longer an option under Oklahoma law." *Fowler v. Ward,* 200 F.3d 1302, 1309 (10th Cir.2000) *overruled on other grounds by Moore v. Marr,* 254 F.3d 1235, 1239 (10th Cir.2001); *see also Brown,* 515 F.3d at 1086; *Hatch v. Oklahoma,* 58 F.3d 1447, 1454 (10th Cir.1995) *overruled on other grounds by Daniels v. United States,* 254 F.3d 1180, 1188 n. 1 (10th Cir.2001).

Nonetheless, Mr. Wilson argues that a second degree instruction was appropriate because the perpetrators brought a dangerous weapon—the baseball bat—into the QuikTrip only after they subdued Yost, and thus it was not used to effectuate the robbery. Mr. Wilson also asserts that he did not have the requisite intent to kill with a dangerous weapon because he was not present in the back room when Yost was beaten to death. The OCCA rejected both versions of the argument, stating that "[i]n this case, the evidence clearly showed that the victim was beaten to death with a baseball bat, a dangerous weapon which was used to complete the robbery.... There was no evidence other than the evidence that a dangerous weapon was used to commit the robbery. Accordingly, we find no error." *Wilson I,* 983 P.2d at 463; *see also Wilson III,* 2006 WL 2289777, at *21 (affirming).

The evidence, as found by the OCCA, demonstrates that the bat was used during the course of the robbery. We afford this finding a presumption of correctness unless it is rebutted by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), a high burden which Mr. Wilson has not met. It is impossible to disaggregate the robbery from the murder. Mr. Wilson stood behind the counter at the QuikTrip, attempting to pull out the safe, as the other codefendants murdered Yost, the sole witness to the robbery, with the bat. Additionally, Mr. Wilson confessed that the

group planned to kill Yost as part of the robbery. The OCCA's decision was not contrary to federal law, nor was it an unreasonable application of the facts to that law. *See Brown,* 515 F.3d at 1086.

## VI. Claims of Error in the Sentencing Phase

Mr. Wilson raises several issues regarding evidence introduced by the state at the sentencing stage in support of aggravating factors. Before a death sentence is imposed in Oklahoma, the sentencer must find, beyond a reasonable doubt, the existence of at least one statutorily defined aggravating factor, and then must further find that the applicable aggravating factors outweigh any mitigating circumstances. Okla. Stat. tit. 21, § 701.11. At the penalty phase of Mr. Wilson's proceedings, the prosecution attempted to prove three aggravating circumstances: (1) that the murder was especially heinous, atrocious, or cruel; (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) that it was probable that the defendant would commit criminal acts of violence in the future that would constitute a continuing threat to society. In response, Mr. Wilson presented mitigating evidence, seeking to avoid a sentence of death. The jury found the existence of all three aggravators beyond a reasonable doubt and recommended a sentence of death. The judge sentenced Mr. Wilson to death. *See generally Turrentine v. Mullin,* 390 F.3d 1181, 1195 (10th Cir.2004).

### A. Heinous, Atrocious, or Cruel Aggravator

In his first sentencing stage claim, Mr. Wilson argues that the state offered insufficient evidence to support the jury's finding that the murder was especially heinous, atrocious, or cruel ("HAC"), and that

he was a major participant in the infliction of such suffering. He also challenges the constitutionality of the aggravator. Mr. Wilson presented these claims to the OCCA and to the district court and was denied relief. *Wilson I*, 983 P.2d at 465; *Wilson III*, 2006 WL 2289777, at \*25–30.

### 1. Sufficiency of the Evidence that the Murder Was Especially Heinous, Atrocious, or Cruel

■ Mr. Wilson argues that there was insufficient evidence at trial to prove the "heinous, atrocious, or cruel" aggravator. In a sufficiency of the evidence claim on habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "This standard reflects our system's longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial." *Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir.2004). Our review is "sharply limited," and when there are conflicting facts in the record that permit disparate inferences, the Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 1197 (quoting *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir.1996)).

Mr. Wilson specifically argues that there was insufficient evidence to show that the murder was preceded by torture or serious physical abuse, at least one of which is required to prove the heinous, atrocious, or cruel aggravator. *See Stouffer v. State*, 742 P.2d 562, 563 (Okla.Crim.App.1987). He particularly emphasizes that there was insufficient evidence of conscious physical suffering.

■ We look to Oklahoma law to determine the substantive elements of the "heinous, atrocious, or cruel" aggravating circumstance. *Valdez v. Bravo*, 373 F.3d 1093, 1097 (10th Cir.2004). This aggravator "requires proof that the death was preceded by torture or serious physical abuse." *Lott v. State*, 98 P.3d 318, 358 (Okla.Crim.App.2004). Torture or serious physical abuse "may take any of several forms":

> Torture may include the infliction of either great physical anguish or extreme mental cruelty ... [it] must be the result of intentional acts by the defendant ... [and] must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created. The length of time which the victim suffers mental anguish is irrelevant.

*Berget v. State*, 824 P.2d 364, 373 (Okla. Crim.App.1991). Physical abuse requires evidence of "conscious physical suffering." *Romano v. Gibson*, 239 F.3d 1156, 1176 (10th Cir.2001); *Medlock v. Ward*, 200 F.3d 1314, 1321 (10th Cir.2000). The OCCA has also stated that there are no "specific, uniform criteria, applicable to all murder cases, which would make the application of the 'heinous, atrocious, or cruel' aggravator a mechanical procedure." *Robinson v. State*, 900 P.2d 389, 401 (Okla. Crim.App.1995). "Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved." *Id.* We engage in a case by case inquiry. *Turrentine*, 390 F.3d at 1197–98.

> The OCCA held that:
> The medical examiner testified that the first blow by the baseball bat could have rendered Yost unconscious. However, before the baseball bat was ever intro-

duced into the attack, Yost was attacked and dragged into the back room by his four assailants. Yost screamed for help while the bat was being retrieved from the car. Obviously he was being restrained at that time by Wilson and another defendant. Yost suffered injuries to his hands, arguably coming from the blow from the bat, indicating defensive wounds. There was a piece of metal from the handcuff imbedded in Yost's head indicating that he had his hands between his head and the bat. In the surveillance tape noises can be heard during the attack after the baseball bat was taken to the cooler where Yost was being held. Once the bat arrived, it is possible that Yost was struck and rendered unconscious with one blow. However, we find that before the bat was brought into the attack, Yost had suffered the extreme mental anguish of being held captive, knowing that his ultimate fate rested in the hands of his attackers whom he could identify if left to live.

. . . .

There is ample evidence of the extreme mental anguish suffered by Yost prior to his death. This evidence illustrates the realization by Yost that he was going to be harmed and even killed by the gang of robbers who had overpowered him and dragged him into a back room.

*Wilson I,* 983 P.2d at 464–65; *see also Wilson III,* 2006 WL 2289777, at *28.

This Court addressed essentially the same argument in the case of Mr. Wilson's co-defendant, and concluded that, viewed in the light most favorable to the state, there was sufficient evidence that Mr. Yost suffered both physical anguish and extreme mental abuse while conscious. *Brown,* 515 F.3d at 1090. We do not reach a different conclusion. Yost's screams from the back room are audible on the videotape—proof of consciousness. Addi-

tionally, Yost was attacked, dragged into the back room, bound, and handcuffed. The fact that Yost's killers "bound his arms and legs is evidence in this case that he was conscious during at least part of the attack; there would be no need to bind a dead person. . . ." *Romano,* 239 F.3d at 1176–77. There were defensive wounds on Yost's hands, fingers, and wrists, and the autopsy revealed a hinge from the handcuffs embedded in his scalp, suggesting Yost had raised his hands in a defensive posture. Tr. Trans. 2/13/1997, at 30, 37. This too supports an inference that Mr. Yost did not lose consciousness immediately upon the attack. *See Brown,* 515 F.3d at 1090; *Woodruff v. State,* 846 P.2d 1124, 1147 (Okla.Ct.Crim.App.1993). But even assuming that Yost was rendered unconscious by the first blow of the bat, he was a victim of physical abuse before the bat struck his head.

Likewise, there is evidence of extreme mental anguish. "Evidence that the victim was conscious and aware of the attack supports a finding of [mental] torture." *Jones v. Gibson,* 206 F.3d 946, 953 (10th Cir.2000); *see also Hamilton v. Mullin,* 436 F.3d 1181, 1195 (10th Cir.2006). The " '[a]nalysis must focus on the acts of the defendant toward the victim and the level of tension created.' " *Hamilton,* 436 F.3d at 1195 (quoting *Cheney v. State,* 909 P.2d 74, 80 (Okla.Crim.App.1995)). This is not a case where the perpetrators entered the QuikTrip and immediately killed Yost. The four surrounded Yost, attacked him, dragged him into the backroom, and bound him. Two exited while the other two remained, retrieved a baseball bat, and returned to the room with the bat. We agree with the OCCA that before the bat was even brought into the attack, "Yost had suffered the extreme mental anguish of being held captive, knowing that his ultimate fate rested in the hands of his attackers whom he could identify if left to

live." *Wilson I*, 983 P.2d at 465; *Hamilton,* 436 F.3d at 1196. While this evidence does not compel an inference of mental torture, it permits it. We agree with the district court that the OCCA's determination was not an unreasonable application of clearly established Supreme Court law.

### 2. Sufficiency of the Evidence that Mr. Wilson Was a Major Participant

█ Mr. Wilson also contends that, even if there is sufficient evidence that the heinous, atrocious, or cruel aggravator should apply to Yost's murder, there is insufficient evidence to indicate that he himself participated in the beating, that he attempted to kill Yost, or that he intended to kill Yost, as the Supreme Court requires before applying capital punishment. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Therefore, he argues, the aggravator is inapplicable to him.

Under *Enmund* and its progeny, when the defendant did not himself strike the blows that killed the victim, in order to be eligible for the death penalty he must either have intended to kill or have been a major participant in the felony who acted with a reckless indifference to human life. *Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). "The central concern of the *Enmund/Tison* line of Supreme Court cases is whether a conviction for felony murder contains an adequate determination of defendants' culpability such that imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment." *Workman v. Mullin,* 342 F.3d 1100, 1110 (10th Cir.2003). On the other hand, the *Tison* court made clear that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital

sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." 481 U.S. at 157–58, 107 S.Ct. 1676.

The OCCA rejected Mr. Wilson's claim, stating:

In the second portion of this proposition, Wilson claims that the especially heinous, atrocious, or cruel aggravator does not apply to him because he did not inflict the serious physical abuse, nor did he intend that such abuse be inflicted. Wilson, citing *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), correctly claims that, in a felony murder prosecution, the State must at least show that the accused substantially participated in the killing.

. . . .

The evidence that Wilson substantially participated in the killing is clear. Wilson was involved in the initial subduing of Yost. He admitted that he knew that Yost would be killed. Wilson even supplied the bat used to beat Yost to death. He was present in the back room when the bat was brought in by Harjo. He was present when sounds of the first blow can be heard on the audio/videotape. He had to know that a beating with a baseball bat would cause serious conscious physical suffering and death.

*Wilson I*, 983 P.2d at 465. The district court affirmed, holding that "[a]s in *Tison,* Petitioner was, at the least, actively involved in the underlying felony of robbery. He helped subdue Yost, and was physically present during the entire sequence of criminal activity culminating in the murder of Yost and the subsequent flight by Petitioner and his co-defendants." *Wilson III,* 2006 WL 2289777, at *29.

Because this is a sufficiency of the evidence claim, we must determine whether any rational trier of fact could have found that Mr. Wilson had the requisite culpabili-

ty. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. There is ample evidence demonstrating that Mr. Wilson intended for lethal force to be employed. *See Fox v. Ward*, 200 F.3d 1286, 1294 (10th Cir.2000). Detective Folks testified at trial that Mr. Wilson admitted the group made the decision to kill Yost about two weeks before the robbery occurred. Additionally, Mr. Wilson did not just serve as a "look-out," as in *Enmund;* he was a "major participant," as he assisted in the robbery's planning, subdued Yost, and was active throughout the entire robbery. He was even in the back room when Harjo and Alverson brought in the bat, and, according to the video, when the parties began hitting Yost with the bat. *See Tison*, 481 U.S. at 158, 107 S.Ct. 1676. Continuing with the robbery despite the knowledge that Yost would likely be killed evidences the reckless behavior required by *Tison. Id.* The OCCA's determination was not an unreasonable application of clearly established law.

### 3. Constitutionality of the Heinous, Atrocious, or Cruel Aggravator ·

Finally, Mr. Wilson claims that the heinous, atrocious, or cruel aggravator was unconstitutional as applied because the jury instruction did not require a finding of "consciousness," though it did require the jury to conclude that there was "torture or physical abuse." R. Vol. II, Box 2, Jury Instruction 6, CR 4–73, at 370. Therefore, it did not sufficiently narrow the class of defendants eligible for the death penalty.

 To be acceptable under the Eighth Amendment, the aggravating circumstance must furnish a sentencer with a principled means of guiding its discretion. *See Maynard v. Cartwright*, 486 U.S. 356, 361–64, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Tenth Circuit has routinely upheld the constitutionality of the heinous,

atrocious, or cruel aggravator so long as it includes the "torture or serious physical abuse" limitation. *See, e.g., Workman*, 342 F.3d at 1115; *Romano*, 239 F.3d at 1176; *Thomas*, 218 F.3d at 1226; *Medlock*, 200 F.3d at 1319; *Moore*, 195 F.3d at 1175–76; *Smallwood*, 191 F.3d at 1274. Nonetheless, Mr. Wilson argues that because the jury instruction did not include the "conscious suffering" requirement imposed by the Oklahoma courts, the aggravator was unconstitutionally vague.

His argument is foreclosed by *Workman.* The *Workman* Court approved a jury instruction stating "[t]he phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse." 342 F.3d at 1116. This is the same language used in Mr. Wilson's case. *See also Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Hatch v. Oklahoma*, 58 F.3d 1447, 1468–69 (10th Cir.1995) *overruled on other grounds by Moore v. Marr*, 254 F.3d 1235 (10th Cir.2001).

Even if the jury instruction did not sufficiently narrow the jury's discretion, the state court can also perform this narrowing function on review. *Walton*, 497 U.S. at 654, 110 S.Ct. 3047. Here, the OCCA found that there was torture in the form of extreme mental anguish, which ensured that the aggravator was not unconstitutionally vague. Mr. Wilson argues that *Ring*, 536 U.S. at 589, 122 S.Ct. 2428, requires a jury to perform this narrowing. Whatever the merits of this argument in the future, *Ring* does not apply retroactively and so is inapplicable to his case.

### B. Continuing Threat Aggravator

Mr. Wilson makes several claims related to the continuing threat aggravator. To

establish that Mr. Wilson had a pattern of criminal conduct likely to continue in the future and was a "continuing threat," the state offered evidence that on February 16, 1995, ten days prior to Yost's murder, police discovered a loaded .25 caliber automatic pistol in Mr. Wilson's car when he was pulled over for speeding. Additionally, the state offered evidence of Mr. Wilson's prior conviction for accessory after the fact to murder. In 1994, Mr. Wilson was charged with and pled guilty to assisting in a drive-by shooting when he held the gun after the crime occurred; the state also produced evidence that he provided the ammunition used on the day of the murder. *Wilson I*, 983 P.2d at 466.

### 1. Constitutionality of the Continuing Threat Aggravator

Mr. Wilson first challenges the constitutionality of the continuing threat aggravator. Under Oklahoma law, this aggravator requires "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Okla. Stat. Ann. tit. 21, § 701.12(7). He claims that this is vague and overbroad because it does not perform the appropriate narrowing function. This claim is foreclosed by our Circuit's precedent. We have repeatedly upheld the constitutionality of this aggravator. *See, e.g., Sallahdin v. Gibson*, 275 F.3d 1211, 1232 (10th Cir. 2002); *Medlock*, 200 F.3d at 1319–20; *Nguyen v. Reynolds*, 131 F.3d 1340, 1353–54 (10th Cir.1997). Mr. Wilson offers no reasons for us to deviate from our prior precedent, and we decline to do so today.

### 2. Admission of Defendant's Incriminating Statements

In support of the continuing threat aggravator, the State offered testimony by Sergeant Samuel McCullough. Sergeant McCullough testified that on February 16, 1995, ten days prior to Yost's murder, he pulled over Mr. Wilson, along with co-defendant Brown, for speeding. McCullough asked Mr. Wilson to exit the car and provide identification; because he had no identification, McCullough ordered him to sit in the patrol car. The officer asked Mr. Wilson who he was and if he had an arrest record. Mr. Wilson identified himself and told Sergeant McCullough that he had been arrested in a double homicide in October of 1994 and was awaiting sentencing on a lesser charge of accessory to murder. When McCullough asked if there were any guns or drugs present in the vehicle, Mr. Wilson offered "[n]o, you can look if you want to." Tr. Trans. 2/18/97 at 55. During the consensual search of the vehicle, McCullough noticed a black aluminum baseball bat laying between the seats and a loaded .25 caliber automatic pistol under the passenger seat. *Id.* at 56. Mr. Wilson was arrested for transporting a loaded firearm. At no point did Mr. Wilson receive *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state offered this evidence to show that Mr. Wilson exhibited a pattern of violent activity and would be a continuing threat in the future.

Mr. Wilson argues that because he did not receive any *Miranda* warnings, his statements to Sergeant McCullough were inadmissible. He also argues that McCullough's testimony about the gun and baseball bat was inadmissible, because his consent to search the car was given during an illegal interrogation and was therefore not voluntary; the weapons should have been excluded as fruits of this illegal interrogation.

At trial, defense counsel objected to the admission of these statements because he believed they were irrelevant to the continuing threat aggravator, not because of the lack of the *Miranda* warning. Accordingly, the OCCA reviewed the *Miranda*-

based claim for plain error and found that "Wilson was not in custody for purposes of *Miranda* and that the consent to search was voluntary." *Wilson I,* 983 P.2d at 464. The district court affirmed this decision. *Wilson III,* 2006 WL 2289777, at \*22–23.

"It is well established that 'police officers are not required to administer *Miranda* warnings to everyone whom they question.'" *United States v. Erving L.,* 147 F.3d 1240, 1246 (10th Cir.1998) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Rather, police officers must only advise individuals of their *Miranda* rights when they are subject to "custodial interrogation." *Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602. Because of the "nonthreatening character" of traffic stop detentions, "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

Mr. Wilson was subject to a routine traffic stop. We find nothing in the record, and Mr. Wilson has pointed to nothing in the record, indicating that "at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest," triggering the need for *Miranda* warnings. *Berkemer,* 468 U.S. at 441, 104 S.Ct. 3138. The questioning was brief; Sergeant McCullough asked for Mr. Wilson's license and identification, and placed Mr. Wilson in the patrol car only after Mr. Wilson could not produce these documents. He then asked about Mr. Wilson's criminal history; once he discovered that Mr. Wilson was under investigation for a homicide, he asked whether there were any drugs or guns in the car. All of these questions are appropriate for a routine traffic stop so long as they do not prolong it excessively. *United States v. Stewart,* 473 F.3d 1265, 1269 (10th Cir.2007); *United States v.*

*Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998). We therefore find that the OCCA's determination was not an unreasonable application of *Miranda* and its progeny. There is no evidence suggesting that Mr. Wilson's consent was involuntary, and so the testimony about the "fruits" of that consent—the gun and the baseball bat— was not admitted in error.

### 3. Admission of Prior Conviction

Mr. Wilson also claims that the admission of his prior conviction for accessory after the fact to murder was in error. During the sentencing phase, the prosecutor presented evidence in support of the continuing threat aggravator that Mr. Wilson had been charged and convicted as an accessory after the fact in a 1994 drive-by shooting. Mr. Wilson argues that this conviction involved no act of violence and therefore had no "logical relationship to predictions of future dangerousness." Pet. Br. at 80.

To prove the continuing threat aggravator, the state must show that a particular defendant has a pattern of criminal conduct likely to continue in the future. *Douglas v. State,* 951 P.2d 651, 676 (Okla.Crim.App.1997). Under Oklahoma law, a nonviolent crime standing alone cannot be the basis for finding the continuing threat aggravator. *Torres v. State,* 962 P.2d 3, 23 (Okla.Crim.App.1998). However, a jury is free to consider "the defendant's nonviolent offenses in conjunction with other factors when determining whether the defendant poses a future risk to society." *Boltz v. Mullin,* 415 F.3d 1215, 1231 (10th Cir.2005). The state may introduce evidence of both adjudicated, and unadjudicated, conduct. *Id.* at 1230; *Hatch v. Oklahoma,* 58 F.3d 1447, 1465 (10th Cir.1995) *overruled on other grounds by Daniels v. United States,* 254 F.3d 1180, 1188 n. 1 (10th Cir.2001).

■ The OCCA held that while the basis for Mr. Wilson's conviction was that he possessed the gun used in a drive-by shooting, "the facts revealed that he may have been more involved in this drive-by shooting by providing ammunition for the gun on the day of the murder." *Wilson I*, 983 P.2d at 466; *see also* Tr. trans. 2/18/97, at 47. Mr. Wilson does not argue that this was an unreasonable interpretation of the facts, and we must assume that it is correct. 28 U.S.C. § 2254(e)(1). Because the OCCA affirmed the jury's finding based on facts other than simply the accessory after the fact—namely, that Mr. Wilson had provided ammunition for the shooting—the OCCA did not act contrary to federal law when it accounted for the conviction in its analysis of the continuing threat aggravator. *Boltz*, 415 F.3d at 1231.

### 4. Prejudicial Hearsay Testimony

Mr. Wilson contends that hearsay testimony introduced during the sentencing phase violated his Sixth Amendment confrontation rights. In support of the continuing threat aggravator, the state produced the testimony of Sergeant Mike Huff. Huff testified that, on September 11, 1994, Detective Gary Meek informed Huff that Wilson was "driving a vehicle which matched the description of the vehicle used in that homicide the previous night." Tr. trans. 2/18/97, at 33. As a result, Huff stopped Wilson when he spotted him driving. Mr. Wilson claims that Huff's repetition of what Meek told him was testimonial hearsay which violated his confrontation rights.

Reviewing for plain error, the OCCA rejected this claim, stating that "the answer was in response to questioning about why Huff was contacting Wilson. The answer was given, not for the truth of the matter asserted, but to explain why he was contacting Wilson." *Wilson I*, 983 P.2d at 465. The district court affirmed. *Wilson III*, 2006 WL 2289777, at *24.

■ The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). While its protections are strong, "[t]he [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n. 9, 124 S.Ct. 1354 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)); *see also Davis v. Washington*, 547 U.S. 813, 826–27, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *United States v. Williams*, 506 F.3d 151, 156 (2d Cir.2007).

First, Huff's statements were most likely not "testimonial hearsay evidence." " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c); Okla. Stat. tit. 12, § 2801(A)(3) (same). Huff's statement was not offered to prove the truth of the matter asserted, but instead, was offered to show Huff's motivation for stopping Mr. Wilson. Accordingly, there is no Confrontation Clause problem. *Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354; *United States v. James*, 487 F.3d 518, 525 (7th Cir.2007); *United States v. Trala*, 386 F.3d 536, 544 (3d Cir.2004).

Second, even if Huff's statement qualified as testimonial hearsay, we have recently stated that it is "far from clear" whether the Confrontation Clause even applies at capital sentencing proceedings. *United States v. Barrett*, 496 F.3d 1079, 1099 (10th Cir.2007) (quoting *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir.2003)); *United States v. Brown*, 441 F.3d 1330, 1361 (11th Cir.2006) (declining

to decide because statements were non-testimonial); *Szabo v. Walls,* 313 F.3d 392, 398 (7th Cir.2002) (the Confrontation Clause does not apply to capital sentencing). Given that this is habeas review, we can reverse only based on clearly established law as articulated by the Supreme Court. We deny Mr. Wilson's request for relief on this ground.

### C. Improper Admission of Victim Impact Evidence

Mr. Wilson contends that the testimony of Angela Yost, the victim's wife, and Alma Dorn, the victim's mother, which was offered as victim impact testimony during the sentencing phase of the trial, violated his right to due process under the Fourteenth Amendment. The OCCA denied this claim of error on appeal, *Wilson I,* 983 P.2d at 466–67, and the district court denied habeas relief on this claim. *Wilson III,* 2006 WL 2289777, at *39–40.

As is required by 22 Okla. Stat. Ann. tit. 22, § 984.1(C), the victim impact statements in written form were provided to the defendant in advance of sentencing. *See also Ledbetter v. State,* 933 P.2d 880, 894 (Okla.Crim.App.1997). Defense counsel objected to one sentence, which was removed. In court, Ms. Yost read her victim impact statement to the jury toward the end of the state's case in the sentencing phase. She began by describing how her life had changed since Yost's death and how she enjoyed cooking and ironing for her husband. After explaining the effect Yost's death had on herself and her two young sons, she stated "Richard was raised in a religion which did not recognize holidays or birthdays, so those times were very special to us. Christmas used to be very special, because Richard got so excited. Here was this 25–year old man who wanted toys for Christmas, because he never got them." Tr. trans. 2/18/97, at 167–68.

Following Ms. Yost's testimony, defense counsel asked to approach the bench and objected, as prejudicial, to a member of the Victim Witness Center's presence in the courtroom, as she had been crying. *Id.* at 168. The court removed the audience member. Counsel did not object to the testimony itself.

The state's final witness was Ms. Dorn. She testified, "[a]s a child, a young adult, Richard didn't give me any problems. He was maturing into a responsible adult, and an asset to our family and community. He had long-range plans of being better educated. He had gone to TJC for two years. He had gotten his real estate license, just set plans, hopes and dreams of taking care of his family." *Id.* at 170. She also discussed her son's plans to take care of her in her old age.

After Ms. Dorn completed her statement, the following colloquy transpired:

Mr. SMALLWOOD: [Mr. Brown's defense attorney] May we make a brief record, Your Honor?

THE COURT: Yes, sir.

MR. SMALLWOOD: Judge, comes now Defendant Brown and objects to the victim impact testimony as being far more prejudicial than relevant.

THE COURT: Overrule your objection, Mr. Smallwood. You had an opportunity to object to these victim impact statements. The Court eliminated one of the sentences that you didn't like of Ms. Yost's. I'll overrule it and overrule your motion for a mistrial.

*Id.* at 171.

Mr. Wilson asserts that this testimony was so highly emotional and unduly prejudicial that it rendered the trial fundamentally unfair in violation of the due process clause of the Fourteenth Amendment. *Payne v. Tennessee,* 501 U.S. 808, 825, 111

S.Ct. 2597, 115 L.Ed.2d 720 (1991). In *Payne*, the Court overruled portions of its decisions in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and held that the Eighth Amendment erects no per se bar to victim impact evidence. 501 U.S. at 827, 111 S.Ct. 2597. "A State may legitimately conclude," as Oklahoma has done, Okla. Stat. tit. 21 § 701.10(C), "that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* However, there will be some cases in which victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 825, 111 S.Ct. 2597.

Because Mr. Wilson's counsel did not object to the victim impact statements, the OCCA correctly reviewed this claim for plain error. It found that:

> In this case, Wilson complains about statements from the victim's wife stating she enjoyed cooking and ironing for the victim. This evidence is relevant to show the psychological, emotional and physical impact of the victim's death. Wilson complains about the victim's mother's statements that he had just received his real estate license and had plans for the future. The victim's mother also stated that the victim told her that he would take care of her in old age and for her not to worry about the future. These statements were relevant to show the financial and emotional impact of the crime itself on the victim's survivors. Wilson claims that the mother's statement was hearsay. Arguably the statement was not offered for the truth of the matter asserted, thus not hearsay. The statement was only offered to show that the victim's mother believed that the victim would take care of her financially in the future.

> The victim's wife testified that the victim was especially fond of Christmas holidays because he was raised in a family that did not celebrate Christmas. The victim's mother testified that she didn't have any problems with the victim as a child. Statements about a victim's childhood have no relevance in victim impact evidence. We find that these comments amounted to error, but they do not rise to the level of plain error, because they did not go to the foundation of the case, or take from Wilson a right essential to his defense.

*Wilson I*, 983 P.2d at 467 (internal citation omitted). Accepting the OCCA's conclusion that the testimony about the victim's childhood was highly emotional and replete with irrelevant information, we agree that it did not rise to the level of plain error. At the outset, "we note that [Mr. Wilson's] assertions of prejudice are undermined by his counsel's delay in challenging [the victim impact] statement[s]." *Short v. Sirmons*, 472 F.3d 1177, 1193 (10th Cir.2006). Counsel had a version of the statements prior to trial, and yet he failed to challenge their admission until after the statements were presented to the jury. *Id.* The requirement of timely objection applies with particular force in this context, when the defendant knows the content of the testimony in advance and could prevent any error from taking place; even an objection to the oral testimony would, if well taken, elicit a curative instruction. Additionally, we have found that far more inflammatory statements did not render the proceeding "fundamentally unfair." For example, in *United States v. Chanthadara*, 230 F.3d 1237, 1274 (10th Cir.2000), the victim's children ended their testimony in tears, and the husband supplied the jury with numerous color photos of the victim while she was alive. *Id.* In the jury room, the

jury viewed the letters the children had written to their dead mother and one child's daily journal describing his loss. *Id.* Despite the tremendous emotional effects of the evidence, this Court held that it was "not so unduly prejudicial as to render the defendant's trial fundamentally unfair." *Id.* at 1273; *see also Turrentine,* 390 F.3d at 1201 (victim's husband's statement that the murder was "brutal," and his request that the jury "let justice be done," did not render the proceeding fundamentally unfair); *Cargle v. Mullin,* 317 F.3d 1196, 1223–24 (10th Cir.2003) (lengthy and emotional statement from victim's sister and photographs of the victims while they were alive not unduly prejudicial). The victim impact statements here contained only a few short references to the victim's childhood. Overall, the statements were very brief, and while a person sitting in the courtroom broke down into tears, there is no evidence that either witness exhibited such an emotionally charged display as might be unduly prejudicial. *Compare with Chanthadara,* 230 F.3d at 1274. We cannot conclude that "[t]he irrelevant testimony regarding Mrs. Yost's enjoyment of cooking and ironing for the victim and involving Mr. Yost's childhood could ... have influenced the jury's finding" as to the aggravating factors, *Brown,* 515 F.3d at 1095, nor could it have prevented the jury from considering the mitigating evidence, *see Short,* 472 F.3d at 1195. The OCCA's application was neither contrary to, nor an unreasonable application of, *Payne,* so we deny habeas relief on this issue.

## VII. Claims Relevant to Both Stages

### A. Introduction of Irrelevant, Cumulative and Prejudicial Evidence

Mr. Wilson alleges that his constitutional rights guaranteed by the Eighth and Fourteenth Amendments were violated because of the introduction of irrelevant, cumulative, and prejudicial evidence, including gruesome photographs, videos of the crime scene, and weapons.

"Federal habeas review is not available to correct state law evidentiary errors; rather, it is limited to violations of constitutional rights." *Smallwood v. Gibson,* 191 F.3d 1257, 1275 (10th Cir.1999) (citing *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). When the habeas petitioner argues that evidence violated the Constitution, we consider "whether the admission of evidence ... so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano v. Oklahoma,* 512 U.S. 1, 12, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). The "Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing *Darden v. Wainwright,* 477 U.S. 168, 179–83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).

### 1. First Stage Evidence

We first address the photographs admitted during the trial's guilt phase. Specifically, Mr. Wilson argues that photographs of the victim's back and head in a pool of blood, a photograph of the victim's entire body face down on the floor, the back of the victim's shaved head, and an additional "grotesque" picture, were more prejudicial than probative. Pet. Br. at 48. The OCCA found that these photographs "aided the medical examiner in his explanation of the wounds to the victim and manner of death" and were "relevant to show the cause of death and the intent of the attacker." *Wilson I,* 983 P.2d, at 468. The district court affirmed. *Wilson III,* 2006 WL 2289777, at *34.

Our role on habeas review is a limited one. The photographs, while gruesome, are relevant to the case. They allowed the examiner to show where the baseball bat caused various injuries. Additionally, these photographs, depicting the extent of the injuries, are probative of the attacker's intent to kill. *See Willingham v. Mullin,* 296 F.3d 917, 928–29 (10th Cir.2002) (photographs relevant to the "critical element" of intent to kill at the penalty phase). Though analyzed in a slightly different context, the *Brown* Court also found that these photographs were relevant. *See Brown,* 515 F.3d at 1084 (analyzed under prosecutorial misconduct). Finally, the evidence at the guilt phase was particularly strong. We have carefully reviewed the record and the arguments and conclude that the admission did not make the proceeding fundamentally unfair. *See Thornburg v. Mullin,* 422 F.3d 1113, 1129 (10th Cir.2005) ("Reviewing the record under AEDPA's constraints, and in light of the probative value of the pictures, the gruesome nature of the crime, and the other evidence incriminating [the defendant]," the Court affirmed the OCCA's denial of relief.).

Mr. Wilson also contends that evidence of the money found on his co-defendants was irrelevant, as the police found no money on him. We cannot agree. Mr. Wilson is charged with robbery, and the state's theory was that he acted in tandem with the other three defendants. The money was relevant evidence of the joint robbery.

### 2. The Sentencing Phase

Mr. Wilson argues that photographs introduced in the sentencing phase were unduly prejudicial, particularly photos of the victim's bruised knuckles and lacerated ring finger, and photos of the right and left sides of the victim's face. The OCCA found that these were probative of consciousness and were relevant to the heinous, atrocious, or cruel aggravating circumstance, and that none of the photos' prejudice was outweighed by their probative value. *Wilson I,* 983 P.2d at 468.

■ Mr. Wilson relies on *Spears v. Mullin,* 343 F.3d 1215 (10th Cir.2003), to argue that the admission of the photographs in the sentencing phase unfairly persuaded the jury to sentence him to death. *Spears* is inapposite to this case. In *Spears,* the gruesome photographs were offered to prove conscious physical suffering; however, the evidence that the victim died or lost consciousness early in the beating was uncontroverted. *Id.* at 1227–28. "[T]here was no logical connection between the photographs and the proposition they were offered to prove." *Thornburg,* 422 F.3d at 1129 (discussing *Spears* ). By contrast, most of the photographs offered at the sentencing phase here showed the defensive wounds on Yost's body, all which suggested that he experienced conscious suffering before his death. There was a logical connection between these photographs and the aggravator.

The photographs of the right and left side of Yost's face, however, cannot be justified on these same grounds, as they do not depict defensive wounds. Regardless of whether they were improperly admitted, however, we cannot say that they rendered Mr. Wilson's trial fundamentally unfair. Unlike in *Spears,* where there was little evidence of conscious physical suffering, here, there was ample support for the jury to find the heinous, atrocious, or cruel aggravator. 343 F.3d at 1228 ("Because the photographs were the primary aggravating evidence specifically presented at the second stage, they constitute a major part of the State's second-stage case."). The two photographs of Yost's face were not likely to "misle[a]d the jury" into finding this aggravator, and they did not render the trial fundamentally unfair. *Id.*

■ Additionally, Mr. Wilson argues that the introduction of two guns at the sentencing phase was irrelevant and prejudicial. One gun was found during a traffic stop in 1995. Wilson was the driver and Brown the passenger; the gun was found under the passenger seat. The second gun was discovered by police when they stopped Mr. Wilson in connection with the 1994 drive-by-shooting. The OCCA held that the introduction of the weapons was proper because they supported the continuing threat aggravator. *Wilson I,* 983 P.2d at 469. We agree and find no error here.

During sentencing, the government introduced a post-autopsy photograph of the interior of the victim's skull. The OCCA found that the admission was error, stating that "we fail to find the relevance of this photograph for second stage. Post-autopsy photographs generally are found to be inadmissible, for any probative value they have is substantially outweighed by prejudicial effect." *Id.* at 468. However, given the gory nature of the other photographs introduced at trial, which were properly admitted, the court found that any error was harmless. *Id.* at 469.

■ We agree with the OCCA that the post-autopsy photograph was irrelevant, as it only demonstrated the medical examiner's work, and not any injuries from the defendant's attack. However, we also agree that the erroneously admitted photograph did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted). This was one photograph in a trial replete with gruesome evidence. Given our "very limited" role, we cannot conclude that the error was harmful. *Thornburg,* 422 F.3d at 1129; *see also Brown,* 515 F.3d at 1085.

### 3. Both Stages

■ Mr. Wilson also argues that the photographs and the crime scene video offered in both the guilt and sentencing phase were cumulative and irrelevant. He first argues that the photographic evidence depicting Yost's death was irrelevant because he did not inflict the wounds on Yost. This argument is meritless; even if he did not hit Yost himself, he was charged with felony murder. He also argues that the still photographs of the crime scene, the diagrams of the crime scene, the color photographs of the store aisles, of the handcuff on the floor, and of broken glass near the victim, were all cumulative of the crime scene video. The OCCA found that:

> [t]he still photographs taken from [the] video made it easier for witnesses to identify the defendants at the time certain events are taking place. Therefore, they were introduced for different purposes and are not cumulative.
>
> He claims that the diagrams and photographs of the scene were also cumulative of the crime scene video introduced during the second stage. The diagrams and the photographs of the scene were introduced to give the jury an idea of the layout of the store and different angles of the crime scene. The crime scene video gives the jury a walk through perspective of the crime scene. This information was relevant to prove the aggravating circumstances alleged by the State: that the murder was especially heinous, atrocious or cruel and that Wilson would commit future acts of violence which would constitute a continuing threat to society. The introduction of these separately did not result in the needless admission of cumulative evidence.

*Wilson I,* 983 P.2d at 468 (footnote omitted). After reviewing all the evidence, we agree that the photographs, crime scene

video and diagrams all provided the jury with different perspectives of the crime scene and were used by witnesses to illustrate different aspects of their testimony. The evidence was not cumulative.

### B. Prosecutorial Misconduct

Mr. Wilson argues several instances of prosecutorial misconduct. He points to six episodes: (1) misstatements of facts made in closing statement; (2) demeaning and ridiculing him by calling him a "psychopath;" (3) improper attacks on defense counsel; (4) invocation of sympathy for the victim and the victim's family; (5) telling the jury it had a civic and moral duty to convict him; and (6) misstatements of the law. Mr. Wilson contends not only that each instance of misconduct is sufficient to violate his right to due process, but that even if each is harmless, the cumulative effect of the errors warrants relief.

██ "[N]ot every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation." *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir.2000). Unless prosecutorial misconduct implicates a specific constitutional right, a prosecutor's improper remarks require reversal of a state conviction only if the remarks " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). To determine whether a trial is rendered fundamentally unfair, we examine the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase as well as any cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir.2006) (internal quotation marks omitted). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Id.*

#### 1. Prosecutor's Misstatement of Facts

█ Mr. Wilson first complains that the prosecutor argued facts not in evidence during his guilt phase closing argument when he stated that rolls of money were found in Mr. Wilson's car. The vehicle stopped by the police was not Mr. Wilson's—he was only a passenger, and though rolls of money were found in the pockets of the three other occupants, none were discovered on Mr. Wilson. *Wilson I*, 983 P.2d at 469. Because defense counsel failed to lodge a timely objection at trial, the OCCA reviewed the unpreserved claim for plain error. The OCCA agreed that this was a misstatement of fact, but held that, "[i]n reviewing this misstatement of the facts in light of the totality of the evidence, we determine that this misstatement of fact by the prosecutor does not rise to the level of plain error." *Id.* The district court agreed. *Wilson III*, 2006 WL 2289777, at *34.

We agree with the OCCA's assessment. This was a minor misstatement in a trial where there was overwhelming evidence of Mr. Wilson's guilt on both the robbery and the first degree murder charge. *Bland*, 459 F.3d at 1024; *Le*, 311 F.3d at 1016. The prosecution introduced a videotape showing Mr. Wilson, along with the other three co-defendants, attacking Yost and dragging him into the back room. Mr. Wilson did not exit that room until after Harjo and Alverson retrieved the bat from the car. Additionally, several eye witnesses saw Mr. Wilson running the register at the QuikTrip during the time period in which the robbery and murder occurred. The prosecution also introduced Mr. Wilson's statement, albeit unrecorded, that the group had always planned on killing

Yost. And finally, much of the evidence, including the baseball bat, was given to the police by Mr. Wilson's mother. This is more than ample evidence on which the jury could base a guilty verdict, notwithstanding the minor error.

Mr. Wilson also claims that the prosecutor misrepresented Mr. Wilson's own statements about the planning of the crime. The prosecutor quoted Mr. Wilson as saying " '[y]eah, we were going to kill him,' " tr. trans. 2/14/97, at 17, and told the jury that Mr. Wilson confessed that the decision to kill Yost was made two weeks prior to the crime, *id.* at 18. Mr. Wilson contends that at no point during his recorded confession presented at trial did he make these statements. At trial, however, Detective Folks testified that Mr. Wilson made these statements during an *unrecorded* segment of the interview. The OCCA found that the prosecutor's statements were an "accurate review of Folks' testimony" and therefore not error. *Wilson I*, 983 P.2d at 469. We agree with the OCCA that the prosecutor properly described Detective Folks' testimony.

### 2. Prosecutor's Use of Disparaging Terms

During the sentencing phase closing argument, the prosecutor referred to Mr. Wilson as a "psychopath," tr. trans. 2/20/97, at 46–47 and an "animal," *id.* at 29, and suggested that he needed to be "put ... down to sleep." *Id.* The prosecutor also referred to Mr. Wilson as "unadulterated evil" and a "psychopathic killer." *Id* at 46. Because defense counsel failed to object, the OCCA reviewed this claim for plain error. The OCCA held that use of the term "psychopath" was not error, as it was an accurate summary of trial testimony; as to the rest of the arguments, it held that though "[t]he State should refrain from unwarranted personal criticism or name calling," the comments did not rise

to the level of plain error. *Wilson I*, 983 P.2d at 470.

■■■ We agree with the OCCA that it was not error to call Mr. Wilson a "psychopath." Dr. Reynolds, the defense mental health expert who testified at the sentencing phase, acknowledged that Mr. Wilson exhibited some characteristics of a psychopath, though he did not believe that Mr. Wilson precisely met this diagnosis. The prosecutor's comments were acceptable characterizations of Dr. Reynolds' concessions.

As to the prosecutor's use of the terms "animal" and "unadulterated evil" to describe Mr. Wilson, we find the pejoratives unprofessional, inappropriate, and unworthy of an officer of the court. Nonetheless, there was ample evidence introduced by the state to support the three aggravators. The state incorporated all first stage evidence into the sentencing phase. Tr. trans. 2/18/97, at 102. It also introduced evidence that Mr. Wilson had prior convictions for transporting a loaded gun and an accessory after the fact to the 1994 murder, in which he also allegedly provided the ammunition for the homicide. Finally, the state introduced, through photographs of defensive wounds and video of the attack, evidence of the conscious physical and mental suffering experienced by Mr. Yost. When this evidence is juxtaposed against the minimal mitigating evidence offered by the defense, we agree with the OCCA that the name calling, however improper, did not rise to the level of plain error.

### 3. Prosecutor's Attack on Defense Counsel

Mr. Wilson also alleges that the prosecutor improperly attacked defense counsel by asking a prospective juror during voir dire if he would "let a smoke screen" fool him, implying that it was defense counsel's

job to trick the jury. Tr. trans. 2/5/97, at. 133, 135. Defense counsel lodged a timely objection and requested a mistrial. The court denied the motion for a mistrial, sustained the objection and admonished the jury to disregard the statement as improper. *Id.* at 135. The OCCA found no error and held that "[t]he prosecutor was merely asking the jury to use common sense to evaluate evidence and not be fooled by irrelevant information." *Wilson I,* 983 P.2d at 470.

■ Attacks on defense counsel can at times constitute prosecutorial misconduct. *See, e.g., United States v. Young,* 470 U.S. 1, 9, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate."); *United States v. Bennett,* 75 F.3d 40, 46 (1st Cir.1996) ("The prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel."). While the prosecutor may have intended to implore the jury to use "common sense," the comments were arguably disparaging and suggested that defense counsel intended to be untruthful. *United States v. Procopio,* 88 F.3d 21, 32 (1st Cir.1996) (prosecutor told the jury that defense arguments were "illusions . . . a smoke screen aimed at creating . . . an illusion," which were arguably excessive belittlement). Even if the prosecutor's comments were improper, however, the trial court's admonition to the jury cured any error. And, given the overwhelming evidence of guilt discussed above, we do not believe that this single comment "seriously affected the jury's deliberations." *Id.* at 32.

### 4. Prosecutor's Invocation of Sympathy for the Victim and the Victim's Family

Mr. Wilson next argues that the prosecutor went too far when he invoked sympathy for the victim and the victim's family in his sentencing phase closing argument. The prosecutor asked the jury to

> put [themselves] in the victim's shoes. Each and every day you get up, you put on your clothes, and you go to work. You tie your shoes, you get off—you get off to work, you kiss your wife and your kids, if you have any, goodbye. And you don't know what the day might bring. You only have hope. And he left that particular night, on the 25th, hoping it to be just like an ordinary day in terms of what he would do. He didn't have the chance to tell Angela goodbye. He didn't have the chance to tell his two sons goodbye. . . . And if you find this man guilty, I submit to you he'll have more than 2 minutes and 11 seconds to ponder his death, much more than Richard Yost.

Tr. trans. 2/20/97, at 30. Later on, in his rebuttal closing argument, the prosecutor stated "I'm sorry that [Mr. Wilson's] mother has to wait 20 minutes to see him in jail. But you know what? Ms. Dorn right over there, guess how long she gets to wait to see her son [Mr. Yost] . . . [t]he rest of her life, she gets to wait to see Richard." *Id.* at 49. Mr. Wilson argues that these statements encouraged the jury to sentence him to death based on sympathy for the victim.

Defense counsel failed to object to these statements, and so the OCCA reviewed for plain error. The OCCA held that

> [t]he State should not encourage the jury to impose the death penalty out of sympathy for the victims. This Court has specifically condemned many of the comments made in second stage, stating '[t]here is no reason for them and counsel knows better and does not need to go so far in the future.' No amount of mitigating evidence can counter this ar-

gument, and if the jury agrees they may not even consider mitigating evidence. *Wilson I*, 983 P.2d at 470, (quoting *Le v. State*, 947 P.2d 535, 554–55 (Okla.Crim. App.1997) (alterations omitted)). However, while the OCCA found that the comments were error, they did not rise to plain error because "Wilson has not shown that the jury improperly weighed the mitigating evidence in his case." *Id.* at 471.

We do "not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision." *Moore v. Gibson*, 195 F.3d 1152, 1172 & n. 11 (10th Cir.1999) (prosecutor implored the jury to "bring back a death verdict out of love for the [victims and parents] of the world and the future and the past victims of [petitioner]." (internal quotation marks omitted)). The jury should make decisions based on the strength of the evidence, and not on raw emotion, though we recognize that some emotional influence is inevitable. However, the OCCA's determination that these statements did not rise to the level of plain error was not an unreasonable application of clearly established law. *Wilson I*, 983 P.2d at 470. The jury was instructed to consider only the evidence, and not "sympathy, sentiment or prejudice" in reaching its verdict. R. Vol. II, at 360, Jury Instruction 35. We assume, without more, that the jury followed this instruction. *See Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (plurality opinion); *see also Moore*, 195 F.3d at 1173. Additionally, given the weak nature of the proffered mitigating evidence, we cannot say that the outcome would have been different had the prosecutor refrained from these inflammatory remarks. *Duvall v. Reynolds*, 139 F.3d 768, 795 (10th Cir.1998).

### 5. *Prosecutor's Statement that the Jury Had a Duty to Convict*

Mr. Wilson alleges that the prosecutor's remarks in his guilt phase closing argument encroached on the province of the jury by telling them they had a duty to convict Mr. Wilson. The prosecutor stated that

> Richard Yost, on the 26th day of February, 1995, was confronted with the fight of his life, and he lost. Sad, but true, he lost. He didn't have a choice. He had a judge, a jury, and executioner all in one. In the form of four individuals and a baseball bat. Now, it's your turn and you have a choice. You can deal with him accordingly. Find him guilty on Count 1, Murder in the 1st Degree and find him guilty on Count 2, Robbery with a Dangerous Weapon.

Tr. Trans. 2/14/97, at 19–20. The prosecutor later argued that the jury process is

> [t]he great equalizer. This is where what was so unfair that night is now equalized. And he has to face the great equalizer that this system is. Because now, it's not four plus a bat on one. Now, it's one versus the justice the 12 of you can deliver to him in your verdict of guilty to murder. The great equalizer.

*Id.* at 37. Defense counsel lodged timely objections to both statements.

The OCCA held that "[t]hese comments were tantamount to telling the jury that their job was to avenge the murder of Yost. The jury's duty is to determine the facts from the evidence, to follow the law, and to reach a verdict based upon the evidence.... The jury's duty is not to render a verdict out of a sense of vengeance or as 'the great equalizer.'" *Wilson I*, 983 P.2d at 471. Though the OCCA found that the comments were error, they were not "so flagrant and of such a nature as to be prejudicial to the defendant." *Id.*

■ "It is improper for a prosecutor to suggest that a jury has a civic duty to convict." *Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir.2005); *see also Mali-*

*coat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir.2005); *Spears v. Mullin*, 343 F.3d 1215, 1247 (10th Cir.2003). Further, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Bland*, 459 F.3d at 1028 (quoting *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion)). Appeals to the jury's emotion or sense of vengeance "call[ ] into question the integrity of the criminal justice system" by encouraging the jury to convict based on outrage, and not on the evidence. *Id.*

Though we emphasize that these remarks were improper, we cannot find that the remarks deprived Mr. Wilson of a fundamentally fair trial because, as previously discussed, the evidence of guilt in this case was overwhelming. However, we remind the government that "[p]rosecutors should be aware that arguments of this sort, while unnecessary to obtain a proper verdict, create grave risk of upsetting an otherwise unobjectionable verdict on appeal or on collateral review. It is time to stop." *Id.* Had this error occurred at the sentencing phase, for example, where the evidence in support of the aggravators was less overwhelming, the result might be different. But because we cannot find that the comments affected the outcome of the guilt phase, we find that the OCCA's judgment of harmless error was not an unreasonable application of clearly established federal law.

### 6. Prosecutor's Misstatements of the Law

Mr. Wilson's final complaint alleges that the prosecutor misstated law during voir dire and closing argument. During voir dire, the prosecutor, in front of the jury, objected to defense counsel's line of questioning, stating that "[defense counsel's question implied] to the jurors that they personally are going to kill him. They'll be recommending a sentence. If we reach the punishment phase, they'll be recommending a sentence." Tr. Tran. 2/4/97, at 85. Mr. Wilson argues that this statement diminished the gravity of the jury's role in sentencing in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The OCCA held that this type of comment was not error. *Wilson I*, 983 P.2d at 471.

A death sentence is unconstitutional if the jury believes "that the responsibility for deciding the appropriateness of the [death penalty] lies elsewhere." *Caldwell*, 472 U.S. at 329, 105 S.Ct. 2633. "[T]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (internal quotation marks omitted). The OCCA has held that state law requires the jury to "recommend" a death sentence. *See Humphreys v. State*, 947 P.2d 565, 570 (Okla.Crim.App. 1997); *Romano v. State*, 847 P.2d 368, 390 (Okla.Crim.App.1993) *aff'd*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). Therefore, the prosecutor's remarks did not improperly "describe[ ] the role assigned to the jury by local law." *Romano*, 512 U.S. at 9, 114 S.Ct. 2004 (internal quotation marks omitted); *compare with Caldwell*, 472 U.S. at 330–33, 335–36, 105 S.Ct. 2633 (prosecutor suggested that the responsibility for determining the appropriateness of a death sentence rested with the appellate court that later reviewed the case; "[that] argument ... cannot be said to be either accurate or relevant to a valid state penological interest.").

Mr. Wilson next argues that the prosecutor misstated the law regarding who could be considered a principal to a crime. During voir dire, the prosecutor asked

whether "an individual that's present during the commission of a crime where an individual is killed ... is guilty of murder." Tr. Tran. 2/4/1997, at 54. He later questioned "[i]f you have an instance where two people are involved in a crime, and one person is actually the person that hits the victim, let's say in the head, while the other one stands by and watches. Is the person that stands by and watches, in your mind, just as guilty as the person that actually hits the person?" *Id.* at 164–65. The OCCA found that some of these statements were cured when the court sustained defense counsel's objections; the others did not give rise to plain error.

The OCCA's decision was not contrary to clearly established federal law. The jury was properly instructed, at the close of trial, as to the requisite involvement a party must have to be responsible for felony murder. R. Vol. II, Box 2, Jury Instruction 25, 26, CR 2–4, CR 2–6, at 350–51 ("Merely standing by, even if standing by with knowledge concerning the commission of a crime, does not make a person a principal to a crime."). Assuming, *arguendo,* that these remarks were erroneous, they did not so infect Mr. Wilson's trial with prejudice as to render it fundamentally unfair.

### C. Cumulative Error

Mr. Wilson has two cumulative error arguments: first, he claims that the prosecutorial misconduct errors, in the aggregate, deprived him of a fair trial at either the guilt or sentencing phase; second, he argues that all errors during the guilt and sentencing phase deprived him of a fair trial. We analyze them together, and hold that the prosecutorial misconduct claims, combined with any other remaining errors, were not so prejudicial as to warrant relief.

■ Cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002) (quoting *United States v. Rivera,* 900 F.2d 1462, 1469 (10th Cir.1990) (en banc)). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of trial is such that collectively they can no longer be determined to be harmless." *Id.* (quoting *Rivera,* 900 F.2d at 1470). In death penalty cases, we review whether the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Thornburg,* 422 F.3d at 1137 (internal citations and quotation marks omitted). The OCCA found that none of the errors, considered cumulatively, required reversal. *Wilson I,* 983 P.2d at 472–73; *Wilson III,* 2006 WL 2289777, at \*46. We must defer to this ruling unless it is an unreasonable application of the cumulative-error doctrine.

This was far from a perfect trial, and we have found several errors, as did the OCCA. At the guilt phase, we found three examples of prosecutorial misconduct: (1) the prosecutor misstated facts about the money found in Mr. Wilson's car; (2) the prosecutor argued that the jury should convict as the "great equalizer;" (3) and the prosecutor disparaged defense counsel. We found no additional errors. As we have already stated, the prosecution's evidence at the guilt phase was quite strong. There was the videotape, the confession, the eyewitnesses, and the evidence left for the police by Mr. Wilson's mother. Despite the impermissible prosecutorial comments, it was not unreasonable for the OCCA "to conclude that the jury had sub-

stantial evidence to convict" Mr. Wilson of first-degree felony murder and that "the errors did not result in a denial of due process." *See Bland,* 459 F.3d at 1029.

We found several errors at the sentencing phase, including: (1) ridiculing Mr. Wilson as an "animal" who needed to be "put ... down to sleep" and "unadulterated evil"; (2) encouraging the jury to sentence Mr. Wilson to death out of sympathy for the victim and the victim's family; (3) introduction of the post-autopsy photo; and (4) introduction of unduly prejudicial victim impact evidence. These are the same errors found by the OCCA. For the purposes of cumulative error analysis, we will also assume, *arguendo,* that it was error to admit the photographs of Yost's bloody face. We do not consider Mr. Wilson's ineffective assistance of trial counsel claim here, as, depending on the outcome of the proceedings below, it will either require reversal of Mr. Wilson's sentence anyway or, if the government offers strong rebuttal evidence against the affidavits drawing into doubt their credibility and requiring an evidentiary hearing, there may not be error at all. This might be a closer case had defense counsel put on stronger mitigation evidence at sentencing. However, given the lack of mitigating evidence, and the strength of the evidence supporting the aggravators, discussed earlier, we must determine that the OCCA "reasonably applied clearly established federal law" in finding that there was not cumulative error. *Id.* at 1029. Habeas relief on this ground is therefore denied.

We think, however, that it is worth noting what the OCCA stated in its opinion. In assessing the cumulative error claim, the OCCA commented that "we are confounded by the fact that experienced prosecutors jeopardize cases, in which the evidence is overwhelming, with questionable argument...." *Wilson I,* 983 P.2d at 471. We too are puzzled as to why prosecutors

are willing to take such risks. We encourage those who take this gamble to reconsider.

## VIII. Conclusion

For the reasons set forth above, we **VACATE** the district court's opinion on the ineffective assistance of counsel claim and **REMAND** for further proceedings in accordance with this opinion. On all other claims, we **AFFIRM** the district court's denial of habeas relief.

HARTZ, Circuit Judge, concurring:

I join Judge McConnell's opinion except for Part III. As for Part III, I join only Part III(C) and concur in the result. I agree that we must remand for further proceedings on Mr. Wilson's claim that he received ineffective assistance of counsel with respect to the investigation and presentation of Mr. Wilson's mental condition

Judge Tymkovich raises important questions regarding Mr. Wilson's claim of ineffective assistance with respect to mitigation. I share many of his thoughts regarding the perils of putting on mental-health evidence and the need to give substantial deference to trial counsel's decisions on what sort of mitigating case to present to the jury. I also am troubled by the omissions in Dr. Reynolds's affidavit of any mention of what he told counsel and how counsel responded. After all, ineffectiveness of counsel must be determined by what the attorney knew when he made a decision, not by what may have been in Dr. Reynolds's mind.

Nevertheless, in light of the procedural posture of this case, I think that we must remand for an evidentiary hearing on this matter. Mr. Wilson was not required to *prove* ineffectiveness of counsel to be entitled to an evidentiary hearing. Under the law as I understand it, he needed only to make allegations in his application under

28 U.S.C. § 2254 that, if true, would sustain a claim for habeas relief. This he has done.

To begin with, as Judge McConnell explains in Part III(C) of his opinion, we must review de novo Mr. Wilson's claim of ineffectiveness with respect to the investigation and presentation of mitigating mental-health evidence. We then apply the pre-AEDPA standard for granting an evidentiary hearing on this claim. "[T]o be entitled to an evidentiary hearing, a petitioner [must] make allegations which, if proved, would entitle him to relief." *Miller*, 161 F.3d at 1252 (internal quotation marks omitted). Of course, those allegations must be "viewed against the record," and no evidentiary hearing is necessary if the allegations are "palpably incredible . . . or patently frivolous or false." *Blackledge v. Allison*, 431 U.S. 63, 76, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (internal quotation marks omitted) (deciding right to evidentiary hearing in case under 28 U.S.C. § 2255); *see Schriro v. Landrigan,* —— U.S. ——, ——, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007). Also, the State can foreclose such a hearing if it submits uncontradicted evidence establishing that the applicant is not entitled to relief. *See Blackledge*, 431 U.S. at 80–81, 97 S.Ct. 1621; *see also* Rules Governing Section 2254 Cases, Rule 8 (evidentiary hearing), Rule 11 (applicability of federal rules of civil procedure).

The critical allegation in Mr. Wilson's § 2254 application is that defense counsel conducted a deficient investigation of Mr. Wilson's mental condition and did not make an informed and competent strategic decision not to conduct a thorough investigation. The investigation was deficient because, according to Mr. Wilson, his counsel waited until the last minute to conduct an investigation, rushed Dr. Reynolds so that he could not conduct adequate testing and obtain necessary background information, and failed to have family members interviewed about Mr. Wilson's mental health. As a result, alleges Mr. Wilson, defense counsel did not learn the full extent of Mr. Wilson's mental illness, including his paranoid schizophrenia and delusions, and did not make an informed decision to refrain from presenting such evidence to the jury. The alleged prejudice to Mr. Wilson is that competent counsel would have presented the full picture to the jury at the penalty stage of trial and at least one juror would have refused to impose the death penalty.

In my view, the allegations of Mr. Wilson's § 2254 application would, if proved, entitle him to relief. Under the two prongs of the *Strickland* test for ineffective assistance of counsel, he has alleged that his counsel's performance was constitutionally deficient and that he was prejudiced thereby. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The record does not undermine the claim of deficient performance, and the State has not presented any additional evidence (such as testimony regarding what defense counsel knew and thought) to rebut the claim. Perhaps the record undermines the claim of prejudice, but that issue was not addressed by the district court and should not be resolved in the first instance by this court.

As Judge Tymkovich points out in dissent, Mr. Wilson's claim is not totally convincing. In particular, defense counsel—in light of the evidence of guilt, particularly the video recording of Mr. Wilson's conduct during the crime—may have decided that a claim of mental illness would not get very far with the jury or would even be counterproductive, so further investigation of the claim (after receiving Dr. Reynolds's initial report) would be a wasted effort. But the record does not reveal such a decision by counsel. Moreover, Judge McConnell's opinion establishes that the

Supreme Court has set a high standard for defense counsel in capital cases with respect to investigating mitigation thoroughly before settling on a strategy. There may have been sound reasons for defense counsel to proceed as he did, but in the absence of evidence of what he knew and why he chose the strategy he pursued, I cannot say that it is implausible to claim that defense counsel's investigation was inadequate and that the results of a proper investigation would have caused constitutionally effective counsel to adopt a different strategy at the trial's penalty phase. *See Bell Atlantic Corp. v. Twombly,* ––– U.S. –––, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (allegations of complaint must be plausible to avoid dismissal for failure to state a claim). I should add that the affidavits submitted by Mr. Wilson are, at least in part, a red herring. To be entitled to an evidentiary hearing, he was not required to *prove* his claim of ineffective assistance. Therefore, it is not our role to consider whether there are gaps in the evidence that he has presented to support his allegations. If the State decides to present counteraffidavits and seek a "summary judgment" that would foreclose an evidentiary hearing, *see Blackledge,* 431 U.S. at 80–81, 97 S.Ct. 1621, Mr. Wilson's affidavits would become significant. But we are not there yet.

TYMKOVICH, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's opinion except for Part III, which reverses the district court's denial of habeas relief to Wilson on his ineffective assistance of counsel claim and grants him an evidentiary hearing. I conclude, even taking all of Wilson's allegations regarding ineffective assistance as true, counsel's performance was not constitutionally inadequate and the district court consequently did not abuse its discretion in denying Wilson an evidentiary hearing on that claim.

I would therefore affirm the district court's denial of habeas relief to Wilson in all respects.

## I. Introduction

Wilson's ineffective assistance of counsel claim presents two issues for our review: (1) whether Wilson is entitled to habeas relief on the claim, and (2) whether Wilson is entitled to an evidentiary hearing on the claim.

While Wilson presents these issues as analytically distinct, they are not; in deciding the first issue, we necessarily decide the second. The decision whether to grant an evidentiary hearing turns on whether the petitioner has alleged facts which would entitle him to habeas relief on the underlying claim. *Schriro v. Landrigan,* ––– U.S. –––, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007); *see also Mayes v. Gibson,* 210 F.3d 1284, 1287–88 (10th Cir. 2000). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro,* 127 S.Ct. at 1940. Because of the convergence between the standard for evidentiary hearings and the standard for habeas relief, in the course of explaining why Wilson is not entitled to habeas relief on his ineffectiveness claim, I will also explain why he is not entitled to an evidentiary hearing.

In this opinion, I will first discuss the standards of review applicable to Wilson's appeal. I will then show why Wilson is not entitled to habeas relief on his claim of ineffective assistance. Finally, I will explain why the district court properly denied Wilson an evidentiary hearing on his claim.

## II. Standard of Review

We apply two standards of review in considering Wilson's ineffectiveness claim. The district court's decision to deny habeas relief on the claim is a legal question we review *de novo*. *Fricke v. Sec'y of the Navy*, 509 F.3d 1287, 1289 (10th Cir.2007); *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir.2006). But the court's decision not to grant an evidentiary hearing is reviewed only for an abuse of discretion. *Coronado v. Ward*, 517 F.3d 1212, 1217 (10th Cir. 2008), *petition for cert. filed*, —— U.S.L.W. ——, (U.S. Apr. 23, 2008) (No. 07–11293); *Anderson v. Att'y Gen. of Kan.*, 425 F.3d 853, 858 (10th Cir.2005). These appellate standards of review are employed in conjunction with the standards all federal courts must use when collaterally reviewing state court judgments. Following AEDPA's clear commands, a federal court may grant a state habeas petitioner relief only if the state court's judgment involved an unreasonable application of federal law or unreasonable determination of the facts of his case. *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005); *Lockyer v. Andrade*, 538 U.S. 63, 70–73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

The twin layers of our standard of review make sense considering this court's position in the judicial hierarchy. First, as a federal court reviewing a state court's final criminal judgment, our sole role is to uphold the United States Constitution; errors of state law are not within our purview. Principles of federalism, comity, and finality compel us to accord proper deference to the state court's judgment. *See, e.g., Williams v. Taylor*, 529 U.S. 420, 436,

120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Second, as a court of appeals reviewing a lower court's decision, our main role is correcting errors of law and abuses of judicial discretion. *See, e.g., Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We are not a court of first resort, but one of (nearly) last resort.

The majority, without according proper deference to either the state or district court's judgments, conducts a *de novo* review of the entire record before us. The majority is wrong for two reasons: (1) it fails to correctly apply the abuse of discretion standard to the district court's decision denying an evidentiary hearing, and (2) it fails to accord AEDPA deference to the state court's judgment on the merits.

The Supreme Court has reaffirmed that we review a district court's decision to deny an evidentiary hearing for an abuse of discretion only. The Court held, "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro*, 127 S.Ct. at 1937.[1] Prior to the enactment of AEDPA, the decision to grant an evidentiary hearing "was generally left to the sound discretion of district courts." *Id.* at 1939. "That basic rule has not changed." *Id.* (citing 28 U.S.C. § 2254, Rule 8(a)). Therefore, it is clear that today, as always, we review the district court's decision to grant or deny a habeas petitioner's request for an evidentiary hearing for abuse of discretion. *Id.*; *see also Coronado*, 517 F.3d at 1217; *Anderson*, 425 F.3d at 858.

---

1. I agree with the majority 28 U.S.C. § 2254(e)(2) does not bar Wilson's request for an evidentiary hearing because Wilson diligently sought to develop the factual basis for his ineffective assistance of counsel claim in state court. Because Wilson diligently requested, and was denied, the opportunity to develop the state court record, § 2254(e)(2) does not bar his request for an evidentiary hearing in federal court. *See Williams*, 529 U.S. at 432, 120 S.Ct. 1479; *Barkell v. Crouse*, 468 F.3d 684, 695–96 (10th Cir.2006).

It is equally clear that when we review a state court decision on the merits, AEDPA's deferential standards apply. "Whether [petitioner's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]." *Mayes*, 210 F.3d at 1287–88; *Schriro*, 127 S.Ct. at 1940 (noting "the deferential standards prescribed by § 2254 control whether to grant habeas relief"). This deference is appropriate whether or not the state court granted petitioner an evidentiary hearing. *See* 28 U.S.C. § 2254(d) (mandating a deferential standard of review "with respect to any claim that was adjudicated on the merits in State court proceedings," without regard to whether an evidentiary hearing was held); *see also Schriro*, 127 S.Ct. at 1938–39; *Hammon v. Ward*, 466 F.3d 919, 926 n. 7, 928, 931 (10th Cir.2006). In *Schriro*, for example, although the state court refused to grant an evidentiary hearing before considering the merits of petitioner's claims, the Court nevertheless applied § 2254(d)'s deferential standard of review. 127 S.Ct. at 1940–44.

Relying upon *Schriro*, several other circuits have recently acknowledged deference must be accorded state court judgments even where the state court did not hold an evidentiary hearing. The First Circuit, in a case like this one dealing with ineffective assistance, noted federal courts must accord AEDPA deference to state judgments when deciding whether an evidentiary hearing is appropriate. *See Teti v. Bender*, 507 F.3d 50, 62 (1st Cir.2007),

*cert. denied,* —— U.S. ——, 128 S.Ct. 1719, 170 L.Ed.2d 525 (2008). The court held, "[Petitioner] must allege more than that he received inadequate assistance; he must allege facts sufficient to overcome AEDPA deference to the state court's fact-findings and legal conclusion to the contrary." *Id.* The Sixth and Ninth Circuits have also noted the deferential standards of § 2254(d) must be taken into account when determining whether petitioner has made out a claim for habeas relief. *See Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir.2008), *cert. denied,* —— U.S. ——, 128 S.Ct. 2973, —— L.Ed.2d —— (2008); *Ivory v. Jackson*, 509 F.3d 284, 298 (6th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1897, 170 L.Ed.2d 765 (2008).

The majority suggests that because Wilson was diligent in his efforts to obtain an evidentiary hearing in state court, but was denied that hearing, *de novo* review is appropriate. This is not so. Diligence does not control our standard of review. Rather, the requirement that a petitioner show diligence is merely one of two procedural hurdles a petitioner must cross before receiving an evidentiary hearing in federal court. After the enactment of AEDPA, a federal habeas petitioner must show he was diligent in developing the factual basis for his claim in state court (hurdle number one), and that his allegations, if true, would entitle him to habeas relief (hurdle number two).[2] In a case like this, where the state court has decided petitioner's claim on the merits, this sec-

---

**2.** *See* 28 U.S.C. § 2254(e)(2) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."); *Schriro*, 127 S.Ct. at 1940 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.")

ond hurdle is even higher because petitioner must show the state court's adjudication of his claim involved an unreasonable determination of the facts or unreasonable application of clearly established federal law.[3]

The majority relies heavily upon our precedents in *Bryan v. Mullin,* 335 F.3d 1207, 1215 (10th Cir.2003) (en banc), and *Miller v. Champion,* 161 F.3d 1249, 1254 (10th Cir.1998), to conclude we review Wilson's ineffective assistance of counsel claim without deference to the state court's judgment. But to the extent those cases rely on § 2254(e)(2)'s diligence inquiry to determine our standard of review, they are no longer good law. *Compare Bryan,* 335 F.3d at 1215 (concluding that because petitioner was diligent, "the appropriate question is whether [petitioner] was entitled to a hearing under pre-AEDPA law"), *with Schriro,* 127 S.Ct. at 1940 (concluding that even though petitioner was diligent, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate"). Whether the state court adjudicated petitioner's claim on the merits—not whether petitioner was diligent—guides our standard of review. *See* 28 U.S.C. § 2254(d); *Schriro,* 127 S.Ct. at 1939–44 & n. 1; *Turrentine v. Mullin,* 390 F.3d 1181, 1188–89 (10th Cir.2004) (quoting 28 U.S.C. § 2254(d)(1) and (d)(2)).

Wilson's claim of ineffective assistance was adjudicated on the merits in Oklahoma state court. "An adjudication on the merits occurs when the state court resolves the case on substantive grounds, rather than procedural grounds." *Valdez v. Cockrell,* 274 F.3d 941, 946–47 (5th Cir. 2001) (internal quotation marks omitted); *see also Harris v. Poppell,* 411 F.3d 1189, 1195–96 (10th Cir.2005) (noting "[w]here there is no indication ... the state court did *not* reach the merits of a claim, we have held that a state court reaches a decision 'on the merits'" (quotation omitted)). The Oklahoma Court of Criminal Appeals (OCCA) concluded Wilson could not show his trial counsel's performance was deficient or prejudicial under the Supreme Court's precedent in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Wilson v. State,* 983 P.2d 448, 471–72 (Okla.Crim.App. 1998). The OCCA's decision was based on substantive, rather than procedural, grounds. *Id.* at 472. Despite this clear holding, the majority applies our Tenth Circuit cases to conclude the decision does not constitute an adjudication on the merits because the OCCA did not consider additional non-record evidence submitted by Wilson. But nothing in the Supreme Court's precedents or AEDPA's text supports the position that a decision ceases to be an adjudication on the merits simply because the petitioner has submitted additional evidence to the federal habeas court.[4] As noted above, § 2254 deference

---

**3.** *See* 28 U.S.C. § 2254(d) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding.").

**4.** I acknowledge there has been a circuit split regarding the correct standard of review in cases where the petitioner presents a federal court with material not considered by the state court. *See LeCroy v. Sec'y Fla. Dep't of Corrs.,* 421 F.3d 1237, 1262–63 & n. 30 (11th Cir.2005) (describing split). In my opinion,

applies whether or not the state court held an evidentiary hearing to allow petitioner to supplement the state court record.

This conclusion is bolstered by our cases holding that the OCCA's denial of an evidentiary hearing under that court's Rule 3.11 bears on the substantive *Strickland* analysis. In both *Bland v. Sirmons*, 459 F.3d 999 (10th Cir.2006), and *Welch v. Sirmons*, 451 F.3d 675 (10th Cir.2006), we concluded the OCCA had adjudicated a claim on the merits because the court decided petitioner failed to meet the substantive standard for obtaining an evidentiary hearing under Rule 3.11. *See Bland*, 459 F.3d at 1030 (conducting a deferential review where "the OCCA considered the claim in light of [petitioner's] request for an evidentiary hearing"); *Welch*, 451 F.3d at 709 (conducting a deferential review where the OCCA determined an evidentiary hearing was not warranted under Rule 3.11); *see also Mayes*, 210 F.3d at 1287–88. Because the standard for obtaining an evidentiary hearing under Rule 3.11 is lower than the standard set forth in *Strickland*—petitioner need only show a "strong possibility" of ineffective assistance [5]—when the OCCA denies an evidentiary hearing under Rule 3.11, it necessarily makes a merits determination petitioner cannot meet the substantive *Strickland* standard. The OCCA need not use any special words in reaching this conclusion; our cases look to the result of a state court's decision, not to its reasoning. *See, e.g., Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir.1999).

Here, although the OCCA did not explain why it denied Wilson an evidentiary hearing, it did conclude "an evidentiary hearing on this claim should be denied." *Wilson*, 983 P.2d at 472 n. 8. The OCCA thus concluded the requirements of Rule 3.11 had not been met. Looking to the OCCA's result, we must conclude the OCCA determined an evidentiary hearing would not have changed the court's determination that counsel's performance was adequate under *Strickland*. *See id.* at 471–72. This is a state court decision on the merits to which we owe AEDPA deference. *See* 28 U.S.C. § 2254(d).

In sum, a petitioner's claim may have been adjudicated on the merits, and therefore subject to AEDPA deference, even if petitioner makes allegations in federal habeas court based on new evidence (1) presented in the form of affidavits (as here), or (2) arising out of a federal evidentiary hearing. *See, e.g., Schriro*, 127 S.Ct. at 1938–39; *Matheney v. Anderson*, 377 F.3d 740, 747 (7th Cir.2004). The new evidence can be considered by the federal habeas court to determine whether the state court reached an unreasonable determination of clearly established federal law or the facts of petitioner's case—but not to eliminate AEDPA's deferential standard of review.

Because Wilson's claim was adjudicated on the merits in Oklahoma state court, AEDPA's § 2254(d) applies to Wilson's federal habeas appeal. To prevail under this deferential standard, Wilson must show the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in

---

*Schriro* sheds considerable light on the correct standard.

**5.** *See* Okla. Stat., tit. 22, ch. 18, Rule 3.11(B)(3)(b)(i) (1997) ("This Court will utilize the following procedure in adjudicating applications regarding ineffective assistance of trial counsel based on evidence not in the record: ... [T]he application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."); *Dewberry v. State*, 954 P.2d 774, 775–77 (Okla.Crim.App.1998).

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

As the Supreme Court has emphasized, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Schriro,* 127 S.Ct. at 1939 (noting the unreasonableness standard presents a "substantially higher threshold" than incorrectness). "[O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard,* 468 F.3d at 671. "[T]he state court decision must be 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.'" *Id.* (quotation omitted).

\* \* \*

The majority incorrectly conducts a *de novo* review of the state court's judgment without deference to the court's legal or factual conclusions. Applying the correct standard of review, this court should ask whether Wilson is entitled to federal habeas relief because the state court's judgment was in some way unreasonable; and, if so, whether the district court abused its discretion in denying Wilson an evidentiary hearing. In answering these questions, we apply twin layers of review, taking into account our role as a federal court reviewing a state court judgment and as a court of appeals reviewing a lower court's decision.

Bounded by these important parameters, our review of the district court's decision to deny habeas relief equates to (1) an independent review (2) of the state court's judgment (3) in which we ask whether the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "was based on an unrea-

sonable determination of the facts," *id.* § 2254(d)(2). Further, our review of the district court's decision to deny an evidentiary hearing equates to (1) a deferential review (2) of the district court's decision (3) in which we ask whether the district court abused its discretion in concluding petitioner's allegations, if true, would not entitle him to federal habeas relief.

## III. Ineffective Assistance of Counsel

I agree with the district court Wilson is not entitled to habeas relief on his ineffective assistance of counsel claim. We evaluate counsel's efforts under the now-familiar two-part standard announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and may deem counsel ineffective only if "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. Wilson must meet both prongs of the two-part test to prevail: "First, [Wilson] must show that counsel's performance was *deficient* . . . . Second, [Wilson] must show that the deficient performance *prejudiced* the defense." *Id.* at 687, 104 S.Ct. 2052 (emphasis added). Because "the proper standard for attorney performance is that of reasonably effective assistance . . . [Wilson] must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052.

The OCCA concluded the performance of Wilson's trial counsel was reasonable under *Strickland* because counsel "put forth a mental health expert to rebut the State's continuing threat contention and to mitigate punishment," and that expert had access to Wilson's mother, Wilson's medical records, school records, and statements from other people who knew Wilson. *Wil-*

*son*, 983 P.2d at 472. The OCCA concluded, "The mere fact more evidence could have been presented is not, in itself, sufficient to show counsel was deficient." *Id.* The court also determined Wilson had failed to show prejudice.

The district court concluded the OCCA's adjudication of Wilson's claim on the merits did not run afoul of § 2254(d). The court held, "[T]he OCCA's rejection of this [ineffectiveness] claim on direct appeal was not an unreasonable application of the legal principle announced by the Supreme Court in *Strickland* to the facts of Petitioner's case. Petitioner has failed to satisfy the § 2254(d) standard on this portion of his ineffective assistance of counsel claim." *Wilson v. Sirmons*, No. 00–147, 2006 WL 2289777, at *43 (N.D.Okla. Aug.8, 2006).

I agree with the district court that the OCCA's determination of Wilson's claim was neither "an unreasonable application of[ ] clearly established Federal law," or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The district court thus correctly determined Wilson was not entitled to habeas relief on his ineffectiveness claim.

After reviewing all the evidence before us, including the additional affidavits submitted by Wilson in conjunction with his habeas petition,[6] it is clear Wilson is not entitled to relief. *First*, exercising "a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, I cannot conclude counsel's representation failed to meet minimal professional standards. *Second*, accepting Wilson's counsel should have known—but apparently did not—about the supplemental mental health evidence Wilson presents in the affidavits, I cannot conclude Wilson was prejudiced by any deficiency. Even if counsel knew a more specific diagnosis were possible with additional testing, counsel knew enough about Wilson's mental health profile to reasonably pursue a mitigation strategy that de-emphasized mental health in favor of what he considered a more promising approach. Reviewing additional evidence would not have substantially altered the portrait of Wilson counsel presented to the jury.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). There is a strong presumption "an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct might have been part of a sound trial strategy." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir.2002) (emphasis omitted). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

To the extent counsel conducts a less-than-complete investigation to uncover potentially mitigating evidence, counsel's investigation remains constitutionally acceptable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. "In other words, counsel has a duty to make reasonable investigations or to

---

**6.** Wilson presents six affidavits to this court. However, it appears only five were presented to the OCCA. The new (sixth) affidavit is from Wilson's state trial counsel.

make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527. Although we of course defer to counsel's strategic judgments, *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, strategic judgments are not reasonable unless backed by a reasonable investigation. *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) (citing *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052).

Keeping these principles in mind, I turn to whether trial counsel's performance at the mitigation phase was deficient and prejudicial under *Strickland.*

### A. Deficient

Wilson contends his counsel's investigation was unreasonable because counsel did not obtain a diagnosis of schizophrenia, which would have been possible had the defense expert, Dr. Reynolds, done additional testing and interviewed additional witnesses. I disagree, and for three reasons conclude counsel exercised reasonable professional judgment in this case.

*First,* the record does not indicate counsel knew or should have known further investigation was necessary. If counsel had no reason to think the information he had was incomplete and that additional diagnoses were possible, counsel reasonably developed his trial strategy based on the information the expert examination had already produced. Glaringly absent in the record is any statement from Wilson's counsel that he did not have enough time to obtain a further diagnosis. Wilson's counsel did, in fact, submit an affidavit— but only about the dual jury issue. The record before us lacks the single most accessible and helpful source of informa-

tion to make an informed and non-speculative conclusion about trial counsel's performance.[7]

*Second,* counsel obtained sufficient information about Wilson's mental health to make a reasonable decision about trial strategy, which he acted on at the mitigation phase. Once counsel decided to focus his mitigation strategy on Wilson's high intelligence and capacity for reform, it was reasonable for counsel not to pursue further leads of mental illness.

*Finally,* we have no reason to believe on this record that the amount of time counsel allotted for the investigation unreasonably limited the information counsel was able to discover. Trial counsel developed a theory of mitigation based on knowledge of Wilson's personal history. As I discuss below, the record supports the conclusion counsel adequately put forward a defense based on his theory of the case.

During the penalty phase of a death penalty case, effective assistance requires counsel to make reasonable efforts to determine whether a defendant's mental health presents a plausible argument against imposing the death penalty. *See Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir.2004) (describing mental health evidence as "of vital importance to the jury's decision at the punishment phase"). "In assessing the reasonableness of an attorney's investigation," we consider "the quantum of evidence already known to counsel, [and] also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S.Ct. 2527.

Counsel conducted a constitutionally sufficient inquiry into Wilson's mental health,

---

7. The absence of any admissions in counsel's affidavit to errors at trial stands in stark contrast to other death-penalty appeals in which counsel confesses his performance was deficient. *See, e.g., Fisher*, 282 F.3d at 1293–98 (noting counsel admitted he failed to, among other things, discover crucial evidence, interview important witnesses, and investigate his client's alibi).

and the record does not reveal that counsel had additional information that should have led to further testing or further witness interviews.

### 1. Counsel Conducted Adequate Testing and Interviews

Wilson argues trial counsel faltered by failing to order further mental health testing and by failing to personally interview several family members. Neither claim has constitutional merit.

*Further Testing*

When investigating a defendant's mental health, counsel by necessity often relies on expert assistance. *See, e.g.,* American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1 (1989) [hereinafter *ABA Guidelines* ] ("Counsel should secure the assistance of experts where it is necessary or appropriate" for the defense.). Wilson concedes counsel engaged a qualified clinical psychologist, Dr. Reynolds, to evaluate him. Dr. Reynolds met with Wilson on three separate occasions, during which time he administered multiple psychological tests. Reynolds also met with Wilson's mother and had access to Wilson's medical records, school records, and statements from people who knew Wilson well, including a teacher, a fellow church member, and a long-time family friend. Counsel and Dr. Reynolds discussed these findings before trial.

In the Supreme Court cases relied upon by the majority, trial counsel did not perform nearly as well. In *Rompilla v. Beard,* for example, counsel failed to investigate the defendant's prior convictions for rape and assault, despite knowing the state intended to introduce those convictions as aggravating factors at sentencing. 545 U.S. 374, 383–87, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). As the Court noted, "looking at a file the prosecution says it will use is a sure bet." *Id.* at 389, 125 S.Ct. 2456. In *Wiggins v. Smith,* moreover, counsel was deficient for failing to expand his investigation beyond readily available materials. Counsel's knowledge of the defendant's life history rested exclusively on the court-created presentence report and foster care records supplied by the city of Baltimore. 539 U.S. at 523, 123 S.Ct. 2527. Although funds were made available for counsel to retain a forensic social worker to investigate the defendant's background and prepare a report, counsel chose not to commission such a report. *Id.* at 524., 123 S.Ct. 2527 This paltry investigation stood in stark contrast to the "standard practice in Maryland in capital cases at the time." *Id.*

Our Tenth Circuit cases have also faulted counsel for doing far less. *See, e.g., Anderson v. Sirmons,* 476 F.3d 1131, 1143 (10th Cir.2007) (finding ineffective assistance when defendant was never evaluated by an expert); *Smith,* 379 F.3d at 939 (finding ineffective assistance when counsel was unaware "mental state or mental illness could be introduced as mitigation").

In determining what would lead a reasonable attorney to order additional rounds of mental health tests, we may expect counsel to rely on the opinion of a mental health expert. *See Bell v. Thompson,* 545 U.S. 794, 809–10, 125 S.Ct. 2825, 162 L.Ed.2d 693 (2005) (suggesting defendant "would have faced an uphill battle" to convince a court the mental health investigation should have continued despite an expert opinion defendant was not mentally ill); *Clark v. Mitchell,* 425 F.3d 270, 285 (6th Cir.2005) ("It was not unreasonable for … counsel, untrained in the field of mental health, to rely on the opinions of these professionals."). Even *Strickland* counseled that when determining the appropriate scope of an investigation, counsel should rely on the information already ob-

tained from the defendant and others. *466 U.S. at 691, 104 S.Ct. 2052.*

Wilson's counsel appropriately relied on Dr. Reynolds to decide how many rounds of mental health testing should be conducted. The record does not reveal that Dr. Reynolds ever advised counsel further testing beyond the initial round was necessary or advisable. Nor did Dr. Reynolds advise further investigation might yield any definitive diagnoses. Only after trial did Dr. Reynolds indicate he needed additional information to support a schizophrenia diagnosis—apparently because of an invalid MMPI–2 test. Even in his post-trial affidavit, however, Dr. Reynolds does not say he told counsel about the invalid test or advised counsel that further testing or investigation would be helpful. Counsel in his affidavit does not indicate he received such advice, and we do not have any report Dr. Reynolds prepared for counsel prior to giving his testimony.[8]

Even if Dr. Reynolds had conducted more testing, there is no reason to think counsel's picture of Wilson would have changed. Dr. Reynolds's affidavit, written after he performed a new battery of tests on Wilson after trial, says only it was *"possible"* Wilson *"could have been* delusional at the time of the crime." Aplt. Add. 2 (emphasis added). Dr. Reynolds noted there was also a "possibility" Wilson suffered from "delusions or hallucinations."

*Id.* at 2. These generalized possibilities do not show, in any way, that if Wilson's counsel had given Dr. Reynolds more time to conduct more tests counsel's picture of Wilson would have changed in the least. The majority's insistence that further testing was necessary is pure speculation.

" 'An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption' that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Sallahdin v. Mullin,* 380 F.3d 1242, 1251–52 (10th Cir.2004) (quoting *Chandler v. United States,* 218 F.3d 1305, 1314 n. 15 (11th Cir.2000)). Without any evidence that counsel disregarded the expert's professional judgment, I conclude counsel reasonably believed he had fulfilled his obligation to investigate Wilson's mental health by hiring an expert and considering the expert's conclusions. *Compare Burger v. Kemp,* 483 U.S. 776, 793, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (finding no ineffective assistance when record left ambiguity about reasonableness of counsel's decision), *with Hooper v. Mullin,* 314 F.3d 1162, 1171 (10th Cir.2002) (finding ineffective assistance when counsel disregarded expert report explicitly recommending further diagnostic investigation).[9] Under the circumstances here, and because of counsel's reasonable strategic choices discussed

---

8. Wilson does not argue Dr. Reynolds performed incompetently as a psychologist. I note, however, the Fourth, Seventh, and Ninth Circuits have explicitly rejected a constitutional right to effective assistance of an expert witness, except to the extent such claim implicates effective assistance of counsel in hiring and preparing the witness. *See Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998); *Harris v. Vasquez,* 949 F.2d 1497, 1520 (9th Cir.1990); *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990).

9. Other circuits have recognized the importance of expert recommendations in counsel's

decision-making concerning mental health investigations. *See Martinez v. Quarterman,* 481 F.3d 249, 257 (5th Cir.2007) (finding no ineffective assistance when nothing in expert report suggested a link between the defendant's epilepsy and his violent behavior); *Hedrick v. True,* 443 F.3d 342, 350–51 (4th Cir.2006) (finding no ineffective assistance when expert did not indicate further investigation of defendant's childhood experiences would be helpful); *Clark,* 425 F.3d at 282 (finding no ineffective assistance when expert review did not indicate further investigation was necessary).

below, counsel's failure to pursue further diagnosis was not unreasonable.

*Further Interviews*

I also disagree with the conclusion counsel was unreasonable for failing to probe deeper into Wilson's mental health history through additional witness interviews. Wilson argues counsel's investigation was insufficient because counsel failed to uncover the information contained in the post-conviction affidavits of Wilson's mother, girlfriend, brother, and sister. Dr. Reynolds's post-conviction affidavit additionally suggests this information would have been helpful to a diagnosis of schizophrenia.

*Strickland* imposes only the obligation to conduct a reasonable investigation—not a perfect one. 466 U.S. at 688, 104 S.Ct. 2052. The record indicates counsel gathered information from a number of people who knew Wilson. For example, counsel provided Dr. Reynolds with statements from a close friend of Wilson's family, a fellow church-member, and two of Wilson's former teachers. All testified on Wilson's behalf at trial.

Counsel also provided Dr. Reynolds with statements from two additional individuals who knew Wilson, but the record does not reveal the substance of their information. And counsel had access to information from Wilson's mother through Dr. Reynolds, who personally interviewed her. Wilson's mother testified at trial and apparently provided counsel with names of individuals who might testify on his behalf. The record does not reveal that counsel failed to pursue any of these leads. *Compare Burger*, 483 U.S. at 794, 107 S.Ct. 3114 (finding no ineffective assistance where counsel interviewed "all potential witnesses who had been called to his attention"), *with Mayes*, 210 F.3d at 1290 (finding ineffective assistance when counsel "never contacted any mitigation witnesses").

From all of these witnesses, counsel obtained significant mitigating information about Wilson's life demonstrating a constitutionally adequate investigation. That counsel used this information to present a constitutionally adequate mitigation defense is shown by the following two points.

First, counsel presented a full picture of Wilson to the jury. Counsel proffered the following evidence: (1) Wilson's friends and family knew him as a kind, caring, church-going person; (2) Wilson's father, a drug addict and alcoholic, abandoned the family when Wilson was young; (3) Wilson's mother was a strong positive influence; (4) a Sunday school teacher close to Wilson died of cancer, which extremely upset Wilson; (5) Wilson was exposed to significant gang activity growing up, and in one incident Wilson was shot in the leg; (6) Wilson's home, where he was living with his mother, was torched by a rival gang; (7) Wilson's brother was in jail; and (8) Wilson lived with his sister in North Carolina for some time and did very well when removed from the environment of his violent neighborhood. The bulk of the affidavit testimony Wilson offers in his habeas petition simply repackages the information counsel actually presented to the jury. This repetition suggests counsel did a reasonably thorough job of uncovering the major contours of Wilson's family and social history. This is certainly not a case where counsel sat idly by, thinking investigation would be futile.

Second, all of the witnesses who provided mitigation evidence at trial were also in a position to observe the kind of strange behavior Wilson now asserts his counsel should have uncovered through additional interviews. Yet the record does not show that anyone during counsel's investigation mentioned Wilson's extreme conduct or otherwise provided information to counsel that should have led to such inquiries.

Because counsel had information from a wide range of people with knowledge of Wilson's family and personal history, none of whom mentioned a serious mental health issue beyond that diagnosed by Dr. Reynolds, it was reasonable for counsel not to interview additional witnesses. Counsel had no reason to think additional witnesses would offer helpful non-cumulative testimony. *See Rompilla,* 545 U.S. at 389, 125 S.Ct. 2456 ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there.").

To the extent counsel was obligated to seek out any behavioral evidence of mental illness, counsel fulfilled his obligation by engaging Dr. Reynolds and providing him with access to Wilson's mother, other witnesses, and Wilson's records. Counsel could reasonably have expected Dr. Reynolds to obtain any information he needed about Wilson's behavior from Wilson's mother, who lived with Wilson and was very close to him. If Dr. Reynolds thought further interviews would be helpful, he could have suggested them to counsel, but we have no information that Dr. Reynolds did so. That Dr. Reynolds later found information provided by additional family members helpful in corroborating his own conclusions does not make the initial investigation unreasonable; reasonableness is evaluated based on the infor-

mation available to counsel *at the time. Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Wilson's mother's post-trial affidavit claims counsel never personally interviewed her prior to trial. Failure to interview a witness prior to her testimony at trial can in some circumstances constitute ineffective assistance of counsel. *See Hooper,* 314 F.3d at 1171. In this case, however, counsel's failure to personally interview the mother was not unreasonable. Counsel had access to her testimony through Dr. Reynolds and reasonably relied on Reynolds's interviews. It is well-settled counsel may rely on the efforts of co-counsel, investigators, and experts in preparing for trial, *e.g., Clark,* 425 F.3d at 286, and that the failure to conduct personal interviews is not necessarily deficient performance, *ABA Guidelines* 11.4.1(3) (interviewing potential witnesses). In fact, ABA Guideline 11.4.1(3) instructs capital defense counsel to "conduct interviews of potential witnesses in the presence of a third person" or rely on "an investigator or mitigation specialist" so there is someone to call "as a defense witness at trial." This is precisely the course Wilson's trial counsel followed.[10]

Perhaps the most cautious of counsel would always interview each member of the defendant's family as well as other close contacts, but the Supreme Court has declined to make prudence the measure of constitutionally effective counsel. "[I]n

---

**10.** In any event, Wilson has not shown he was prejudiced by counsel's failure to interview his mother. Counsel's examination of the mother at trial effectively portrayed the sympathetic side of Wilson's life and the effect his death would have on his family. To the extent her affidavit contains mental health information not presented at trial, there is no reason to believe trial counsel would have elicited it in an interview. I find it instructive Dr. Reynolds apparently did not discover this information when he spoke with Wilson's mother during an interview whose purpose was to bolster the psychological testing already conducted. Wilson has not shown counsel would have discovered this information by conducting another interview himself. Accordingly, Wilson has made no showing that the mother's testimony would have changed and therefore no prejudice. *See Hedrick,* 443 F.3d at 354 (finding no prejudice where defendant did not show witness's testimony would have differed); *Crisp v. Duckworth,* 743 F.2d 580, 584 (7th Cir.1984) (same).

considering claims of ineffective assistance of counsel, we address not what is prudent or appropriate, but only what is constitutionally compelled." *Burger*, 483 U.S. at 794, 107 S.Ct. 3114 (internal quotations omitted). "[C]ounsel need not interview every possible witness to have performed proficiently." *Young v. Sirmons*, 486 F.3d 655, 680 (10th Cir.2007).

Counsel need only conduct a reasonable investigation. I cannot say that counsel's investigative efforts in this case—which included collecting information from Wilson's mother, teachers, and others close to the family—were unreasonable, particularly because counsel's investigation evidently uncovered the bulk of the mitigating information Wilson's new affidavits offer. On this record, counsel had no reason to think additional interviews would provide helpful noncumulative evidence, and counsel's failure to conduct additional interviews was not constitutionally ineffective.

Finally, the affidavit evidence the majority claims would have been helpful in the mitigation case is, at best, a two-edged sword.[11] *See Bryan*, 335 F.3d at 1216 & n. 21; *Cannon v. Gibson*, 259 F.3d 1253, 1277–78 (10th Cir.2001). The majority claims the affidavit evidence could have supported a finding of schizophrenia, which might have elicited sympathy from the jury. Perhaps. On the other hand, though, the jury could have drawn a negative picture about Wilson's gang involvement and the murder itself. Wilson's brother describes his own gang involvement and how Wilson became involved along with him. He said he and Wilson "both put on our gang face when we went out the front door" and talked of Wilson being targeted by "rival gangs." Aplt. Add. 5. The brother also said Wilson "knew that the gang considered him a police rat and his reputation was permanently ruined. I never heard anything specific, but I am sure there was teasing and serious pressure to do this crime." *Id.*

Wilson's sister said she believed Wilson "was being pulled into the gang scene by at least his ninth grade year of high school. I remember [Wilson] got real suspicious and paranoid after he joined the gang.... I know that [Wilson] was present when some of his fellow gang members were killed." Aplt. Add. 6. She also corroborated the idea the gang thought Wilson was a rat:

> I knew that [Wilson] had been arrested on another offense prior to his trial.... [Wilson] fumbled with the decision of what to say to police because the gang saw it as ratting out one of their own.... [Wilson] told me that the [*sic*] he was in danger with the gang. The gang threatened him and made it clear he had to prove he was with them. I believe [Wilson] was pressured and coerced into the Quick Trip crime.

*Id.*

Finally, Wilson's girlfriend refers to Wilson having trouble in prison because of a rumor he "snitched" on two Bloods until "word was out [Wilson] was back on the same side." Aplt. Add. 4.

The affidavits present a disturbing picture of the murder in this case—Wilson

---

11. What Wilson asserts is substantively new testimony involves the following: (1) Wilson telling his girlfriend his father was dead, when his father was alive but had abandoned the family years earlier; (2) Wilson introducing himself as Tom and using a different voice and facial expressions; (3) Wilson telling his girlfriend he heard voices; (4) Wilson, when he was a child, trying to convince his school his mother was white; (5) Wilson acting paranoid and suspicious; (6) Wilson having frequent violent dreams; (7) Wilson experiencing periodic depression, detachment, and memory gaps; and (8) Wilson speaking in a disconnected manner. Aplt. Add. 2–6.

was in trouble with his gang because of the perception he had "snitched" in a prior case, and Wilson got involved in the crime to prove his loyalty. If Wilson's counsel were aware of this background, he had good reason not to give the prosecutor the opportunity to confirm it by allowing Wilson's girlfriend, sister, and brother to testify. This negative affidavit information is further indication Wilson was not prejudiced by counsel's failure to interview these witnesses or to present their testimony at trial.

\* \* \*

In sum, I cannot conclude that after counsel interviewed a number of people who knew Wilson and obtained an initial mental health diagnosis from Dr. Reynolds, it was unreasonable for counsel not to pursue the mental health investigation further. Counsel conducted a reasonably extensive inquiry into Wilson's background. Nothing in the record indicates reasonably competent counsel could not have concluded he had all the relevant information available. I therefore agree with the district court's conclusion that the OCCA's adjudication of Wilson's ineffectiveness claim was reasonable.

## 2. Counsel's Strategic Decision Not to Emphasize Mental Illness Made Further Investigation Unnecessary

The trial record reflects that counsel made a strategic decision to de-emphasize Wilson's mental illness and instead to focus his mitigation case on Wilson's intelligence and capacity to become a productive member of society. Strickland requires that we defer to counsel's strategic judgments that fall within the "wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. 2052. Although the majority criticizes my focus on counsel's strategic judgments as outside the scope of the parties' briefing, the issue of strategy

is inextricably intertwined with the rest of the Strickland analysis, including the proper scope of investigation and witness choices. See Wiggins, 539 U.S. at 521, 123 S.Ct. 2527 ("[S]trategic choices ... are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (quoting Strickland, 466 U.S. at 690–91, 104 S.Ct. 2052)); Williams, 529 U.S. at 373, 120 S.Ct. 1495 (concluding "counsel's failure to contact a potentially persuasive character witness was likewise not a conscious strategic choice," but rather deficient representation under Strickland); Strickland, 466 U.S. at 690, 104 S.Ct. 2052 (holding "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

In any event, this court may affirm the district court "on any ground adequately supported by the record." Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir.2004); see also Richie v. Mullin, 417 F.3d 1117, 1128 n. 3 (10th Cir.2005) (Hartz, J., concurring) ("Comity with the state courts is a particularly compelling reason to consider grounds for affirmance not argued on appeal.").

I would conclude on this record counsel made a reasonable strategic judgment backed by a reasonable investigation.

### Reasonable Strategic Judgment

Counsel's mitigation emphasis during the penalty phase of trial is a classically strategic decision. See, e.g., Bell, 545 U.S. at 810, 125 S.Ct. 2825 (characterizing as strategic the decision, after a mental health evaluation, "not to pursue a mitigation strategy based on mental illness"); Young, 486 F.3d at 682 (noting counsel "chose to pursue an alternative theory [of mitigation], making exactly the type of strategic decision the Supreme Court and

this court have held is not ineffective assistance of counsel").

Counsel chose to emphasize Wilson's intelligence and rehabilitative potential in the following manner: (1) Dr. Reynolds testified that because of Wilson's high intelligence and the excellent positive influence of his mother, Wilson's mental disorders could probably be successfully treated and Wilson would likely mature into a contributing member of society; (2) Dr. Reynolds testified Wilson excelled in structured environments and because of his intelligence could be particularly beneficial to others; (3) other character witnesses testified Wilson was an intelligent, helpful, and caring person who could turn his life around; (4) counsel argued in closing: "There is some reason for him to live.... I submit to you that an intelligent person who has the capacity to do good can be of benefit to society."; and (5) counsel suggested in closing that even serving a life prison term Wilson could, because of his high intelligence and positive influences, mentor other young men in prison to help them become productive members of society when released. Trial Tr. (Feb. 20, 1997), at 42–44. Wilson has failed to demonstrate counsel's strategic focus was unreasonable.

Wilson argues counsel should have discovered and used a diagnosis of schizophrenia to convey to the jury that Wilson was a mentally ill man deserving of sympathy and pity. But emphasizing Wilson's mental health could have undercut counsel's chosen strategy of focusing on Wilson's ability to grow into a useful role model for other young men in trouble. A schizophrenia diagnosis could have made Wilson's mental health problems appear more intractable and untreatable, and added ammunition to the prosecution's case that Wilson was a dangerously ill person.

As with the evidence of Wilson's gang involvement, emphasizing Wilson's mental health issues was a two-edged sword. As the majority believes, the jury may have felt some sympathy for Wilson based on a diagnosis of schizophrenia. But, equally as likely, this diagnosis may have supported the prosecution's portrait of Wilson as a dangerous and continuing threat to society. *See, e.g., Bryan,* 335 F.3d at 1222 (recognizing counsel's legitimate concern that testimony about defendant's mental health "might play into the prosecution's case that [defendant] was a continuing threat to society"); *Cannon,* 259 F.3d at 1277–78 (noting certain neuropsychological evidence defendant's counsel did not present to the jury was "far less beneficial than asserted by [defendant] ... and could have strengthened the prosecution's argument"). In this case, counsel could reasonably conclude that additional mental health evidence would not help Wilson's case and might actually harm it.

The majority presents a false dichotomy with regard to Dr. Reynolds's more recent mental health evaluation. The majority argues trial counsel had to either (1) go all the way in basing a mitigation defense on a schizophrenia diagnosis, or (2) not present any evidence of Wilson's mental health at all. Although the majority presents an all-or-nothing choice, trial counsel could have quite reasonably chosen a middle path: presenting enough mental health evidence to obtain the sympathy of some members of the jury without having to persuade more skeptical members Wilson's mental illness was severe. Neither Supreme Court precedent nor the ABA Guidelines foreclose such a middle ground.

Commentators have recognized a mitigation defense based purely on the defendant's mental health can be risky. One commentator, for example, noted counsel may decide to limit mitigation evidence because it "purportedly undermines residual doubt, because it has a double-edged

effect of inspiring jury fears, or because it opens the door to unrevealed criminal history." Leona D. Jochnowitz, *Missed Mitigation: Counsel's Evolving Duty to Assess and Present Mitigation at Death Penalty Sentencing*, 43 Crim. L. Bull. 1 (2007). Another commentator suggested trial counsel faced a barrier of "juror cynicism toward mental health issues in criminal cases." Russell Stetler, *Mental Disabilities and Mitigation* (rev.3/13/01), http://www.nynd-fpd.org/articles.htm (follow "Mental Health"; then follow "Mental Health Mitigation"). *See also* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L.Rev. 1109 (1997) (finding capital jurors were skeptical of mental health experts supplied by the defense); James M. Doyle, *The Lawyers' Art: 'Representation' in Capital Cases*, 8 Yale J.L. & Human. 417 (1996) (noting difficulties of presenting mental illness as mitigation evidence). In the end, as Professor Sundby found: "Severe mental illness in particular, although appearing to be a compelling mitigating circumstance, raises a number of collateral issues that may lead the jury to vote for a sentence of death rather than life." 83 Va. L.Rev. at 1165.

Wilson also suggests his trial counsel was ineffective for not asking Dr. Reynolds to testify more completely about his diagnosis. Wilson claims,

> [Dr. Reynolds's] testimony was left completely out of context, and on cross-examination the prosecutor was able to turn him into a sounding board for the prosecutor's diagnosis of [Wilson] as a psychopath. Despite the fact that Dr. Reynolds had said [Wilson] was not a psychopath, on redirect counsel never gave Dr. Reynolds an opportunity to explain the meaning of the term psychopath, or to explain why his diagnosis indicated that [Wilson] was not a psychopath. This left the prosecutor free

on closing argument to ridicule [Wilson] as a psychopath.

Aplt. Br. 71–72.

First of all, faulting counsel's questioning during witness examination is particularly vulnerable to the kind of hindsight second-guessing that *Strickland* warned against. 466 U.S. at 689, 104 S.Ct. 2052. Undoubtedly, all witness examinations fall short of perfection, but this does not mean counsel's examination "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. The failure to ask questions another counsel might have asked does not prove ineffective assistance.

Secondly, it was reasonable for counsel not to revisit a point he wished to avoid. *See, e.g., Bland v. Sirmons*, 459 F.3d 999, 1032 (10th Cir.2006) (holding counsel was not deficient "for failing to question [the expert] in such a way as to reveal the full extent of [defendant's] mental and substance-abuse problems" when expert's testimony was reasonably well-developed). Dr. Reynolds had already testified on cross-examination that Wilson was not a psychopath. Counsel's decision to de-emphasize Wilson's mental illness supports his decision not to ask Dr. Reynolds for a more specific diagnosis, to describe Wilson's illness in greater detail, or to describe in more detail the characteristics of a psychopath.

Once counsel decided a mitigation argument based on Wilson's mental illness would not strengthen his case, he had no reason to obtain a definitive diagnosis of schizophrenia from Dr. Reynolds. Wilson's chaotic family life, coupled with his mental health problems, meant he did not do well on the Tulsa streets. But in the structured environment of prison—as with his sister's home in North Carolina—Wilson could succeed. Wilson's high IQ, religious faith, and well-mannered behavior

could make him an asset to other troubled youths.

The Supreme Court has concluded counsel was not ineffective for limiting the investigation into mitigating evidence under similar circumstances. *See Bell,* 545 U.S. at 810, 125 S.Ct. 2825 (suggesting reasonable counsel might end mental health investigation after initial evaluations were completed and counsel selected mitigation strategy not emphasizing mental illness); *Burger,* 483 U.S. at 795, 107 S.Ct. 3114 (holding counsel not ineffective for limiting investigation when counsel reasonably determined that additional evidence of a "tragic childhood" would not "minimize[ ] the risk of the death penalty"); *Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (holding counsel not ineffective for limiting mitigation strategy to "simple plea for mercy" when character evidence could be harmful). This court has reached similar conclusions. *Compare Bryan,* 335 F.3d at 1222 & n. 20 (holding counsel not ineffective for failing to present mental health evidence that "would just more nearly accentuate the position of the State, that [defendant] was prone to be and could be a danger to society"), *with Hooper,* 314 F.3d at 1170–71 (counsel had obligation to fully develop mental health evidence once he decided to rely on it at trial). Counsel's determination that additional mental health evidence would not strengthen his case that Wilson could be rehabilitated was thus a "reasonable decision that makes particular investigations unnecessary." *Wiggins,* 539 U.S. at 521, 123 S.Ct. 2527.

Instead of focusing entirely on serious mental health problems, counsel reasonably pursued a strategy where Dr. Reynolds's limited mental health testimony would bolster a rehabilitation defense. Although counsel's chosen strategy was ultimately unsuccessful, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. If I consider counsel's decision without the benefit of hindsight, I cannot conclude the argument Wilson suggests based on his allegations of schizophrenia was so vastly superior to the argument counsel actually made that counsel's choice was not "within the wide range of reasonable professional assistance." *See id.*

*Supported by Reasonable Investigation*

An investigation is sufficient to support a strategic decision if it uncovers for counsel all available options for presenting and arguing mitigating evidence. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 (explaining "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *cf. Wiggins,* 539 U.S. at 524–25, 123 S.Ct. 2527 (finding ineffective assistance where counsel did not know the extent of potential mitigating evidence); *Anderson,* 476 F.3d at 1145 (finding ineffective assistance where counsel *never investigated* the defendant's family background and mental health).

In *Wiggins,* counsel was ineffective for not uncovering evidence of the extensive physical, sexual, and emotional abuse suffered by the defendant. 539 U.S. at 524–25, 123 S.Ct. 2527. Although counsel knew something about the defendant's troubled childhood and alluded to a difficult childhood in opening statements, counsel failed to obtain a complete social history of the defendant, even though it was easily obtainable. *Id.* at 525–26, 123 S.Ct. 2527.

Unlike *Wiggins,* Wilson's is not a case where counsel's investigation touched on mitigating evidence but failed to unearth the full extent of it. Counsel unearthed

enough information about Wilson's mental health to reasonably formulate a trial strategy, and the new information Wilson now offers would not have changed that strategy. *Cf. id.* at 535, 123 S.Ct. 2527. Even if counsel had known Wilson suffered from "schizophrenia, paranoid type," rather than simply "a severe personality disturbance," Wilson has not shown this knowledge would have changed counsel's strategic decision to de-emphasize Wilson's mental health problems.

In this case, counsel had enough information to consider all reasonable options prior to trial. Dr. Reynolds's evaluation revealed a great deal about Wilson's mental health. Before trial, Dr. Reynolds told counsel: (1) Wilson had an IQ in the superior range; (2) Wilson had no organic brain damage; (3) Wilson exhibited some indications of several disorders including (i) generalized anxiety disorder, (ii) bipolar disorder, (iii) post-traumatic stress disorder, (iv) paranoid personality disorder, and (v) narcissistic personality disorder with passive-aggressive and schizotypal personality features; and (4) Wilson sometimes exhibited a lack of contact with reality and paranoid suspicious behaviors. Counsel knew enough to establish during Dr. Reynolds's direct examination Wilson had "a severe mental disorder" and testing indicated "a severe personality disturbance." Trial Tr. (Feb. 19, 1997), at 57. Dr. Reynolds also told the jury Wilson "has some very unusual, bizarre types of thinking. That would suggest that at times he's not or has not periodically been in touch with reality. That he basically does not necessarily function at times in a normal state but that he has a great deal of emotional pathology." *Id.* Counsel therefore knew Wilson had significant mental health problems.

Given the indications of mental illness in Dr. Reynolds's initial analysis, I cannot conclude counsel had insufficient knowledge to make an informed decision about whether to focus his mitigation strategy on Wilson's mental health. Counsel had evidence available to make the argument Wilson suggests he should have—that because Wilson was mentally ill he did not deserve to die. Instead, counsel chose a different focus, which is the essence of strategy. Whether or not counsel knew a more specific diagnosis was possible with further testing, counsel certainly knew mental illness was an available argument in mitigation and was entitled to de-emphasize that argument in favor of what he considered the more promising emphasis.

\* \* \*

In sum, because counsel's decision to focus on Wilson's rehabilitative potential was supported by reasonable investigation and strategic judgment, his decision not to pursue further diagnosis of mental illness was similarly reasonable. I therefore find nothing wrong with the OCCA's view of the matter under *Strickland.*

### 3. Counsel Allowed Sufficient Time to Prepare

Wilson contends counsel's mental health investigation was unreasonable because counsel did not contact Dr. Reynolds until three weeks before trial and did not meet with Dr. Reynolds until two days before he testified. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. As a court of appeals, we are in no position to micromanage defense counsel's representation by establishing investigation deadlines.

To be sure, insufficient preparation of the mitigation case can constitute ineffective assistance of counsel. *See Williams,*

529 U.S. at 395, 120 S.Ct. 1495; *Anderson,* 476 F.3d at 1143–44. But this is so only if the investigation actually fails to uncover evidence due to time limitations, not simply because of the amount of time allotted. In *Williams,* the Supreme Court noted the mitigation investigation began only a week before trial, and in *Anderson,* this court noted the mitigation investigation was undertaken only in the month before trial. Timing was only part of the problem, though. The investigations in those cases were unreasonable not simply because they had been undertaken late, but because they failed to uncover significant mitigating evidence. *See id.*

The cases from the Ninth Circuit relied upon by the majority also reveal that counsel's inadequate timing must result in detriment to the client to constitute ineffective assistance. *See Bloom v. Calderon,* 132 F.3d 1267, 1277 (9th Cir.1997) (quoting *Hendricks v. Calderon,* 70 F.3d 1032, 1038 (9th Cir.1995)). "The complete lack of effort by [defendant's] trial counsel to obtain a psychiatric expert until days before trial, *combined with* counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance." *Id.* (emphasis added). Although the majority would read out the causality implied by the phrase "combined with," this causality is essential to the constitutional analysis. *See id.* ("Because counsel did not acquire the services of this key witness until days before trial, a hurried and inaccurate report resulted."); *see also Wallace v. Stewart,* 184 F.3d 1112, 1116 (9th Cir.

1999) (finding that "had [medical] experts known the details of [defendant's] family background, the substance and tone of the sentencing hearings would have been significantly different"). Counsel cannot be deemed deficient based on the timing of counsel's investigation alone.

The record in this case does not indicate counsel allowed insufficient time to conduct his investigation. The majority suggests three weeks is insufficient to complete an adequate expert investigation.[12] Yet in this very case, Dr. Reynolds had sufficient time to meet with Wilson multiple times, review life history files, conduct multiple tests, and interview Wilson's mother. Nor do I see a reason why meeting with an expert two days before his testimony should in all cases be unreasonable. *See Rompilla,* 545 U.S. at 381, 125 S.Ct. 2456 ("A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules...."). In this case, if Dr. Reynolds's findings required action on counsel's part, two days provided counsel sufficient time to adjust strategy, ask for a continuance, or otherwise respond accordingly.

The record gives no indication that the time counsel allowed for investigating Wilson's mental health in any way limited the development or presentation of mitigating evidence. Wilson argues that if counsel had allowed more time for the investigation, Dr. Reynolds, by conducting additional tests and interviews, could have obtained a diagnosis of schizophrenia on top of the other mental health problems he had already identified.[13] But Dr. Reyn-

---

12. Of course, in an ideal world defense counsel would in all cases begin a mitigation investigation as soon as a representation begins, not mere weeks in advance. *See ABA Guidelines* 11.4.1. The record in this case does not reflect when counsel's efforts to investigate mitigating evidence began. Although counsel engaged Dr. Reynolds as an expert witness three weeks before trial, counsel provided Dr.

Reynolds with information showing counsel had begun developing a mitigation defense even earlier.

13. After the initial tests, Dr. Reynolds had concluded: "Mr. Wilson was functioning in the Superior Range of intelligence with an IQ score of 126. There was no evidence of neurological or organic brain damage impair-

olds's affidavit does not state he advised counsel more time was needed. Nor does the affidavit state counsel rebuffed any request for more time to conduct additional tests or collect additional data from Wilson's family or friends. Not surprisingly, trial counsel did not consider additional tests and interviews necessary. If counsel *had* considered further investigation necessary, he could have sought a continuance or conducted what further investigation was possible in the time remaining.

As the above discussion demonstrates, Dr. Reynolds's investigation revealed enough information to convince a reasonable counsel the investigation was adequate and to ensure counsel's strategic decisions at trial were reasonably informed. The Constitution requires nothing more.

### B. Prejudice

Even if counsel's performance were deficient under *Strickland's* first prong, Wilson must also establish that any deficiency prejudiced his defense. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). We must therefore determine "whether there is a reasonable probability that, absent the errors, the [jury] ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052; *accord Boltz v. Mullin,* 415 F.3d 1215, 1222 (10th Cir.2005) (citing *Strickland* ). "In making this determination, we consider the strength of the

State's case, the aggravating circumstances the jury found, the mitigating evidence defense counsel did present, and the additional mitigating evidence the defense might have presented." *Neill v. Gibson,* 278 F.3d 1044, 1062 (10th Cir.2001).

Juries may interpret evidence of mental illness in mitigation in several ways. They may decide not to impose the death penalty because mental illness helps to explain why the defendant behaved the way he did and makes the defendant less culpable for his crimes. Or they may decide not to impose the death penalty because mental illness makes the defendant a more humanized, sympathetic figure. *See Smith,* 379 F.3d at 943 ("We have previously emphasized that mitigation evidence affords an opportunity to humanize and explain." (internal marks omitted)). Wilson has not shown a reasonable probability that the additional evidence he offers would have changed the jury's balance of aggravating and mitigating circumstances under either approach.

Notably, none of the evidence Wilson offers on habeas review would add to a jury's understanding of how Wilson's mental illness explains his role in the murder. In *Smith,* we found prejudice when counsel failed to offer mental health evidence explaining how the defendant's childhood brain injury caused a loss of emotional control, which could have resulted in murder when the defendant was unable to control his anger. *Id.; see also Williams,* 529 U.S. at 398, 120 S.Ct. 1495 (finding prejudice when omitted evidence would have corroborated "the view that in each case [defendant's] violent behavior was a

ment. The MCMI–III indicated an Axis I diagnosis of Generalized Anxiety Disorder, Bipolar Disorder (severe w/o psychotic features) and Posttraumatic Stress Disorder. It further indicated an Axis II diagnosis of Paranoid

Personality Disorder and Narcissistic Personality Disorder with Passive–Aggressive and Schizotypal Personality Features." Aplt. Add. 2.

compulsive reaction rather than the product of cold-blooded premeditation").

Wilson offers no plausible explanation of the role his mental health could have played in the murder. Even after diagnosing Wilson as possibly schizophrenic, Dr. Reynolds suggests only an inconclusive "possib[ility]" that Wilson "could have been delusional at the time of the crime." Aplt. Add. 2. As evidence of this delusion, Dr. Reynolds suggests that Wilson "must have been delusional to believe that he would not be easily identified" when he robbed the store where he worked. *Id.* Of course, the better explanation for Wilson's behavior that night is Wilson and his three accomplices planned to kill the only witness who could identify him. None of the additional affidavit evidence Wilson offers corroborates the idea Wilson suffered from delusions the night of the murder or at any other time that would help a jury understand why Wilson behaved the way he did.[14] This is not the kind of additional explanatory information that could have altered the outcome in this case, particularly where the jury already knew the basic details about Wilson's mental health.

To counteract the prosecution's aggravating factors, counsel presented a constitutionally adequate case of mitigation on Wilson's behalf. The jury heard the various categories of mitigating evidence the ABA has identified as appropriate in capital cases. *See ABA Guidelines* 11.4.1(2) (identifying categories of potential mitigat-

ing evidence). This evidence included: (1) medical history, including signs of mental illness; (2) family and social history, including substance abuse and abandonment by Wilson's father and life in a violent neighborhood affected by gang violence; (3) traumatic events, such as the sudden death of Wilson's Sunday school teacher, being shot in the leg, and having his house burned down; (4) religious influences, including the faith of Wilson's mother and his church activities; and (5) educational history, including academic achievement and well-mannered behavior in the structured school environment.

With regard to Wilson's mental health, the jury heard evidence that Wilson had "a severe mental disorder" and a "severe personality disturbance." Trial Tr. (Feb. 19, 1997), at 57. The jurors knew Wilson "has some very unusual bizarre types of thinking" and "has not periodically been in touch with reality." *Id.* They also heard Wilson was not a psychopath, even though he had some characteristics that could indicate psychopathy.

Had the jury heard all of this alongside a specific diagnosis of paranoid schizophrenia, I cannot conclude to a reasonable probability the jury would have weighed the aggravating and mitigating factors differently. Further diagnosis and discussion of Wilson's condition would only have given the prosecutor more opportunity to focus on the dangerous characteristics associated with Wilson's mental illness. Dr.

---

**14.** To the contrary, all the evidence points to lucid thinking and planning. In particular, Wilson coordinated his actions with three co-defendants, and the video tape of the robbery shows Wilson first chatting with the victim as he and his co-defendants perused the store. Wilson and his co-defendants waited until the store was free of customers before attacking the victim and forcing him into a back room. Wilson restrained the victim while his co-defendants left the store to retrieve the murder weapon. When his co-defendants re-

turned, Wilson served customers and attempted to remove the store's safe when the store was empty. Wilson's words and actions that night offer no evidence of delusional thinking. Furthermore, none of the purported evidence of delusions Wilson offers in the post-conviction affidavits from his mother, sister, brother, and girlfriend are temporally tied to the night of the murder. Nor does the record reveal any other indication Wilson had been behaving strangely around the time he committed this crime.

Reynolds was able to deny that Wilson was a psychopath, but he could not have denied the dangerous aspects of schizophrenia if asked about them by the prosecutor.

This case is a far cry from *Anderson v. Sirmons*, 476 F.3d at 1148, where the mitigation evidence left the jury with a "pitifully incomplete" picture of the defendant, or *Wiggins v. Smith*, 539 U.S. at 537, 123 S.Ct. 2527, where counsel failed to present any life history evidence in mitigation, relying instead on the fact defendant had no prior convictions. The additional evidence Wilson now offers "would barely have altered the sentencing profile presented to" the jury. *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052; *see also Clark*, 425 F.3d at 286 ("[T]o establish prejudice, the new evidence ... must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.").

Based on Dr. Reynolds's testimony alone, the jury was able to consider Wilson's mental disabilities when determining his sentence. Dr. Reynolds's descriptions of Wilson's behavior meant the same thing to a lay jury as a clinical diagnosis, and may actually have been more useful to them. *See Clark*, 425 F.3d at 286 (finding no prejudice when, although expert failed to specifically name the *cause* of defendant's mental deficiencies, he described their *effects* ). Although counsel could have presented a succession of witnesses to corroborate the bizarre thinking Dr. Reynolds described, the additional testimony would only have repeated what the jury heard through Dr. Reynolds. *See Bland*, 459 F.3d at 1031 (finding no prejudice when counsel failed to present additional, redundant testimony about defendant's drug use).

It is not even clear from the record that Dr. Reynolds's testimony at trial would have changed had he performed additional testing. The description of Wilson's illness

Dr. Reynolds gave at trial reasonably encompasses the diagnosis Dr. Reynolds says he arrived at after trial. At trial, Dr. Reynolds testified Wilson had "very unusual, bizarre types of thinking. That would suggest that at times he's not or has not periodically been in touch with reality." Trial Tr. (Feb. 19, 1997), at 57. That description is similar to a diagnosis of schizophrenia. The American Psychiatric Association describes the characteristic symptoms of schizophrenia as including, among other things, "bizarre delusions," "disorganized thinking and behavior," and hallucinations. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders DSM–IV–TR* 299–300, 313 (4th ed.2000); *see also id.* ("The essential feature of the Paranoid Type of Schizophrenia is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect.").

Having Dr. Reynolds change his testimony or add additional diagnoses to it would not likely have changed the jury's decision. The failure to present additional diagnoses to a jury will not prejudice the defendant when the jury has already heard some evidence about the defendant's mental health. *See Malicoat v. Mullin*, 426 F.3d 1241, 1261 (10th Cir.2005) (finding additional diagnosis regarding history of seizures would not have influenced outcome when jury heard evidence of abuse defendant suffered as child); *Knighton v. Mullin*, 293 F.3d 1165, 1178–79 (10th Cir. 2002) (finding additional diagnosis of "significant organic brain damage present, with a likely psychotic condition with auditory and visual hallucinations" would not have influenced outcome when jury heard evidence of depression, substance abuse, suicide attempts, and memory loss); *Humphreys v. Gibson*, 261 F.3d 1016, 1021 (10th Cir.2001) (finding additional diagnoses of addiction, organic brain damage,

and brain seizures would not have influenced outcome when jury heard evidence of depression, alcohol abuse, and a personality disorder).

Multiple aggravating circumstances lessen the likelihood of prejudice even further. See *McCracken v. Gibson,* 268 F.3d 970, 978–80 (10th Cir.2001) (finding additional mental health diagnoses would not have influenced outcome when jury found six aggravating factors and diagnoses may have supported aggravating factor of continuing threat). Wilson's jury found three aggravating factors: (1) the murder was especially heinous, atrocious or cruel; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) a probability existed that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Wilson,* 2006 WL 2289777, at *3. Because the jury heard evidence about Wilson's mental health and still found these three aggravating circumstances, there is no reasonable probability that a further diagnosis indicating possible schizophrenia would have influenced the sentencing outcome.

In sum, the jury heard extensive mitigating evidence, and Wilson's newly proffered evidence adds little to that calculus. I cannot conclude there is a reasonable probability that had Dr. Reynolds explained Wilson's diagnosis in more detail rather than simply describing its effects, the jury "would have struck a different balance between the mitigating and aggravating factors." *Anderson,* 476 F.3d at 1148. The OCCA's decision was not an unreasonable application of clearly established federal law.

## IV. *Evidentiary Hearing*

The district court did not abuse its discretion in denying Wilson an evidentiary hearing on his claim of ineffective assistance of trial counsel. Because my review of the record reveals Wilson is not entitled to relief on his claim, the district court was within its discretion in denying Wilson an evidentiary hearing.

A district court abuses its discretion only if its decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Atencio,* 435 F.3d 1222, 1235 (10th Cir.2006) (quotation omitted). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan,* — U.S. —, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007); *accord Mayes v. Gibson,* 210 F.3d 1284, 1287 (10th Cir.2000).

Where, as here, the state court has adjudicated a petitioner's claim on the merits, the petitioner must pass a high bar to show his entitlement to federal habeas relief. *See Schriro,* 127 S.Ct. at 1940; *Mayes,* 210 F.3d at 1287–88. Taking petitioner's allegations as true, petitioner must show the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In this case, the district court concluded, "As the disposition of Petitioner's habeas corpus petition does not require reference to any materials beyond those that are available and currently before the Court, the Court finds that there is no need for an evidentiary hearing in this case. There are no disputed factual questions remaining that could possibly entitle Petitioner to habeas corpus relief." *Wilson,* 2006 WL 2289777, at *47.

Considering both the state trial court records and the additional affidavits supplied with Wilson's petition for habeas corpus, I cannot say the district court abused its discretion in concluding an evidentiary hearing could not help Wilson's habeas case. Rather, I agree with the district court that an evidentiary hearing would be of no use to Wilson. *See Schriro*, 127 S.Ct. at 1940 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

I also note Wilson has not identified a factual dispute requiring an evidentiary hearing. Oklahoma's and Wilson's accounts of counsel's preparation for trial appear to be identical, and the state does not dispute any of the information Wilson offers in his affidavits. Accordingly, the only dispute in this case is a matter of law based on the record before us. Because we need only determine whether the facts contained in the record amount to ineffective assistance of counsel under *Strickland*, no evidentiary hearing is required. *See, e.g., Anderson v. Att'y Gen. of Kan.*, 425 F.3d 853, 860 (10th Cir.2005) ("The purpose of an evidentiary hearing is to resolve conflicting evidence.").

The district court therefore correctly rejected Wilson's request for an evidentiary hearing.

## V. Conclusion

Because I conclude the OCCA correctly determined Wilson's trial counsel was not constitutionally ineffective under *Strickland*, and because the district court did not abuse its discretion in denying an evidentiary hearing, I respectfully dissent from Part III of the majority's opinion.